## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSOURI; and | ) | |
| | ) | |
| THE STATE OF TEXAS, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States of | ) | |
| America; | ) | |
| | ) | |
| The UNITED STATES OF AMERICA; | ) | |
| | ) | |
| ALEJANDRO N. MAYORKAS, | ) | |
| in his official capacity as | ) | |
| Secretary of the United States | ) | |
| Department of Homeland Security; | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOMELAND SECURITY; | ) | |
| | ) | |
| TROY A. MILLER, | ) | |
| in his official capacity as | ) | |
| Acting Commissioner of the | ) | |
| United States Customs and Border | ) | |
| Protection; and | ) | |
| | ) | |
| UNITED STATES CUSTOMS AND BORDER | ) | |
| PROTECTION, | ) | |
| | ) | |
| *Defendants.* | ) | |

## **<u>COMPLAINT</u>**

## INTRODUCTION

1.      This is an action challenging the Executive Branch's pervasive violations of the Constitution and federal law in its southwest border policy.

2.      This Complaint focuses on the President of the United States' refusal to spend funds appropriated by Congress mandating the construction of a wall along the southwest border, and the Department of Homeland Security's termination of contracts to perform work on construction projects to build the wall.

3.      In 2018, DHS assessed the effectiveness of physical barriers on the southwest border in controlling illegal immigration and drug trafficking, and proclaimed: "Walls Work.  When it comes to stopping drugs and illegal aliens from crossing our borders, walls have proven extremely effective."  DHS noted that border wall construction in one sector led to a *90 percent decrease* in border apprehensions.  *See* **Exhibit A**.

4.      Consistent with this assessment, Congress has appropriated funds for the construction of border walls on the southwest border.  In DHS's appropriation bills for FY 2020 and FY 2021, Congress twice appropriated $1.375 billion for "construction of a barrier system along the southwest border," and provided that this money "*shall only* be available for barrier systems."  *See* **Exhibits B & C**.

5.      But while on the campaign trial, then-presidential candidate Joe Biden promised termination of border wall construction, declaring that "[t]here will not be another foot of wall constructed on my administration[.]"[1]

---

[1] Barbara Sprunt, *Biden Would End Border Wall Construction, But Wouldn't*

6.     He kept his promise, breaking the law to do so.  On January 20, 2021, President Biden, in one of his first official actions, issued a Proclamation directing DHS to "pause immediately the obligation of funds related to construction of the southern border wall" and to "pause work on each construction project on the southern border wall."[2]  This included pausing "wall projects funded by direct appropriations."[3]  The justification according to the White House: "building a massive wall that spans the entire southern border is not a serious policy solution" and "a waste of money[.]"[4]

7.     Following the Proclamation issued on January 20, DHS implemented it by stopping all work on any border wall projects, including border fencing or associated structures, leaving hundreds of miles of planned and funded—but unfinished—wall along the southwest border.

8.     In fact, DHS has taken specific steps pursuant to the Proclamation to ensure that the wall never gets built.  On June 11, DHS released a plan for use of the appropriated border wall funds, which, consistent with President Biden's Proclamation, refused to use the funds to construct the wall, even though DHS acknowledged that it is "legally required to use" such funds "consistent with their

---

*Tear Down Trump's Additions*, NAT'L PUB. RADIO (Aug. 5, 2020, 10:00 a.m. EST), https://tinyurl.com/3pzstmdj.

[2] Termination of Emergency with Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction, 86 Fed. Reg. 7225, 7225 (Jan. 20, 2021) (attached as **Exhibit D**).

[3] *Id.* at *7226.

[4] *Id.* at *7225.

appropriated purpose."[5]   Notably, DHS "call[ed] on Congress to cancel funds it previously appropriated for border barrier projects so that these resources can *instead* be used for modern, effective border measures[.]"[6]

9.     Earlier this year, on June 15, the Government Accountability Office advised Congress that, although "DHS has almost fully obligated the approximately $4 billion appropriated across fiscal years 2018, 2019, and 2020, for barrier construction projects[,]" DHS "has not yet obligated its fiscal year 2021 barrier system appropriation."[7]   Thus, "in order to facilitate Congress's oversight of executive spending and its Constitutional power of the purse," the GAO recommended that "the congressional oversight and appropriations committees should consider requiring [the Office of Management and Budget] and DHS to submit a timeline detailing the planned uses and timeframes for obligating this appropriation."[8]   "A detailed timeline," the GAO found, "could serve as a tool for rigorous oversight to ensure *the President does not substitute his own policies and priorities in place of those established through the legislative process.*"[9]

---

[5] DHS Releases Plan for Use of Border Barrier Funds, U.S. Dep't of Homeland Sec. (June 11, 2021), *available at* https://tinyurl.com/yrxnsh58 (last accessed Oct. 15, 2021) (attached as **Exhibit E**).

[6] *Id.* (emphasis added).

[7] U.S. Gov't Accountability Office, *Matter of Off. of Mgmt. & Budget & U.S. Dep't of Homeland Sec.-Pause of Border Barrier Constr. & Obligations*, B-333110.1, 2021 WL 2451823, at *3-4 (Comp. Gen. June 15, 2021) (attached as **Exhibit F**); *see Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (while GAO's findings are "not binding," they are entitled to "special weight" in light of "its accumulated experience and expertise in the field of government appropriations") (cleaned up).

[8] *Pause of Border Barrier Constr. & Obligations*, 2021 WL 2451823, at *7.

[9] *Id.* at *1 (emphasis added).

10.     GAO's recommendation, however, appears to have fallen on deaf ears, as DHS continued to implement the January 20 Proclamation.  Indeed, most recently, on October 8, DHS announced its decision to terminate "the remaining border barrier contracts" entered into for the purpose of building the border wall Congress authorized.[10]  DHS also confirmed in this recent statement that none of its recent activities "will … involve any construction of new border barrier or permanent land acquisition."[11]  DHS again "call[ed] on Congress to cancel remaining border wall funding and *instead* fund smarter border security measures, like border technology and modernization of land ports of entry[.]"[12]  "Until and unless Congress cancels those funds," DHS openly admitted, "the law requires DHS to use the funds consistent with their appropriated purpose[.]"[13]

11.     Thus, DHS has neither constructed nor intends to construct any additional barriers using congressionally-appropriated funds to build a wall along the southwest border.  And, on information and belief, DHS has still not obligated its FY 2021 barrier system appropriation, notwithstanding Congress' mandate.

12.     The President and his agencies may not unilaterally override duly enacted appropriations bills to fulfill a campaign promise.

13.     The President's January 20 Proclamation (and DHS's actions

---

[10] DHS to Terminate Border Barrier Contracts in Laredo and Rio Grande Valley, U.S. Dep't of Homeland Sec. (Oct. 8, 2021), *available at* https://tinyurl.com/2cd87d6b (last accessed Oct. 15, 2021) (attached as **Exhibit G**).

[11] *Id.*

[12] *Id.* (emphasis added).

[13] *Id.*

implementing it) run afoul the Constitution and federal law.

14.     The President had neither constitutional nor statutory authority to refuse to spend funds Congress authorized mandating the construction of the border wall, and thus DHS acted without any authority in implementing the January 20 Proclamation, including cancelling contracts entered into for the purpose of building the border wall.

15.     Even if the President had any statutory authority (and he did not), he still failed to comply with federal law, and thus DHS acted without any authority to implement the January 20 Proclamation.

16.     In doing so, DHS failed to consider important aspects of the problem, including its own prior assessment of walls as effective security measures, and its own prior admission that it was legally obligated to spend money appropriated by Congress on border wall construction.  DHS also failed to consider the degree to which States like Missouri and Texas relied on Congress, through its exclusive power over the purse, mandating the construction of the border wall to secure the southwest border, especially in the face of an ongoing crisis at the border, where enforcement encounters have gone from 75,000 in January 2021 (when the Proclamation was issued), to over 210,000 in July.  *See Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 3603341, at *9, n.7 (N.D. Tex. Aug. 13, 2021) (Kacsmaryk, J.).  According to DHS itself, "[b]ased on current trends," it "expects that total encounters *this fiscal year*" alone "are likely to be *the highest ever recorded*."  *Id.* (emphasis added).

17.     The Supreme Court has recognized "the importance of immigration

policy to the States[,]" which "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012).  The additional costs of issuing driver's licenses, educating, providing healthcare, and criminal-justice processing place burdens on the States of Missouri and Texas as a consequence of DHS's actions.  Thus, irresponsible border-security policies that invite and encourage illegal immigration irreparably injure these States.

18.    DHS's actions are puzzling in light of its previous assessment favoring the construction of a border wall in the southwest, which it has studiously ignored during the current Administration.  Indeed, as noted above, according to DHS, "[w]hen it comes to stopping … illegal aliens from crossing our borders, border walls have proven to be extremely effective."[14]  The "bottom line" is that "Walls Work."[15] This assessment was based on empirical observation, not speculation: "For example, when we installed a border wall in the Yuma sector, we have seen border apprehensions decrease by 90 percent."  *Id.*

19.    DHS failed adequately to explain its abrupt reversal in course.  Any explanation made now would constitute impermissible post-hoc rationalization.

20.    DHS's decisions are both arbitrary and capricious and have been taken in violation of numerous federal laws.

21.    DHS's actions, therefore, should be declared unlawful, vacated, and, enjoined.

---

[14] U.S. DEP'T OF HOMELAND SEC., *Walls Work* (Dec. 12, 2018), https://www.dhs.gov/news/2018/12/12/walls-work.
[15] *Id.* (cleaned up).

## PARTIES

22.     Plaintiffs incorporate by reference all preceding paragraphs.

23.     Plaintiff State of Missouri is a sovereign State of the United States of America.

24.     Plaintiff State of Texas is a sovereign State of the United States of America.

25.     When Defendants violate the Constitution and fail to comply with federal law on immigration policy, Missouri and Texas end up footing the bill.  The Biden Administration's refusal to spend congressional appropriations mandating the construction of the wall and the termination of contracts regarding the same allow more illegal aliens to enter and remain in Missouri and Texas, resulting in increased costs to issue driver's licenses, provide public education, provide healthcare for such aliens, and process and incarcerate aliens in their criminal-justice systems, which in turn results in irreparable injuries to these States.

26.     Border-security measures reduce both the number of illegal aliens attempting to come to the States and the percentage of illegal aliens released into the States and the rest of the United States.  Dismantling such measures has increased and will increase the number of illegal aliens attempting to come to the States and the percentage of illegal aliens released into the States and the rest of the United States, including the States of Texas and Missouri.  Indeed, DHS's 2018 assessment concluded that border wall construction in a single sector had decreased border apprehensions by 90 percent.

27.     Because Texas contains the largest portion of the Nation's southern border, a large number of aliens arriving illegally in the United States enter into and remain in Texas.  Likewise, empirical evidence shows that about 6 out of every 1,000 illegal aliens entering the United States enters and remains in Missouri.

28.     Dismantling border-security measures such as construction of the border wall causes Missouri and Texas to incur unrecoverable costs in issuing driver's licenses, providing education, and administering healthcare.  *Texas v. Biden*, 10 F.4th 538, 545-49 (5th Cir. 2021) (per curiam).  The States incur similar unrecoverable costs in processing and incarcerating illegal aliens in their criminal-justice systems.

29.     Texas law subsidizes driver's licenses, including for noncitizens who have "documentation issued by the appropriate United States agency that authorizes [them] to be in the United States."  *Id.* at 547 (quoting TEX. TRANSP. CODE § 521.142(a)).  Aliens unlawfully present in Texas thus will be eligible for subsidized driver's licenses.[16]  By enabling more aliens to secure subsidized licenses, dismantling border-security measures such as construction of the border wall injures Texas.  *See id.* at 545-49.

30.     "Missouri likewise faces a cost of verifying lawful immigration status for each additional customer seeking a Missouri driver's license."  *Texas*, 2021 WL 3603341, at *10.

31.     Missouri and Texas also spend money providing social services to illegal

---

[16] Tex. Dep't of Public Safety, *Verifying Lawful Presence* 4 (Rev. 7-13), https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifying lawfulpresence.pdf (listing "Parolees" as eligible for driver's licenses).

aliens. Those services include education services and healthcare. Federal law requires the States to include illegal aliens in some of these programs. Dismantling border-security measures such as construction of the border wall injures these States by increasing the number of illegal aliens receiving such services at the States' expense.

32. Some aliens and the children of those aliens receive education benefits from the States at taxpayer expense. *See Plyler v. Doe*, 457 U.S. 202, 205, 230 (1982) (Constitution prohibits States from "deny[ing] to undocumented school-age children the free public education that it provides to children who are citizens of the United States or legally admitted aliens").

33. Dismantling border-security measures such as construction of the border wall increases education expenditures by the States each year for alien children. *See, e.g.*, *Texas*, 2021 WL 3603341, at *10 ("The total costs to Texas (and Missouri) of providing public education for illegal alien children will rise in the future as the number of illegal alien children present in the State increases."); *accord Texas*, 10 F.4th at 545-49.

34. Additionally, some aliens unlawfully present in the United States "will use state-funded healthcare services or benefits in Texas and Missouri." *Texas*, 2021 WL 3603341, at *10. Indeed,

> Texas funds three healthcare programs that require significant expenditures to cover illegal aliens: the Emergency Medicaid Program, the Family Violence Program, and the Texas Children's Health Insurance Program. Texas is required by federal law to include illegal aliens in its Emergency Medicaid Program. 42 C.F.R. § 440.255(c). Texas also incurs costs for uncompensated care provided by state public

10

hospital districts to illegal aliens.  The total costs to the State will increase as the number of aliens within the state increases.  Missouri is similarly situated.

*Id.* (citations omitted).

35.     Likewise, both Missouri and Texas face unrecoverable increased costs from the influx of illegal aliens caused by Defendants illegally cessation of border-wall construction, as some of those illegal aliens are processed and incarcerated in the States' criminal-justice systems.

36.     Texas has also had to spend its own money on border barriers as a direct result of the federal government's failure to build the wall in general, as well as the Biden Administration's illegal cancellation of border-wall contracts and refusal to spend money as directed by Congress in particular.

37.     For example, the Texas Legislature passed and Governor Abbott recently signed House Bill 9, which allocates $1.8 billion in funding for border security personnel, equipment, jail space, and, most relevant here, a border wall.  Of that $1.8 billion, about $750 million is dedicated to the construction of border barriers.  This is on top of the $250 million Texas transferred in June 2021 from the Texas Department of Criminal Justice to assist with construction.  What's more, the Texas Department of Transportation in June 2021 awarded a $25 million contract for a barrier in Eagle Pass.  And in September 2021, the Texas Facilities Commission approved an $11 million contract to manage border-wall construction budgets, identify state land appropriate for wall construction, and find private landowners to facilitate construction.

38.     These and other expenditures would not be necessary, at least in part, if the Biden Administration complied with its legal obligations.

39.     Dismantling border-security measures such as cessation of construction of the border wall will negatively impact Texas's public revenues now and over time. It will terminate employment for Texas workers and contractors participating in border wall development and construction. This, in turn, will reduce Texas's income taxes and local and state sales taxes that would have been paid from the economic activity resulting from the development and construction of the border wall.

40.     Defendants are officials of the United States government and United States governmental agencies responsible for implementing the January 20 Proclamation.

41.     Defendant Joseph R. Biden, Jr., is the President of the United States of America. He issued the January 20 Proclamation. He is sued in his official capacity.

42.     Defendant United States Department of Homeland Security is a federal cabinet agency responsible for implementing and enforcing certain immigration-related statutes, policies, and directives, including the January 20 Proclamation. DHS is a Department of the Executive Branch of the United States Government, 5 U.S.C. § 101, and is an agency within the meaning of 5 U.S.C. § 551(1). DHS oversees Defendant United States Customs and Border Protection. DHS was tasked by the January 20 Proclamation to develop a plan to cease construction on border wall projects, terminate border wall construction contracts, and redirect the appropriated funds.

43.     Defendant Alejandro N. Mayorkas is the Secretary of Homeland Security and the head of DHS.  He is sued in his official capacity.

44.     Defendant Troy A. Miller is the Acting Commissioner of the United States Customs and Border Protection.  He is sued in his official capacity.

## JURISDICTION AND VENUE

45.     Plaintiffs incorporate by reference all preceding paragraphs.

46.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201(a).  This action arises under the Constitution (art. I, §§ 8, 9; art. II, §§ 1, 3), 5 U.S.C. §§ 702-03, and other federal statutes.

47.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e).  Defendants are United States agencies or officers sued in their official capacities.  The State of Texas is a resident of this judicial district and a substantial part of the events or omissions giving rise to this complaint occurred and continue to occur within the Southern District of Texas.

48.     Missouri and Texas bring this action to redress harms to their sovereign interests, quasi-sovereign interests, and proprietary interests; and to vindicate their interests under 5 U.S.C. § 702.  *See Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015) ("In enacting the APA, Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, [5 U.S.C. § 702] and the states fall well within that definition.").  Plaintiffs have justiciable interests that fall within the zone of interests of the relevant federal statutes.  The injury to Missouri's and Texas's fiscal interests from the increase in unlawful migrants entering and remaining in the

States provides them with redressable injuries in this case as well.

49.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. §§ 1361, 2201, and 2202, and its inherent equitable powers.

## BACKGROUND

50.     Plaintiffs incorporate by reference all preceding paragraphs.

### Legal Framework

51.     The Administrative Procedure Act provides for judicial review of agency action.  *See* 5 U.S.C. § 701 *et seq.*

52.     Under the APA, a federal court "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  *Id.* § 706.

53.     In reviewing agency action, the court "shall" "hold unlawful and set aside agency action, findings, and conclusions" that the court finds are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" or the court finds "contrary" to the Constitution.  *Id.* § 706(2)(A)-(B).

54.     The APA also prohibits agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  *Id.* § 706(2)(C).  It also prohibits agency action taken "without observance of procedure required by law[.]"  *Id.* § 706(2)(D).

55.     Under the APA, federal administrative agencies are required to engage in "reasoned decision-making."  *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522

U.S. 359, 374 (1998) (cleaned up).  In other words, "agency action is lawful only if it rests on a consideration of the relevant factors" and "important aspects of the problem." *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (cleaned up). "These include … States' legitimate reliance interests," the border wall's "benefits," and "implications" under the Constitution and federal law for terminating funding and construction. *Texas*, 10 F.4th at 553.

56.     In reviewing an agency's failure to act, the APA states that the Court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

57.     Missouri and Texas are asserting a procedural right under the APA to challenge agency action involving the failure to protect certain formerly sovereign prerogatives that are now lodged in the federal government.

58.     The challenged agency action is both final and reviewable under the APA.  5 U.S.C. § 704.

### Factual Background

59.     Plaintiffs incorporate by reference all preceding paragraphs.

60.     Congress has at least twice authorized and required the construction of a physical barrier along the southwest border by appropriating funds that must be expended for that specific purpose.

61.     The Fiscal Year 2020 DHS Appropriations Act, P.L. 116-93, 133 Stat. 2511, Div. D, § 209(a)(1)—which was passed as part of the Consolidated Appropriations Act of 2020—included $1.375 billion for "construction of barrier

15

system along the southwest border."

62.     In other words, "[o]f the total amount made available under 'U.S. Customs and Border Protection—Procurement, Construction, and Improvements', $1,904,468,000 *shall* be available *only* as follows:"

(1) $1,375,000,000 for the construction of barrier system along the southwest border;

(2) $221,912,000 for the acquisition and deployment of border security technologies and trade and travel assets and infrastructure;

(3) $62,364,000 for facility construction and improvements;

(4) $199,519,000 for integrated operations assets and infrastructure; and

(5) $45,673,000 for mission support and infrastructure.

*Id.* (Emphasis added).

63.     These designated amounts "*shall only* be available for barrier systems"

that … (1) use … (A) operationally effective designs deployed as of the date of enactment of the Consolidated Appropriations Act, 2017 (Public Law 115–31), such as currently deployed steel bollard designs, that prioritize agent safety; or (B) operationally effective adaptations of such designs that help mitigate community or environmental impacts of barrier system construction, including adaptations based on consultation with jurisdictions within which barrier system will be constructed; and (2) are constructed in the highest priority locations as identified in the Border Security Improvement Plan.

*Id.* § 209(b) (emphasis added).

64.     Similarly, the FY2021 DHS Appropriations Act, P.L. 116-260, 134 Stat. 1182, Div. F, § 210—which was passed as part of the Consolidated Appropriations Act of 2021—reiterated that

[o]f the total amount made available under "U.S. Customs and Border

Protection—Procurement, Construction, and Improvements", *an amount equal* to the amount made available in section 209(a)(1) of division D of the Consolidated Appropriations Act, 2020 (Public Law 116–93) *shall* be made available *for the same purposes* as the amount provided under such section in such Act.

(Emphasis added).

65.     Thus, Congress appropriated $2.75 billion for border wall construction (and only for that purpose), and over $3.8 billion including expenditures related to border wall construction.

66.     But on Inauguration Day 2021, the Biden Administration directed DHS to "pause immediately the obligation of funds related to construction of the southern border wall" and to "pause work on each construction project on the southern border wall."[17]

67.     This included pausing "wall projects funded by direct appropriations" like the two described above.[18]  The justification, according to the White House, was that "building a massive wall that spans the entire southern border is not a serious policy solution" and "a waste of money[.]"[19]

68.     President Biden's remarks echoed those made by Candidate Biden on the campaign trail: "There will not be another foot of wall constructed on my administration[.]"[20]

69.     That campaign promise was unlawfully implemented through the

---

[17] 86 Fed. Reg. 7225, 7225.
[18] *Id*. at *7226.
[19] *Id*. at *7225.
[20] Sprunt, *supra*, at n.1.

January 20 Proclamation and a series of actions by DHS to carry out the Proclamation's directives.

70.     Specifically, on June 11, 2021, DHS released a plan for use of the appropriated border wall funds, which, consistent with President Biden's Proclamation, refused to use the funds to construct the wall, notwithstanding its acknowledgement that it is "legally required to use" such funds "consistent with their appropriated purpose."[21]   Notably, DHS "call[ed] on Congress to cancel funds it previously appropriated for border barrier projects so that these resources can *instead* be used for modern, effective border measures[.]"[22]  In the announcement, DHS stated that it would use border-wall funds for environmental remediation, flood-control, and cleanup projects, but not a penny for any actual "construction of barrier systems along the southwest border."

71.     On June 15, the GAO advised Congress that, although "DHS has almost fully obligated the approximately $4 billion appropriated across fiscal years 2018, 2019, and 2020, for barrier construction projects[,]" DHS "has not yet obligated its fiscal year 2021 barrier system appropriation."[23]  "[I]n order to facilitate Congress's oversight of executive spending and its Constitutional power of the purse," the GAO recommended that "the congressional oversight and appropriations committees should consider requiring OMB and DHS to submit a timeline detailing the planned

---

[21] DHS Releases Plan, *supra*, at n.5.

[22] *Id.* (emphasis added).

[23] *Pause of Border Barrier Constr. & Obligations*, 2021 WL 2451823, at *3-4.

uses and timeframes for obligating this appropriation."[24]  "A detailed timeline," the GAO found, "could serve as a tool for rigorous oversight *to ensure the President does not substitute his own policies and priorities in place of those established through the legislative process*."[25]

72.    Despite the GAO's findings and recommendation, on October 8, 2021, DHS announced its decision to terminate "the remaining border barrier contracts" entered into for the purpose of building the border wall Congress mandated.[26]  This announcement specifically terminated border contracts to construct barriers along the Texas-Mexico border in Laredo and the Rio Grande Valley, and announced DHS's intention to expend the money on "environmental planning" activities instead.  *Id.* DHS also confirmed in this recent statement that none of its recent activities "will … involve any construction of new border barrier or permanent land acquisition."[27] DHS again "call[ed] on Congress to cancel remaining border wall funding and *instead* fund smarter border security measures, like border technology and modernization of land ports of entry[.]"[28]  "Until and unless Congress cancels those funds," DHS again admitted, "the law requires DHS to use the funds consistent with their appropriated purpose[.]"[29]

73.    In both the June 11 and October 8 announcement, consistent with the

---

[24] *Id.* at *7.
[25] *Id.* at *1 (emphasis added).
[26] DHS to Terminate Border Barrier Contracts, *supra*, at n.10.
[27] *Id.*
[28] *Id.* (emphasis added).
[29] *Id.*

President's January 20 Proclamation, DHS specifically stated that it was not and would not expend any money on the actual *construction* of barrier systems at the southern border. The June 11 announcement stated that DHS's plan "fulfills a requirement of President Biden's Proclamation," and stated DHS's intention to "end wall expansion." The October 8 announcement stated that DHS's "activities will not involve any construction of new border barrier or permanent land acquisition." DHS has thus made it extremely clear that it will not expend a single penny of appropriated money for Congress's stated purpose of "the construction of barrier system along the southwest border."

74. The Executive Branch's cancellation of mandatory funding approved by Congress to build the southwest border wall necessarily means that the wall will not be erected, which in turn means that the border will be less secure. A less secure border means that some illegal aliens will not be deterred from coming to the United States (as plainly demonstrated by the ongoing crisis at the border) and admitted into the interior, where some will then reside in Missouri and Texas and seek driver's licenses, education, and healthcare; and some will inevitably incur criminal-justice costs as well. *Accord Texas*, 10 F.4th at 548 (citing *Massachusetts v. EPA*, 549 U.S. 497, 523 (2007) (traceability present where EPA's challenged action might cause individuals to drive less fuel-efficient cars, which in turn may contribute to a rise in sea levels, which may then cause erosion of coastline)).

75. This is, in the Supreme Court's words, the "predictable effect of government action on the decisions of third parties." *Dep't of Com. v. New York*, 139

S. Ct. 2551, 2566 (2019).

## CLAIMS

### COUNT I
### (Separation of Powers)

76.    Plaintiffs incorporate by reference all preceding paragraphs and incorporate each paragraph of each count as applicable to each other count.

77.    Through the APA, Missouri and Texas have an "interest in reinforcing … structural separation of powers principles." *California v. Trump*, 963 F.3d 926, 943 (9th Cir. 2020).

78.    Unconstitutional agency action or inaction violates the APA.   *See* 5 U.S.C. § 706.

79.    Constitutional violations are also actionable independent of the APA. Federal courts have long exercised the power to enjoin federal officers from violating the Constitution, pursuant to their inherent equitable powers.   *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England").

80.    The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  And "Congress's power to spend is directly linked to its power to legislate." *Id*.

81.    Nothing in the Constitution " 'authorizes the President to enact, to amend, or to repeal statutes.' "  *Id.* at 1232 (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

82.     Save for the power of veto, "the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *Id.*

83.     "Simply put," " 'the President does not have unilateral authority to refuse to spend the funds.' " *Id.* (quoting *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013)). "And, 'the President may not decline to follow a statutory mandate or prohibition simply because of policy objections.' " *Id.* (quoting *In re Aiken*, 725 F.3d at 259). "As Justice Kennedy … observed [in *Clinton*], if the decision to spend is determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Id.* (cleaned up).

84.     At bottom, "when it comes to spending, the President has none of his own constitutional powers to rely upon." *Id.* at 1233-34 (quotations omitted).

85.     Here, "[n]ot only has the [Biden] Administration claimed for itself Congress's exclusive spending power, it has also attempted to coopt Congress's power to legislate." *Id.* at 1234. "Absent congressional authorization," as is the case here, "the Administration may not … withhold properly appropriated funds in order to effectuate its own policy goals." *Id.* at 1235.

86.     Where, as here, the President has taken such action, his Proclamation (and DHS's actions implementing it) "violates the constitutional principle of the Separation of Powers." *Id.*

87.     Accordingly, President Biden's and DHS's refusal to spend funds appropriated by Congress mandating the construction of a wall along the southwest border, and DHS's subsequent termination of contracts to perform work on

construction projects to build the wall, violates the constitutional principle of the separation of powers, pursuant to which the Constitution committed the Spending power to Congress.

## COUNT II
### (Take Care Clause)

88.     Plaintiffs incorporate by reference all preceding paragraphs and incorporate each paragraph of each count as applicable to each other count.

89.     The Constitution requires the President to "take Care that the Laws be faithfully executed."  U.S. CONST. art. II, § 3; *San Francisco*, 897 F.3d at 1234.

90.     This constitutional limitation is binding on agencies and officers exercising executive power.  *See* U.S. CONST. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President).

91.     "Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations."  *San Francisco*, 897 F.3d at 1233-34.

92.     "Moreover, the obligation is an affirmative one, meaning that failure to act may be an abdication of the President's constitutional role."  *Id.*

93.     "As then-Assistant Attorney General William Rehnquist noted in 1969, '[w]ith respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.' "  *Id.* (quoting Office of Legal Counsel, Memorandum Opinion on Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, at 8 (Dec. 1, 1969)).

94.    "And, even if the President's duty to execute appropriations laws was once unclear, Congress has affirmatively and authoritatively spoken" through the Impoundment Control Act of 1974.  *Id.* (citing 2 U.S.C. §§ 681–688 (establishing congressional oversight when the Executive proposes to defer or rescind budget authority)).[30]

95.    Accordingly, President Biden's and DHS's refusal to spend funds appropriated by Congress mandating the construction of a wall along the southwest border, and DHS's subsequent termination of contracts to perform work on construction projects to build the wall, violate the President's affirmative obligation to faithfully execute the Appropriation laws at issue, in violation of the Take Care Clause.

## COUNT III
## (Impoundment Control Act of 1974)

96.    Plaintiffs incorporate by reference all preceding paragraphs and incorporate each paragraph of each count as applicable to each other count.

97.    The President had neither constitutional nor statutory authority to refuse to spend funds Congress authorized mandating the construction of the border

---

[30] Through the ICA, Congress sought "to restore responsibility for the spending policy of the United States to the legislative branch. ... No matter how prudently Congress discharges its appropriations responsibility, legislative decisions have no meaning if they can be unilaterally abrogated by executive impoundments."  H.R. Rep. No. 93-658, *as reprinted in* 1974 U.S.C.C.A.N. 3462, 3463; *see also* S. Rep. No. 93-688, *as reprinted in* 1974 U.S.C.C.A.N. 3504, 3572–3575 (collecting cases "consistently den[ying]" the Executive Branch's attempts to refuse spending as a means "to achieve less than the full objectives and scope of programs enacted and funded by Congress").

wall, and thus DHS acted without any authority to implement the January 20 Proclamation, including cancelling contracts entered into for the purpose of building the border wall.

98.     The only possible statutory basis President Biden and DHS could have based their actions on here is that under the ICA.

99.     But the relevant text of the ICA states that the Act is inapplicable here, where the Appropriations at issue *mandate* the obligation or expenditure of funds related to "construction of barrier system along the southwest border." 2 U.S.C. § 681(4) ("Nothing contained in this Act, or in any amendments made by this Act, shall be construed as … superseding any provision of law which *requires* the obligation of budget authority or the making of outlays thereunder.") (emphasis added); *accord Maine v. Goldschmidt*, 494 F. Supp. 93, 98-99 (D. Me. 1980) ("The plain and unambiguous language of" § 681(4) "makes clear the congressional intent that the provisions of the" ICA "shall not apply to any other act which *mandates* the obligation or expenditure of funds[,]" meaning that the Act "cannot provide an independent statutory basis for the deferral challenged in this case") (emphasis added).

100.    And even if the ICA was applicable here, the President still violated the Act.

101.    To be sure, when the ICA applies, the President has the authority to impound, or withhold, budget authority in very limited circumstances.  These circumstances are expressly provided in the ICA and separated into two exclusive

categories—deferrals and rescissions.

102.   With a deferral, the President may temporarily withhold funds from obligation only in a limited range of circumstances: to provide for contingencies; to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or as specifically provided by law.  2 U.S.C. § 684(b).  Thus, the deferral of budget authority "for any other purpose[,]" including to advance a policy disagreement, is unlawful.  *Id.*

103.   Proposed deferrals require the President or his agents to "transmit to the House of Representatives and the Senate a special message specifying":

> (1) the amount of the budget authority proposed to be deferred;

> (2) any account, department, or establishment of the Government to which such budget authority is available for obligation, and the specific projects or governmental functions involved;

> (3) the period of time during which the budget authority is proposed to be deferred;

> (4) the reasons for the proposed deferral, including any legal authority invoked to justify the proposed deferral;

> (5) to the maximum extent practicable, the estimated fiscal, economic, and budgetary effect of the proposed deferral; and

> (6) all facts, circumstances, and considerations relating to or bearing upon the proposed deferral and the decision to effect the proposed deferral, including an analysis of such facts, circumstances, and considerations in terms of their application to any legal authority, including specific elements of legal authority, invoked to justify such proposed deferral, and to the maximum extent practicable, the estimated effect of the proposed deferral upon the objects, purposes, and programs for which the budget authority is provided.

*Id.* § 684(a).

104.    With a rescission, the President may seek the permanent cancellation of

funds when he

> determines that all or part of any budget authority will not be required
> to carry out the full objectives or scope of programs for which it is
> provided or that such budget authority should be rescinded for fiscal
> policy or other reasons (including the termination of authorized projects
> or activities for which budget authority has been provided), or whenever
> all or part of budget authority provided for only one fiscal year is to be
> reserved from obligation for such fiscal year[.]

*Id.* § 683(a).

105.    Proposed rescissions require "the President" (and not his agents) to

"transmit to both Houses of Congress a special message specifying":

> (1) the amount of budget authority which he proposes to be
> rescinded or which is to be so reserved;

> (2) any account, department, or establishment of the Government
> to which such budget authority is available for obligation, and the
> specific project or governmental functions involved;

> (3) the reasons why the budget authority should be rescinded or is
> to be so reserved;

> (4) to the maximum extent practicable, the estimated fiscal,
> economic, and budgetary effect of the proposed rescission or of the
> reservation; and

> (5) all facts, circumstances, and considerations relating to or
> bearing upon the proposed rescission or the reservation and the decision
> to effect the proposed rescission or the reservation, and to the maximum
> extent practicable, the estimated effect of the proposed rescission or the
> reservation upon the objects, purposes, and programs for which the
> budget authority is provided.

*Id.*

106.    Notably, "[a]ny amount of budget authority proposed to be rescinded or

that is to be reserved as set forth in such special message *shall* be made available for

obligation *unless*, within the prescribed 45-day period, the Congress has completed action on a rescission bill rescinding all or part of the amount proposed to be rescinded or that is to be reserved." *Id.* § 683(b) (emphasis added).

107.   On information and belief, the President has not transmitted a special message to Congress proposing either a deferral or rescission of the border wall funds at issue.

108.   The January 20 Proclamation is not a special message, and it does not purport to be one.

109.   Nor does the Proclamation assert that the President will send a special message proposing a deferral or rescission of the funds in question.

110.   Even if the President, through the January 20 Proclamation, did transmit a special message proposing a deferral or rescission (and he did not), the Proclamation does not articulate any rationale sufficient to justify either a deferral or rescission under the ICA.

111.   Instead, the Proclamation provides only that the pause it directs is the result of a policy disagreement with Congress.

112.   And even if the President were to now transmit a sufficient special message, it would consist of impermissible post-hoc rationalization.

113.   Because the President's actions constitute neither a deferral nor rescission, the DHS appropriations at issue have been unlawfully impounded since the Proclamation's direction took effect in January 2021.

114.   Accordingly, President Biden's and DHS's refusal to spend funds

appropriated by Congress mandating the construction of a wall along the southwest border, and DHS's subsequent termination of contracts to perform work on construction projects to build the wall, constitutes an unlawful impoundment of funds under the ICA.

## COUNT IV
### (Arbitrary and Capricious Agency Action—Lack of Reasoned Decision-Making and Action Contrary to Law)

115.   Plaintiffs incorporate by reference all preceding paragraphs and incorporate each paragraph of each count as applicable to each other count.

116.   DHS has previously recognized the importance of the construction of the southwest border wall.  Among other things, DHS's prior assessment concluded that "Walls Work," that border walls are highly effective in deterring and preventing illegal immigration and illegal drug trafficking across the southwest border, and that the construction of border barriers on the southwest border led to a 90 percent reduction in border apprehensions in the Yuma region in particular.

117.   Discontinuing that construction through the January 20 Proclamation (and subsequent implementation by DHS) represents a sharp departure from DHS's previous policy, and it constitutes a final agency action subject to judicial review. Among other things, the President's Proclamation and DHS's statements make clear beyond any possible doubt that DHS has no intention of expending a single penny of appropriated money for Congress's stated purpose of actual "construction of barrier system along the southwest border."

118.   DHS provided no reasoning, much less sufficient reasoning, for its

actions.

119.   DHS failed to consider important aspects of the problem before it, including but not limited to: (1) its own prior, highly favorable assessment of the effectiveness of border barriers; (2) the perverse incentives and causal contribution of Biden Administration's permanent "pause" on border barrier construction on the current border crisis, including the current explosion of unlawful entries, unaccompanied minors, human smuggling, human trafficking, and drug trafficking along the border; (3) the fact that DHS's failure to expend duly appropriated funds violates both the DHS Appropriation Acts for FY 2020 and FY 2021 and the Impoundment Control Act of 1974; (4) the reliance interests of States like Missouri and Texas in the construction of barrier systems to deter and reduce unlawful immigration with its associated unrecoverable costs for the States; and (5) DHS's own prior admissions that it is legally obligated to expend the appropriated funds for Congress's specified purpose of construction of barrier system along the southwest border.

120.   The current Administration failed to consider the benefits of building the southwest border wall (and the costs of not having it).

121.   Failing to consider important costs of a new policy, and other important aspects of the problem, renders that policy arbitrary and capricious.  *See Michigan*, 135 S. Ct. at 2706 ("[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.' ").

122.   DHS failed to engage in reasoned decision-making when it canceled the

remaining border wall contracts.  All the October 8 statement says is that DHS is canceling the contracts pursuant to its June 11 border plan, which in turn refers back to the President's January 20 Proclamation that merely says "building a massive wall that spans the entire southern border is not a serious policy solution" and "a waste of money[.]"

123.    When an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy" it must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  "In such cases it is not that further justification is demanded by the mere fact of policy change[,] but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *Id.* at 515-16.  "It would be arbitrary or capricious to ignore such matters."  *Id.* at 515.

124.    Certainly,   the   ICA   required   reasoned   decisionmaking.    *See* 2 U.S.C. §§ 683-84.  The APA requires the same.

125.    Any attempt by DHS now to provide an explanation for its reversal would constitute impermissible post-hoc rationalization that should be given no consideration.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908-10 (2020).

126.    For similar reasons, DHS's actions are also contrary to law in violation of the APA, because they violate the Separation of Powers, the Take Care Clause, the Impoundment Control Act, and the plain language of DHS's Appropriation Bills for

FY 2020 and FY 2021, as alleged in detail herein.

127.   At bottom, the Executive Branch's actions here amount to no more than policy disagreements with the former Administration.   To be sure, "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part & dissenting in part).   But the new Administration (through its agencies) must act "within the bounds established by Congress," and "may not choose not to enforce laws of which it does not approve, or to ignore statutory standards in carrying out its regulatory functions." *Id.*   It has failed to do that here.

## COUNT V
### (Arbitrary and Capricious Agency Action—Failure to Consider State Reliance Interests)

128.   Plaintiffs incorporate by reference all preceding paragraphs and incorporate each paragraph of each count as applicable to each other count.

129.   DHS was obligated to consider the costs of ending construction of the southwest border wall to the States.   It transparently failed to do so, having made its decision without seeking input from Texas and Missouri and without inquiring about the costs Texas and Missouri bear from illegal immigration.   DHS ignored the harms that discontinuing the construction will cause, such as increased costs to states, which "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397.   Certainly, the January 20 Proclamation did not analyze those costs.   This,

too, was arbitrary and capricious. *See Michigan*, 135 S. Ct. at 2706.

130.   DHS failed to consider the States' reliance interests in securing the southwest border. The Supreme Court in *Regents* required DHS to consider reliance interests, including States' reliance interests, especially when it "changes course[.]" 140 S. Ct. at 1913-15. Here, DHS simply did not consider any of Missouri's or Texas' reliance interests, such as increased costs for providing social services, rendering DHS's actions arbitrary and capricious.

131.   DHS particularly failed to consider whether "there was 'legitimate reliance' on the" prior administration's use of building the wall as a method to secure the southwest border. *Regents*, 140 S. Ct. at 1913 (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)). That was arbitrary and capricious; where, as here, "an agency changes course ... it must 'be cognizant that longstanding policies may have engendered serious reliance interest that must be taken into account.' " *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting another source)).

132.   Any belated consideration by DHS of the States' reliance interests constitutes impermissible post-hoc rationalization. *See id.* at 1908-10.

## COUNT VI
### (Arbitrary and Capricious Agency Action—No Stated Basis for Agency Action)

133.   Plaintiffs incorporate by reference all preceding paragraphs and incorporate each paragraph of each count as applicable to each other count.

134.   Even if there were some way to explain or justify DHS's actions, it would

be irrelevant because DHS did not provide any such explanation or justification in the October 8 Statement or any of its communications implementing the January 20 Proclamation. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). Because DHS failed to provide *any* grounds for its decision, it is precluded from asserting new grounds before this Court—and therefore its refusal to spend appropriated funds to build the southwest border wall and cancellation of contracts regarding the same are necessarily arbitrary.

135.   Further, by cancelling the border wall contracts and otherwise refusing to expend any money on actual construction of border barriers, DHS is precluded from complying with Congress' mandate in the Appropriations laws at issue.

136.   Because DHS does not sufficiently explain its sudden departure from implementing the Appropriations, its action cancelling the border wall contracts is arbitrary and capricious.

137.   Each of these numerous flaws renders DHS's decisions legally invalid. Yet those invalid acts will cause Texas and Missouri irreparable injury that cannot be remedied adequately at law.   Texas and Missouri are therefore entitled to injunctive relief to enforce DHS's obligations under the applicable law.

138.   And any belated explanation by DHS now constitutes impermissible post-hoc rationalization. *See id.* at 1908-10.

## COUNT VII
### (Violation of Consolidated Appropriations Acts of 2020 and 2021)

139.   Plaintiffs incorporate by reference all preceding paragraphs and

incorporate each paragraph of each count as applicable to each other count.

140.    The Consolidated Appropriations Act of 2021, read together with the Consolidated Appropriations Act of 2020, mandated—through the use of "shall"—the "construction of barrier system along the southwest border[,]" and for that purpose alone. *See* 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law").

141.    According to the GAO, DHS has not yet obligated its fiscal year 2021 barrier system appropriation.

142.    And, on information and belief, DHS has still not obligated its FY 2021 barrier system appropriation, notwithstanding Congress' mandate.

143.    By cancelling the border wall contracts and otherwise refusing to spend any money on actual construction of border barriers, DHS is precluded from complying with Congress' mandate in the Appropriations laws at issue because cancellation of those contracts ensures that the southwest border wall will be left unfinished.

144.    Failure to comply with Congress' mandate is unlawful, and thus DHS acted without legal authority.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a.    Hold unlawful and set aside Defendants' termination of funding and construction of the southwest border wall;

b.    Declare that Defendants' termination of funding and construction of the

southwest border wall was unlawful;

      c.      Compel Defendants to spend the funds appropriated for "construction of barrier system along the southwest border" for that very purpose;

      d.      Issue preliminary and permanent injunctive relief enjoining Defendants nationwide from enforcing or implementing the January 20 Proclamation;

      e.      Issue preliminary and permanent injunctive relief requiring Defendants nationwide to spend the funds appropriated for "construction of barrier system along the southwest border" for that very purpose;

      f.      Issue preliminary and permanent injunctive relief requiring Defendants nationwide to enforce or implement the "construction of barrier system along the southwest border";

      g.      Issue preliminary and permanent injunctive relief requiring Defendants to immediately rescind their cancellation of border wall construction contracts;

      h.      Award Missouri and Texas the costs of this action and reasonable attorney's fees; and

      i.      Award such other and further relief as the Court deems equitable and just.

Date: October 21, 2021

ERIC S. SCHMITT
Attorney General of Missouri

/s/ *Jesus A. Osete*
D. JOHN SAUER, #58720MO*
Solicitor General

JESUS A. OSETE, #69267MO*
Deputy Attorney General
for Special Litigation

MADDIE M. GREEN, #73724MO*
Assistant Attorney General
for Special Litigation

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-1800
Fax (573) 751-0774
John.Sauer@ago.mo.gov
Jesus.Osete@ago.mo.gov
Maddie.Green@ago.mo.gov

*Counsel for Plaintiff*
*State of Missouri*

**Pro hac vice* motion forthcoming

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

/s/ *Aaron F. Reitz*
AARON F. REITZ
*Attorney-in-Charge*
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
Southern Dist. of Texas Bar No. 3653771

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
Tel.: (512) 936-1700

*Counsel for Plaintiff State of Texas*