# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSOURI, and | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | Case No. 7:21-cv-00420 |
| Plaintiffs, | § | (formerly 6:21-cv-00052) |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United | § | |
| States of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS .............................................................................. 6

SUMMARY OF THE ARGUMENT .......................................................... 14

ARGUMENT .................................................................................................... 16

    I.    Plaintiffs Are Likely to Succeed on the Merits ........................................ 16

        A. DHS's actions implementing the January 20 Proclamation are arbitrary and capricious, in violation of the APA .............................. 17

        B. The January 20 Proclamation and DHS's actions implementing it are contrary to the Consolidated Appropriations Acts of 2020 and 2021, and the Impoundment Control Act of 1974, in violation of the APA .. 23

        C. The January 20 Proclamation and DHS's actions implementing it are contrary to the Separation of Powers, in violation of the APA ........... 29

        D. The January 20 Proclamation and DHS's actions implementing it are contrary to the Take Care Clause of the Constitution, in violation of the APA ................................................................................................. 32

        E. No Procedural Issue Precludes this Court's Review ........................... 34

    II.    Missouri and Texas Will Suffer Irreparable Harm if an Injunction Is Not Granted ................................................................................................... 47

    III.    The Equities and Public Interest Overwhelmingly Favor an Injunction . 48

CONCLUSION ............................................................................................... 50

TABLE OF AUTHORITIES

## Cases

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
    522 U.S. 359 (1998) ............................................................................ 17

*Arizona v. United States,*
    567 U.S. 387 (2012) .................................................................... 22, 37

*Armstrong v. Exceptional Child Center, Inc.,*
    575 U.S. 320 (2015) ............................................................................ 31

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................................ 45

*Block v. Cmty. Nutrition Inst.,*
    467 U.S. 340 (1984) ............................................................................ 44

*California v. Trump,*
    963 F.3d 926 (9th Cir. 2020) ............................................................ 29

*City & Cty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) .............................................. 30, 32, 33

*Clinton v. City of New York,*
    524 U.S. 417 (1998) ............................................................................ 30

*Combs v. Newpark Res., Inc.,*
    422 S.W.3d 46 (Tex. App.—Austin 2013, no pet.) ........................ 42

*Czyzewski v. Jevic Holding Corp.,*
    137 S. Ct. 973 (2017) ........................................................................ 35

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,*
    710 F.3d 579 (5th Cir. 2013) ............................................................ 49

*Dart v. United States,*
    848 F.2d 217 (D.C. Cir. 1988) .......................................................... 31

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019) .......................................................... 36, 37, 38

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ............................... 17, 20, 21, 22, 29, 44, 45

*Encino Motorcars, LLC v. Navarro,*
  136 S. Ct. 2117 (2016) ................................................................ 21

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) .......................................................... 19, 21

*Green Valley Special Util. Dist. v. City of Schertz,*
  969 F.3d 460 (5th Cir. 2020) ...................................................... 31

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ................................................................ 44

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.,*
  804 F.2d 1390 (5th Cir. 1986) ...................................................... 47

*ICC v. Brotherhood of Locomotive Eng'rs,*
  482 U.S. 270 (1987) ................................................................ 44

*In re Aiken Cty.,*
  725 F.3d 255 (D.C. Cir. 2013) .................................................. 30, 31

*In re Nestle USA,*
  387 S.W.3d 610 (Tex. 2012) ........................................................ 42

*Japan Whaling Ass'n v. Am. Cetacean Soc.,*
  478 U.S. 221 (1986) ................................................................ 44

*Kingdomware Techs., Inc. v. United States,*
  136 S. Ct. 1969 (2016) ............................................................ 23

*League of Women Voters of United States v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ........................................................ 49

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ................................................................ 44

*Maine Cmty. Health Options v. United States,*
  140 S. Ct. 1308 (2020) ............................................................ 23

*Maine v. Goldschmidt,*
  494 F. Supp. 93 (D. Me. 1980) ...................................................... 26

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ............................................................ 35, 36

*Michigan v. EPA,*
  576 U.S. 743 (2015) ........................................................ 17, 20, 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................................. 20

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) ............................................................................. 49

*Nevada v. Dep't of Energy*,
    400 F.3d 9 (D.C. Cir. 2005) ........................................................................ 5, 7, 8

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................................... 48, 49

*OGCI Training, Inc. v. Hegar*,
    No. 03-16-00704-CV, 2017 WL 4899015 (Tex. App.—Austin Oct. 27, 2017, no pet.)
    ........................................................................................................................... 42

*Plyler v. Doe*,
    457 U.S. 202 (1982) ........................................................................................... 39

*Roho Inc. v. Marquis*,
    902 F.2d 356 (5th Cir. 1990) ............................................................................ 16

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ............................................................................................ 22

*Simmat v. U.S. Bureau of Prisons*,
    413 F.3d 1225 (10th Cir. 2005) .................................................................... 31, 32

*Smiley v. Citibank (South Dakota), N.A.*,
    517 U.S. 735 (1996) ........................................................................................... 21

*Southwestern Bell Tel. Co. v. Combs*,
    270 S.W.3d 249 (Tex. App.—Amarillo 2008, pet. denied) ...................................... 42

*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021) ..................17, 34, 35, 36, 38, 39, 40, 41, 44, 47, 48, 49

*Texas v. Biden*,
    No. 2:21-CV-067-Z, 2021 WL 3603341, n.7 (N.D. Tex. Aug. 13, 2021) 12, 13, 19, 37,
    38, 39, 50

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) ............................................................................. 45

*Texas v. United States*,
    328 F. Supp. 3d 662 (S.D. Tex. 2018) ........................................ 35, 39, 40, 41, 47, 48

*Texas v. United States,*
   524 F. Supp. 3d 598 (S.D. Tex. 2021) ..................... 17, 22, 35, 39, 40, 41, 46, 48, 49

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015)..................................................... 34, 35, 37, 38, 44, 48

*United States v. Escobar,*
   No. 2:17-CR-529, 2017 WL 5749620 (S.D. Tex. Nov. 28, 2017) ............................ 50

*United States v. Garner,*
   767 F.2d 104 (5th Cir. 1985)......................................................................... 17

*United States v. Martinez–Fuerte,*
   428 U.S. 543 (1976) .................................................................................. 50

*Valley v. Rapides Parish School Bd.,*
   118 F.3d 1047 (5th Cir. 1997) ..................................................................... 16

*Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.,*
   No. 21-60766, 2021 WL 4955257 (5th Cir. Oct. 26, 2021) ............................... 17, 18

*Washington v. Reno,*
   35 F.3d 1093 (6th Cir. 1994) ....................................................................... 49

*Webster v. Doe,*
   486 U.S. 592 (1988) .................................................................................. 44

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
   139 S. Ct. 361 (2018).................................................................................. 44

*Wyoming v. Oklahoma,*
   502 U.S. 437 (1992) ................................................................................... 41

## Statutes

2 U.S.C. § 681(4) ............................................................................................ 25

2 U.S.C. § 684(b) ................................................................................. 26, 27, 28

2 U.S.C. §§ 681–688 ....................................................................................... 33

2 U.S.C. §§ 683-84 .......................................................................................... 17

5 U.S.C. § 701................................................................................... 43, 45

5 U.S.C. § 701(a) ............................................................................................ 45

5 U.S.C. § 701(a)(1) ............................................................................. 44

5 U.S.C. § 701(a)(2) ............................................................................. 44

5 U.S.C. § 702 ...................................................................................... 35

5 U.S.C. § 704 ................................................................................ 45, 47

5 U.S.C. § 706 ...................................................................................... 31

5 U.S.C. § 706(2)(A) ............................................................................ 17

31 U.S.C. § 1301(a) .............................................................................. 24

P.L. 116-93, 133 Stat. 2511 ............................................................. 9, 10

P.L. 116-260, 134 Stat. 1182 .................................................................. 9

Public Law 115–31 .................................................................................. 9

TEX. TAX. CODE § 171.001(a) ............................................................... 41

TEX. TAX CODE § 171.002 .................................................................... 42

TEX. TAX CODE §§ 171.101(a)(1) .......................................................... 42

TEX. TRANSP. CODE § 521.142(a) ......................................................... 38

U.S. CONST. art. II, § 1, cl. 1 ................................................................ 32

U.S. CONST. art. II, § 3 .................................................................... 15, 32

**Regulations**

42 C.F.R. § 440.255(c) .......................................................................... 41

**Other Authorities**

1974 U.S.C.C.A.N. 3462 ....................................................................... 33

1974 U.S.C.C.A.N. 3504 ....................................................................... 33

H.R. Rep. No. 93-658 ............................................................................ 33

House Bill 9 .......................................................................................... 43

S. Rep. No. 93-688 ................................................................................ 33

INTRODUCTION

This action challenges the Executive Branch's pervasive violations of the Constitution and federal law in its southwest border policy.

Less than a year in office, the Biden Administration's immigration policy has created a humanitarian catastrophe at the border.  The results of this crisis are as predictable as they are tragic—an explosion of illegal immigration, resulting in total encounters on pace to be the highest ever recorded.  Central to the federal government's immigration failures has been the Biden Administration's refusal to spend funds appropriated by Congress mandating the construction of a wall along the southwest border, and the Department of Homeland Security's recent termination of contracts to perform work on construction projects to build the wall.

In 2018, DHS assessed the effectiveness of physical barriers on the southwest border in controlling illegal immigration and drug trafficking, and proclaimed: "Walls Work. When it comes to stopping drugs and illegal aliens from crossing our borders, border walls have proven to be extremely effective." App.007.  DHS noted that border wall construction in one sector led to a *90 percent decrease* in border apprehensions. App.008.  As a result, border walls render illegal crossings much more difficult and remove a powerful incentive for illegal border crossings.

DHS again assessed the effectiveness of border walls in 2020, concluding they "have proved to be a critical component in gaining operational control of the border." App.010.  Indeed, in the Yuma Sector alone: (1) "Illegal entries in areas with new border wall system plummeted over 87% in FY 20 compared to FY 19"; (2) "In FY 19,

CBP deployed a temporary barrier, which it has replaced with a permanent system, at the Sanchez Canal, which resulted in illegal entries decreasing in this area by more than 1,000 per month"; and (3) "In FY 19, in areas of older existing border fencing or barriers, Yuma Sector apprehended 12 large groups (over a 100 persons) compared to zero large groups in FY 20 with new border wall system." App.011.[1]

The Rio Grande Valley and El Paso Sectors also showed promising results. "In a section of RGV (Zone 1) apprehensions have decreased since the construction of the border wall system. This is a location that has never had any border infrastructure." App.011. Specifically, CBP saw (1) a "79% decrease in apprehensions in this area (Zone 1) since the completion of border wall system," and (2) "a 26% decrease in narcotics seizures since the completion of border wall system in this area." App.012. And "[i]n another section of RGV, prior to construction of the border wall system it was common to see illegal aliens running across a heavily traveled road, putting themselves and members of the community at risk" but the border wall system "forced [smugglers] to take their groups further west into areas that are less dense with brush and easier for CBP surveillance cameras to detect illicit activity." *Id.*

Finally, the "El Paso Sector has experienced a significant reduction in drug and smuggling activities in areas where the new border wall system was built. Most notably, in Zones 14 and 15 of the Santa Teresa (STN) AOR where apprehensions have decreased by 60% and 81% respectively when comparing the last half of fiscal

---

[1] DHS's 2020 assessment found that "Family Unit entries … decreased over 95%"—i.e., "FY 19: 51,961 vs. FY 20: 2,940." *Id.*

year FY 20 to the first half of FY 20.  El Paso Station has experienced similar results from the new border wall in Zones 20 − 23, with a reduction in apprehensions of 70% during the same timeframe."  App.012.

At bottom, "[t]he results," DHS remarked, "speak for themselves: illegal drug, border crossings, and human smuggling activities *have decreased in areas where barriers are deployed*."  App.011 (emphasis added).  "Destroying the wall," DHS found, "would put needless strain on DHS resources, lead to increases in crime, and make it nearly impossible for us to determine who is coming into our country." App.012.

Consistent with these assessments, Congress appropriated funds for the construction of border walls on the southwest border.  In DHS's appropriation bills for FY 2020 and FY 2021, Congress appropriated $1.375 billion each year for "construction of barrier system along the southwest border," and provided that this money "*shall only* be available for barrier systems."  App.015-16 (emphasis added).

But while on the campaign trial, then-presidential candidate Joe Biden promised termination of border wall construction, declaring that "[t]here will not be another foot of wall constructed on my administration[.]"[2]

He kept his promise.  On January 20, 2021, President Biden, in one of his first official actions, issued a Proclamation directing DHS to "pause immediately the obligation of funds related to construction of the southern border wall" and to "pause

---

[2] Barbara Sprunt, *Biden Would End Border Wall Construction, But Wouldn't Tear Down Trump's Additions*, NAT'L PUB. RADIO (Aug. 5, 2020, 10:00 a.m. EST), https://tinyurl.com/3pzstmdj.

work on each construction project on the southern border wall." App.021. This included pausing "wall projects funded by direct appropriations." App.022. The justification according to the White House: "building a massive wall that spans the entire southern border is not a serious policy solution" and "a waste of money[.]" App.021.

Following the Proclamation issued on January 20, DHS implemented it by stopping all work on any border wall projects, including border fencing or associated structures, leaving hundreds of miles of planned and funded—but unfinished—wall along the southwest border.

In fact, DHS has taken specific steps pursuant to the Proclamation to ensure that the wall never gets built. First, on June 11, DHS released a plan for use of the appropriated border wall funds, which, consistent with President Biden's Proclamation, refused to use the funds to construct a single foot of the wall, even though DHS acknowledged that it is "legally required to use" such funds "consistent with their appropriated purpose." App.025. Notably, DHS "call[ed] on Congress to cancel funds it previously appropriated for border barrier projects so that these resources can *instead* be used for modern, effective border measures[.]" App.026 (emphasis added).

Four days later, on June 15, the Government Accountability Office advised Congress that, although "DHS has almost fully obligated the approximately $4 billion appropriated across fiscal years 2018, 2019, and 2020, for barrier construction projects[,]" App.036, DHS "has not yet obligated its fiscal year 2021 barrier system

4

appropriation." App.034.[3] Thus, "in order to facilitate Congress's oversight of executive spending and its Constitutional power of the purse," the GAO recommended that "the congressional oversight and appropriations committees should consider requiring [the Office of Management and Budget] and DHS to submit a timeline detailing the planned uses and timeframes for obligating this appropriation." App.028. "A detailed timeline," the GAO found, "could serve as a tool for rigorous oversight to ensure *the President does not substitute his own policies and priorities in place of those established through the legislative process.*" *Id.* (emphasis added).

GAO's recommendation, however, fell on deaf ears, as DHS continued to implement the January 20 Proclamation. Indeed, most recently, on October 8, DHS announced its decision to terminate "the remaining border barrier contracts" entered into for the purpose of building the border wall Congress authorized. App.055. DHS also confirmed in this recent statement that none of its recent activities "will … involve any construction of new border barrier or permanent land acquisition." *Id.* DHS again "call[ed] on Congress to cancel remaining border wall funding and *instead* fund smarter border security measures, like border technology and modernization of land ports of entry[.]" *Id.* (emphasis added). "Until and unless Congress cancels those funds," DHS openly admitted, "the law requires DHS to use the funds consistent with their appropriated purpose[.]" App.055-56.

---

[3] *See Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (while GAO's findings are "not binding," they are entitled to "special weight" in light of "its accumulated experience and expertise in the field of government appropriations") (cleaned up).

Thus, DHS has neither constructed nor intends to construct any additional barriers using congressionally-appropriated funds to build a wall along the southwest border. Ending construction of the southwest border wall has had pernicious effects for Missouri, Texas, and their citizens. *See* App.070-83, 129-63.

The President had neither constitutional nor statutory authority to refuse to spend funds Congress authorized mandating the construction of the border wall, and thus DHS acted without any authority in implementing the January 20 Proclamation, including canceling contracts entered into for the purpose of building the border wall. Even if the President had any statutory authority (and he did not), he still failed to comply with federal law, and thus DHS acted without any authority to implement the January 20 Proclamation.

Specifically, DHS's refusal to obligate and spend duly-enacted appropriations mandating the construction of the southwest border wall violates the Separation of Powers, the Take Care Clause, the Impoundment Control Act of 1974 (to the extent it applies), the Administrative Procedure Act, and the Consolidated Appropriations Acts of 2020 and 2021. For these reasons, the Court should preliminarily enjoin Defendants from implementing the January 20 Proclamation directing DHS to refuse to spend the appropriations for construction of the southwest border wall.

## STATEMENT OF FACTS

"Walls work." That was DHS's "bottom line" in 2018 when assessing border walls as effective security measures. App.007. DHS's own prior assessment favored the construction of a border wall in the southwest because, "[w]hen it comes to

6

stopping … illegal aliens from crossing our borders, border walls have proven to be extremely effective." App.007. This assessment was based on empirical observation, not speculation: "For example, when we installed a border wall in the Yuma sector, we have seen border apprehensions decrease by 90 percent." App.007-08. In other words, border walls make illegal crossings much more difficult and reduce incentives to cross the border illegally, allowing the federal government to conserve enforcement resources.

DHS again assessed the effectiveness of border walls in 2020, concluding they "have proved to be a critical component in gaining operational control of the border." App.010. Indeed, in the Yuma Sector alone: (1) "Illegal entries in areas with new border wall system plummeted over 87% in FY 20 compared to FY 19"; (2) "In FY 19, CBP deployed a temporary barrier, which it has replaced with a permanent system, at the Sanchez Canal, which resulted in illegal entries decreasing in this area by more than 1,000 per month"; and (3) "In FY 19, in areas of older existing border fencing or barriers, Yuma Sector apprehended 12 large groups (over a 100 persons) compared to zero large groups in FY 20 with new border wall system." App.011.[4]

The Rio Grande Valley and El Paso Sectors also showed promising results. "In a section of RGV (Zone 1) apprehensions have decreased since the construction of the border wall system. This is a location that has never had any border infrastructure." App.011. Specifically, CBP saw (1) a "79% decrease in apprehensions in this area

---

[4] DHS's 2020 assessment found that "Family Unit entries … decreased over 95%"—i.e., "FY 19: 51,961 vs. FY 20: 2,940." *Id.*

(Zone 1) since the completion of border wall system," and (2) "a 26% decrease in narcotics seizures since the completion of border wall system in this area." App.012. And "[i]n another section of RGV, prior to construction of the border wall system it was common to see illegal aliens running across a heavily traveled road, putting themselves and members of the community at risk" but the border wall system "forced [smugglers] to take their groups further west into areas that are less dense with brush and easier for CBP surveillance cameras to detect illicit activity." *Id.*

Finally, the "El Paso Sector has experienced a significant reduction in drug and smuggling activities in areas where the new border wall system was built. Most notably, in Zones 14 and 15 of the Santa Teresa (STN) AOR where apprehensions have decreased by 60% and 81% respectively when comparing the last half of fiscal year FY 20 to the first half of FY 20. El Paso Station has experienced similar results from the new border wall in Zones 20 – 23, with a reduction in apprehensions of 70% during the same timeframe." App.012.

At bottom, "[t]he results," DHS remarked, "speak for themselves: illegal drug, border crossings, and human smuggling activities have decreased in areas where barriers are deployed." App.011. "Destroying the wall," DHS found, "would put needless strain on DHS resources, lead to increases in crime, and make it nearly impossible for us to determine who is coming into our country." App.012.

Congress agreed. After DHS's assessments in 2018 and 2020, Congress at least twice directly authorized and required the construction of a physical barrier along the southwest border by appropriating funds that must be expended for that specific

8

purpose. The Fiscal Year 2020 DHS Appropriations Act, P.L. 116-93, 133 Stat. 2511,

Div. D, § 209(a)(1)—which was passed as part of the Consolidated Appropriations Act

of 2020—included $1.375 billion for "construction of barrier system along the

southwest border." App.015.

In other words, "[o]f the total amount made available under 'U.S. Customs and

Border Protection—Procurement, Construction, and Improvements', $1,904,468,000

*shall* be available *only* as follows:"

> (1) $1,375,000,000 for the construction of barrier system along the
> southwest border;
>
> (2) $221,912,000 for the acquisition and deployment of border security
> technologies and trade and travel assets and infrastructure;
>
> (3) $62,364,000 for facility construction and improvements;
>
> (4) $199,519,000 for integrated operations assets and infrastructure;
> and
>
> (5) $45,673,000 for mission support and infrastructure.

*Id.* § 209(a) (emphasis added); App.015.

> These designated amounts "*shall only* be available for barrier systems"
>
> that … (1) use … (A) operationally effective designs deployed as of the
> date of enactment of the Consolidated Appropriations Act, 2017 (Public
> Law 115–31), such as currently deployed steel bollard designs, that
> prioritize agent safety; or (B) operationally effective adaptations of such
> designs that help mitigate community or environmental impacts of
> barrier system construction, including adaptations based on
> consultation with jurisdictions within which barrier system will be
> constructed; and (2) are constructed in the highest priority locations as
> identified in the Border Security Improvement Plan.

*Id.* § 209(b) (emphasis added); App.016.

Similarly, the FY2021 DHS Appropriations Act, P.L. 116-260, 134 Stat. 1182,

Div. F, § 210—which was passed as part of the Consolidated Appropriations Act of 2021—reiterated that

> [o]f the total amount made available under "U.S. Customs and Border Protection—Procurement, Construction, and Improvements", *an amount equal* to the amount made available in section 209(a)(1) of division D of the Consolidated Appropriations Act, 2020 (Public Law 116–93) *shall* be made available *for the same purposes* as the amount provided under such section in such Act.

(emphasis added); App.018-19.

Thus, Congress appropriated billions for border wall construction—and only for that purpose—because, as DHS aptly concluded (twice): "Walls Work."

Having found that walls work as a matter of policy, Defendants could have constructed the southwest border wall Congress mandated.  Instead, they reversed course—without explanation—on the Biden Administration's very first day in office. On Inauguration Day 2021, President Biden directed DHS to "pause immediately the obligation of funds related to construction of the southern border wall" and to "pause work on each construction project on the southern border wall[.]" App.021.  This included pausing "wall projects funded by direct appropriations" like the two described above.  App.022.  The justification, according to the White House, was that "building a massive wall that spans the entire southern border is not a serious policy solution" and "a waste of money[.]"  App.021.

In other words, the Biden Administration studiously ignored DHS's own prior assessments and Congress's mandate through congressionally-authorized funds by unilaterally concluding that walls don't work.  This conclusion mirrored remarks made by Candidate Biden on the campaign trail: "There will not be another foot of

10

wall constructed on my administration[.]"[5]

That campaign promise was unlawfully implemented through the January 20 Proclamation and a series of actions by DHS to carry out the Proclamation's directives.

Specifically, on June 11, 2021, DHS released a plan for use of the appropriated border wall funds, which, consistent with President Biden's Proclamation, refused to use the funds to construct the wall, notwithstanding its acknowledgement that it is "legally required to use" such funds "consistent with their appropriated purpose." App.025. Notably, DHS "call[ed] on Congress to cancel funds it previously appropriated for border barrier projects so that these resources can *instead* be used for modern, effective border measures[.]" App.026 (emphasis added). In the announcement, DHS stated that it would use border-wall funds for environmental remediation, flood-control, and cleanup projects, but not a penny for any actual "construction of barrier systems along the southwest border." *Id.*

Four days after DHS's announcement, on June 15, the GAO advised Congress that, although "DHS has almost fully obligated the approximately $4 billion appropriated across fiscal years 2018, 2019, and 2020, for barrier construction projects[,]" App.036, DHS "has not yet obligated its fiscal year 2021 barrier system appropriation." App.034. "[I]n order to facilitate Congress's oversight of executive spending and its Constitutional power of the purse," the GAO recommended that "the congressional oversight and appropriations committees should consider requiring

---

[5] Sprunt, *supra*, at n.2.

11

OMB and DHS to submit a timeline detailing the planned uses and timeframes for obligating this appropriation." App.043. "A detailed timeline," the GAO found, "could serve as a tool for rigorous oversight *to ensure the President does not substitute his own policies and priorities in place of those established through the legislative process*." App.028 (emphasis added).

Since Defendants discontinued construction of the southwest border wall, the crisis at the border has worsened, where enforcement encounters have gone from 75,000 in January 2021 (when the Proclamation was issued), to over 210,000 in July. *See Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 3603341, at *9, n.7 (N.D. Tex. Aug. 13, 2021) (Kacsmaryk, J.). According to DHS itself, "[b]ased on current trends," it "expects that total encounters *this fiscal year*" alone "are likely to be *the highest ever recorded*." *Id.* (emphasis added).

In light of these problems, Defendants should have reversed course and restarted construction of the southwest border wall. Instead, they doubled down.

Despite the GAO's findings and recommendation, on October 8, 2021, DHS announced its decision to terminate "the remaining border barrier contracts" entered into for the purpose of building the border wall Congress mandated. App.055. This announcement specifically terminated border contracts to construct barriers along the Texas-Mexico border in Laredo and the Rio Grande Valley, and announced DHS's intention to expend the money on "environmental planning" activities instead. *Id.* DHS also confirmed in this recent statement that none of its recent activities "will … involve any construction of new border barrier or permanent land acquisition." *Id.*

DHS again "call[ed] on Congress to cancel remaining border wall funding and *instead* fund smarter border security measures, like border technology and modernization of land ports of entry[.]" *Id.* (emphasis added). "Until and unless Congress cancels those funds," DHS again admitted, "the law requires DHS to use the funds consistent with their appropriated purpose[.]" App.055-56.

In both the June 11 and October 8 announcement, consistent with the President's January 20 Proclamation, DHS specifically stated that it was not and would not expend any money on the actual *construction* of barrier systems at the southwest border. The June 11 announcement stated that DHS's plan "fulfills a requirement of President Biden's Proclamation," and stated DHS's intention to "end wall expansion." App.025. The October 8 announcement stated that DHS's "activities will not involve any construction of new border barrier or permanent land acquisition." App.055. DHS has thus made it extremely clear that it will not expend a single penny of appropriated money for Congress's stated purpose of "the construction of barrier system along the southwest border."

The Executive Branch's cancelation of mandatory funding approved by Congress to build the southwest border wall necessarily means that the wall will not be erected, which in turn means that the border will be less secure. A less secure border means that some illegal aliens will not be prevented or deterred from coming to the United States (as plainly demonstrated by the ongoing crisis at the border) and admitted into the interior, where some will then reside in Missouri and Texas and seek driver's licenses, education, and healthcare. App. 003 ¶11, 064-83, 098–128,

13

129-63; 098–128.

## SUMMARY OF THE ARGUMENT

Plaintiffs are likely to succeed on the merits of their claims that DHS's refusal to spend funds appropriated by Congress mandating the construction of a wall along the southwest border, and its termination of contracts to perform work on construction projects to build the wall, are unlawful.

*First*, DHS's actions implementing the January 20 Proclamation—including without limitation the June 11 and October 8 announcements—were arbitrary and capricious under the APA.

DHS did not address its own prior assessments from 2018 and 2020 finding border walls as effective security measures in reducing illegal crossings into the United States. It thus failed to consider important aspects of the problem.

DHS's actions also failed to grapple with the costs of terminating border wall construction for States like Missouri and Texas. DHS failed to consider the degree to which States like Missouri and Texas relied on Congress, through its exclusive power over the purse, mandating the construction of the border wall to secure the southwest border, especially in the face of an ongoing crisis at the border, where enforcement encounters have gone from 75,000 in January 2021 (when the Proclamation was issued), to over 210,000 in July. The additional costs of driver's licenses, education, and healthcare place burdens on the States of Missouri and Texas as a consequence of DHS's actions. Thus, irresponsible border-security policies that invite and encourage illegal immigration irreparably injure these States.

14

*Second*, DHS's actions implementing the January 20 Proclamation also violate the APA because they are contrary to federal law.  The plain language of the 2020 and 2021 CAAs *mandated* that funds be spent only on "construction of a barrier system along the southwest border," but Defendants are simply not doing that (and have no intention of doing so).  Moreover, to the extent it applies here, the Impoundment Control Act of 1974 requires that the President comply with a specific procedure to defer or rescind the obligation of funds appropriated by Congress, but that procedure wasn't followed here.

*Third*, DHS's actions implementing the January 20 Proclamation also violate the APA because they are contrary to the Constitution.

Defendants' actions in refusing to spend duly-enacted appropriations violate the Separation of Powers because the Constitution grants Congress, not the President, the exclusive power of the purse, and neither the President nor his subordinates had unilateral authority to refuse to spend funds appropriated by Congress due to policy objections.

Defendants' actions also violate the Take Care Clause, the constitutional obligation that the President and his subordinates "take Care that the Laws be faithfully executed."  U.S. CONST. art. II, § 3.  By refusing to follow Congress's commands in the 2020 and 2021 Consolidated Appropriation Acts, the President (and DHS through its implementation of the January 20 Proclamation) has violated the Constitution.

Because illegal aliens impose increased costs on the States (and there is no way

15

for the States to recover those costs from the federal government), Defendants' actions should be held unlawful and "set aside" under the APA.  But the Court should also award injunctive relief compelling Defendants to obligate the funds at issue to avoid irreparable injuries to Missouri and Texas.

The final requirements for a preliminary injunction—balancing of the equities and the public interest—are also satisfied here.  Defendants have no legitimate interest in implementing an unlawful Proclamation, and the public interest strongly favors enforcement of the federal statutes Defendants are violating.

ARGUMENT

The issuance of a preliminary injunction is appropriate when the movant shows (1) a likelihood of success on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and that (4) an injunction is in the public interest.  *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997) (citing *Roho Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)).  Plaintiffs easily satisfy these standards.

## I.    Plaintiffs Are Likely to Succeed on the Merits.

Missouri and Texas are likely to succeed on the merits of their claims because DHS's actions implementing the January 20 Proclamation are unlawful.  First, these actions are arbitrary and capricious under the APA.  Second, they substantively violate the Impoundment Control Act (to the extent it applies at all) and the Consolidated Appropriation Acts for 2020 and 2021.  Third, they violate the Separation of Powers and the President's constitutional obligation to take care that the laws be faithfully executed.  Finally, no procedural hurdle prevents the Court

16

from reaching the merits of these claims.

### A. DHS's actions implementing the January 20 Proclamation are arbitrary and capricious, in violation of the APA.

DHS's actions implementing the January 20 Proclamation violate the APA because they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Under the APA, federal administrative agencies are required to engage in "reasoned decision-making." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (cleaned up).[6]  In other words, "agency action is lawful only if it rests on a consideration of the relevant factors" and "important aspect[s] of the problem." *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (cleaned up).  "These include … States' legitimate reliance interests," the border wall's "benefits," and "implications" under the Constitution and federal law for terminating funding and construction.  *Texas v. Biden*, 10 F.4th 538, 553 (5th Cir. 2021) (per curiam).  Although agencies are entitled to deference, "the arbitrary and capricious standard of review . . . is by no means a rubber stamp."  *Texas v. United States*, 524 F. Supp. 3d 598, 653 (S.D. Tex. 2021) (Tipton, J.) (quoting *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985)).  In other words, the Court's review is not "toothless" and, indeed, "after *Regents*,[7] it has serious bite."  *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, No. 21-60766, 2021 WL 4955257, at *3 (5th Cir. Oct. 26, 2021) (cleaned up).

---

[6] So too the President under the Impoundment Control Act of 1974, where applicable.  *See* 2 U.S.C. §§ 683-84.

[7] *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020).

DHS's actions implementing the January 20 Proclamation are arbitrary and capricious for multiple reasons.

First, Defendants' actions ignore one of the southwest border wall's main purposes: "stopping drugs and illegal aliens from crossing our borders[.]" App.007. Defendants previously concluded (twice) that "walls work" and that they had effectively advanced that important purpose: walls had "proven" to be "extremely effective" at "stopping drugs and illegal aliens from crossing" into the United States. App.007, 010-11. Indeed, using a single sector alone as a sample size in 2018, DHS found that "border apprehensions decrease[d] by 90 percent" where a wall was installed. App.008. Border walls thus reduce incentives to cross the border illegally, allowing the federal government to conserve enforcement resources.

DHS reached the same conclusion in its 2020 assessment: border walls "have proved to be a critical component in gaining operational control of the border." App.010. Border crossings significantly decreased in three different Sectors due to the border wall system. App.011-12. Illegal entries decreased in Yuma "by more than 1,000 per month," decreased in the Rio Grande Valley by 79%, and decreased in El Paso by 70%. *Id.* "The results," DHS remarked, "speak for themselves: illegal drug, border crossings, and human smuggling activities have *decreased in areas where barriers are deployed*." App.011 (emphasis added). "Destroying the wall," thus, "would put needless strain on DHS resources, lead to increases in crime, and make it nearly impossible for us to determine who is coming into our country." App.012.

Neither the January 20 Proclamation nor DHS's June 11 and October 8 actions

mention this benefit of having border walls in place (or the costs of not having them), much less justify forgoing them.  The only justification put forward by the White House is the conclusory statement that building a border wall "is not a serious policy solution" and "a waste of money[.]"  App.021.  DHS merely parrots this trope.  App. 024-26, 054-56 (June 11 and Oct. 8 memos).

This explanation is insufficient under the APA.  When an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy" it must "provide a more detailed justification than what would suffice for a new policy created on a blank slate."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  "In such cases it is not that further justification is demanded by the mere fact of policy change[,] but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *Id.* at 515-16.  "It would be arbitrary or capricious to ignore such matters."  *Id.* at 515.

But Defendants provided no data to dispute the prior Administration's assessments that border walls prevented aliens from entering by making illegal crossing much more difficult, and deterred and discouraged illegal aliens from attempting to cross the border in the first place.  None of Defendants' actions discuss the likely problems created by dismantling border security measures, as evidenced by the ongoing border crisis with total encounters this year alone "likely to be the highest ever recorded."  *Texas*, 2021 WL 3603341, at *9, n.7.

To be sure, Defendants' justification that a border wall "is not a serious policy solution" and "a waste of money" amounts to no more than a policy disagreement with

19

the prior Administration "brought about by the people casting their votes" and thus may provide a "reasonable basis for an executive agency's *reappraisal* of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part & dissenting in part). But the new Administration (through its agencies) must engage in reasoned decision-making, it must act "within the bounds established by Congress," and it "may not choose not to enforce laws of which it does not approve, or to ignore statutory standards in carrying out its regulatory functions." *Id.* It has failed to do that here.

By failing to consider a critically important factor supporting construction of the southwest border wall, Defendants have acted arbitrarily and capriciously. "Agency action is lawful only if it rests on a consideration of the relevant factors." *Michigan*, 576 U.S. at 750 (internal quotation marks omitted). Defendants cannot dispute that deterring illegal crossings is crucial when the federal government's enforcement resources have been strained by the record-high apprehensions. Defendants' failure to consider this factor is independently sufficient to set aside the January 20 Proclamation and DHS's actions implementing it. *See, e.g.*, *Regents*, 140 S. Ct. at 1913.

Moreover, Defendants' actions are arbitrary and capricious because they reverse their own prior position on the importance of deterring illegal border crossings without "a reasoned analysis for the change." *State Farm*, 463 U.S. at 42. Defendants have utterly failed to explain why they seemingly no longer think it is

important to prevent aliens from attempting to illegally gain entry into the United States.

DHS also failed to consider whether "there was 'legitimate reliance' on the" prior administration's method of using border walls as an "extremely effective" tool in "stopping drugs and illegal aliens from crossing" into the United States. *Regents*, 140 S. Ct. at 1913 (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)). That was arbitrary and capricious; where, as here, "an agency changes course ... it must 'be cognizant that longstanding policies may have engendered serious reliance interest that must be taken into account.' " *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *FCC*, 556 U.S. at 515)).

Neither the January 20 Proclamation nor DHS's actions implementing it discusses the costs that termination of border wall construction would impose on States. These actions never even mention States, much less consider the significant burdens that Defendants' policy will impose on state budgets in areas like driver's licenses, education, or healthcare. App.070-83, 129-63. Because DHS does not explain its sudden departure from implementing the appropriations passed by Congress, its actions canceling the border wall contracts are arbitrary and capricious.

For this additional reason, Defendants' actions do not "rest[] on a consideration of the relevant factors." *Michigan*, 576 U.S. at 750 (internal quotation marks omitted). States "bear[] many of the consequences of unlawful immigration," and "[t]he problems posed to the State by illegal immigration must not be

underestimated." *Arizona v. United States*, 567 U.S. 387, 397-98 (2012). Accordingly, Defendants had a "clear and obvious responsibility to consider" Missouri's and Texas's "expenses and costs." *Texas*, 524 F. Supp. 3d at 655.

Even if DHS could have decided that other policy considerations outweighed the costs to States, DHS did not in fact make such a decision. Considering such policy concerns "was the agency's job, but the agency failed to do it." *Regents*, 140 S. Ct. at 1914. In other words, even if there were some way to explain or justify DHS's actions, it would be irrelevant because DHS did not provide any such explanation or justification in either the June 11 announcement or the October 8 announcement implementing the January 20 Proclamation. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). Because DHS failed to provide *any* grounds for its decision, it is precluded from asserting new grounds before this Court—and therefore its refusal to spend appropriated funds to build the southwest border wall and cancelation of contracts regarding the same are necessarily arbitrary. *See, e.g.*, *Regents*, 140 S. Ct. at 1907, 1909 (holding that it is a "foundational principle of administrative law" to reject an agency's "impermissible *post hoc* rationalizations").

Finally, DHS failed to consider another important aspect of the problem: terminating construction of the southwest border wall necessarily means that it will never be able to comply with Congress's mandate in the 2020 and 2021 CAAs that the appropriated funds "shall" be spent on the "construction of a barrier system along

the southwest border." App.015, 018-19.

Congress's use of the word "shall" in statutes indicates mandatory action. "The first sign that the statute impose[s] an obligation is its mandatory language: 'shall.'" *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020). "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." *Id.* (quoting *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016)).

DHS's failure to spend appropriated funds Congress commanded it to spend violates the plain language of the 2020 and 2021 CAAs; the Impoundment Control Act of 1974 (to the extent it applies, as explained in more detail below); the separation of powers; and the Take Care Clause. But neither the January 20 Proclamation nor DHS's actions implementing it took any of this into consideration when refusing to spend the funds and when terminating construction of the border wall. In fact, DHS previously admitted (twice) that it is legally obligated to expend the appropriated funds for Congress's specified purpose of construction of barrier system along the southwest border. App.025, 055-56. By canceling the border wall contracts and otherwise refusing to expend any money on actual construction of border barriers, DHS is precluded from complying with Congress's mandate in the appropriations laws at issue.

> **B.    The January 20 Proclamation and DHS's actions implementing it are contrary to the Consolidated Appropriations Acts of 2020 and 2021, and the Impoundment Control Act of 1974, in violation of the APA.**

For similar reasons, DHS's actions implementing the January 20 Proclamation

are also contrary to the plain language of the 2020 and 2021 CAAs, and the Impoundment Control Act of 1974 (to the extent it applies), in violation of the APA.

      1. <u>Violation of Congress's Mandate in the Consolidated Appropriations Acts of 2020 and 2021.</u>

The Consolidated Appropriations Act of 2021, read together with the Consolidated Appropriations Act of 2020, mandates—through the use of "shall"—the "construction of barrier system along the southwest border[,]" and for that purpose alone. *See* 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law").

In other words, the plain language of the 2020 and 2021 CAAs *mandated* that funds be spent only on "construction of a barrier system along the southwest border," but Defendants are simply not doing that (and have no intention of doing so).

Indeed, according to the GAO, DHS has not yet obligated funds appropriated under the 2021 CAA. App.028. And, notwithstanding Congress's mandate, DHS in the October 8 announcement (1) stated DHS was terminating "the remaining border barrier contracts" entered into for the purpose of building the border wall Congress mandated, and (2) confirmed that future DHS "activities will not involve any construction of new border barrier or permanent land acquisition." App.055.

DHS has thus made it extremely clear that it will not expend a single penny of appropriated money for Congress's stated purpose of "the construction of barrier system along the southwest border." By canceling the border wall contracts and otherwise refusing to spend any money on actual construction of border barriers, DHS is precluded from complying with Congress's mandate in the 2020 and 2021 CAAs

because cancelation of those contracts ensures that the southwest border wall will be left unfinished. Failure to comply with Congress's mandate is unlawful, and thus DHS acted without legal authority.

2. Violation of the Impoundment Control Act of 1974, if applicable.

To the extent it applies here, the Impoundment Control Act of 1974 requires that the President comply with a specific procedure to defer or rescind the obligation of funds appropriated by Congress, but that procedure wasn't followed here.

As explained throughout this Brief, the President had neither constitutional nor statutory authority to refuse to spend funds Congress authorized mandating the construction of the border wall, and thus DHS acted without any authority to implement the January 20 Proclamation, including canceling contracts entered into for the purpose of building the border wall.

The only possible statutory basis President Biden and DHS could have based their actions on here is that under the ICA.

But the relevant text of the ICA states that the Act is inapplicable here, where the 2020 and 2021 CAAs *mandate* the obligation or expenditure of funds related to "construction of barrier system along the southwest border." 2 U.S.C. § 681(4) ("Nothing contained in this Act, or in any amendments made by this Act, shall be construed as … superseding any provision of law which *requires* the obligation of budget authority or the making of outlays thereunder.") (emphasis added). Indeed, "[t]he plain and unambiguous language of" § 681(4) "makes clear the congressional intent that the provisions of the" ICA "shall not apply to any other act

which *mandates* the obligation or expenditure of funds[.]" *Maine v. Goldschmidt*, 494 F. Supp. 93, 98-99 (D. Me. 1980) (emphasis added).  That means that where, as here, other statutes require the obligation of appropriated funds, the ICA "cannot provide an independent statutory basis" for the President's authority to withhold funds.  *Id.* (emphasis added).

And even if the ICA applied here, the President still violated the Act.

To be sure, when the ICA applies, the President has the authority to impound, or withhold, budget authority in very limited circumstances.  These circumstances are expressly provided in the ICA and separated into two exclusive categories—deferrals and rescissions.

With a deferral, the President may temporarily withhold funds from obligation only in a limited range of circumstances: to provide for contingencies; to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or as specifically provided by law.  2 U.S.C. § 684(b).  Thus, the deferral of budget authority "for any other purpose[,]" including to advance a policy disagreement, is unlawful.  *Id.*

Proposed deferrals require the President or his agents to "transmit to the House of Representatives and the Senate a special message specifying":

(1) the amount of the budget authority proposed to be deferred;

(2) any account, department, or establishment of the Government to which such budget authority is available for obligation, and the specific projects or governmental functions involved;

(3) the period of time during which the budget authority is proposed to be deferred;

26

(4) the reasons for the proposed deferral, including any legal authority invoked to justify the proposed deferral;

(5) to the maximum extent practicable, the estimated fiscal, economic, and budgetary effect of the proposed deferral; and

(6) all facts, circumstances, and considerations relating to or bearing upon the proposed deferral and the decision to effect the proposed deferral, including an analysis of such facts, circumstances, and considerations in terms of their application to any legal authority, including specific elements of legal authority, invoked to justify such proposed deferral, and to the maximum extent practicable, the estimated effect of the proposed deferral upon the objects, purposes, and programs for which the budget authority is provided.

*Id.* § 684(a).

With a rescission, the President may seek the permanent cancelation of funds

when he

determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for which it is provided or that such budget authority should be rescinded for fiscal policy or other reasons (including the termination of authorized projects or activities for which budget authority has been provided), or whenever all or part of budget authority provided for only one fiscal year is to be reserved from obligation for such fiscal year[.]

*Id.* § 683(a).

Proposed rescissions require "the President" (and not his agents) to "transmit

to both Houses of Congress a special message specifying":

(1) the amount of budget authority which he proposes to be rescinded or which is to be so reserved;

(2) any account, department, or establishment of the Government to which such budget authority is available for obligation, and the specific project or governmental functions involved;

(3) the reasons why the budget authority should be rescinded or is

27

to be so reserved;

      (4) to the maximum extent practicable, the estimated fiscal, economic, and budgetary effect of the proposed rescission or of the reservation; and

      (5) all facts, circumstances, and considerations relating to or bearing upon the proposed rescission or the reservation and the decision to effect the proposed rescission or the reservation, and to the maximum extent practicable, the estimated effect of the proposed rescission or the reservation upon the objects, purposes, and programs for which the budget authority is provided.

*Id.*

Notably, "[a]ny amount of budget authority proposed to be rescinded or that is to be reserved as set forth in such special message *shall* be made available for obligation *unless*, within the prescribed 45-day period, the Congress has completed action on a rescission bill rescinding all or part of the amount proposed to be rescinded or that is to be reserved." *Id.* § 683(b) (emphasis added).

Here, the President has not transmitted a special message to Congress proposing either a deferral or rescission of the border wall funds at issue. The January 20 Proclamation is not a special message, and it does not purport to be one. Nor does the Proclamation assert that the President will send a special message proposing a deferral or rescission of the funds in question.

Even if the President, through the January 20 Proclamation, did transmit a special message proposing a deferral or rescission (and he did not), the Proclamation does not articulate any rationale sufficient to justify either a deferral or rescission under the ICA. Instead, the Proclamation provides only that the pause it directs is

the result of a policy disagreement with Congress (and DHS).[8]

Because the President's actions constitute neither a deferral nor rescission, the funds appropriated under the 2020 and 2021 CAAs have been unlawfully impounded since the Proclamation's directives took effect in January 2021. Accordingly, President Biden's and DHS's refusal to spend funds appropriated by Congress mandating the construction of a wall along the southwest border, and DHS's subsequent termination of contracts to perform work on construction projects to build the wall, constitutes an unlawful impoundment of funds under the ICA.

### C. The January 20 Proclamation and DHS's actions implementing it are contrary to the Separation of Powers, in violation of the APA.

DHS's actions implementing the January 20 Proclamation also violate the APA because they are contrary to the Separation of Powers guaranteed in the Constitution. *See California v. Trump*, 963 F.3d 926, 943 (9th Cir. 2020) (under the APA, States have an "interest in reinforcing … structural separation of powers principles").

Defendants' actions in refusing to spend duly enacted appropriations violate the Separation of Powers because the Constitution grants Congress, not the President, the exclusive power of the purse, and neither the President nor his subordinates had unilateral authority to refuse to spend funds appropriated by Congress due to policy objections.

---

[8] And even if the President were to now transmit a sufficient special message, it would consist of impermissible *post hoc* rationalization. *See Regents*, 140 S. Ct. at 1908.

The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). And "Congress's power to spend is directly linked to its power to legislate." *Id.*

Nothing in the Constitution " 'authorizes the President to enact, to amend, or to repeal statutes.' " *Id.* at 1232 (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)).

Save for the power of veto, "the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *Id.* "Simply put," " 'the President does not have unilateral authority to refuse to spend the funds.' " *Id.* (quoting *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013)). "And, 'the President may not decline to follow a statutory mandate or prohibition simply because of policy objections.' " *Id.* (quoting *In re Aiken*, 725 F.3d at 259). "[I]f the decision to spend is determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Id.* (cleaned up).

At bottom, "when it comes to spending, the President has none of his own constitutional powers to rely upon." *Id.* at 1233-34 (quotations omitted).

Here, "[n]ot only has the [Biden] Administration claimed for itself Congress's exclusive spending power, it has also attempted to coopt Congress's power to legislate." *Id.* at 1234. "Absent congressional authorization," as is the case here, "the Administration may not … withhold properly appropriated funds in order to effectuate its own policy goals." *Id.* at 1235. Where, as here, the President has taken

30

such action, his Proclamation (and DHS's actions implementing it) "violates the constitutional principle of the Separation of Powers." *Id.*

President Biden's and DHS's refusal to spend funds appropriated by Congress mandating the construction of a wall along the southwest border, and DHS's subsequent termination of contracts to perform work on construction projects to build the wall, violates the constitutional principle of the separation of powers, pursuant to which the Constitution committed the spending power to Congress. Unconstitutional agency action or inaction violates the APA. *See* 5 U.S.C. § 706.

Constitutional violations are also actionable independent of the APA. Indeed, federal courts have long exercised the power to enjoin federal officers from violating the Constitution, pursuant to their inherent equitable powers. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England"). Plaintiffs have a cause of action "*at equity*[.]" *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 475 (5th Cir. 2020) (en banc). "Equity thus provides the basis for relief—the cause of action, so to speak"—when a plaintiff seeks prospective relief for a constitutional violation committed by a federal official. *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1232 (10th Cir. 2005) (McConnell, J.).

As a result, even if the Court were to disagree with Plaintiffs' arguments relating to the APA, that would not affect their right to relief on the constitutional claim. *See Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (APA's reviewability limitation in Section 701 "serves only to take away what the APA has

otherwise given—namely, the APA's own guarantee of judicial review," "not repeal the review of *ultra vires* actions that was recognized long before" the APA); *Simmat*, 413 F.3d at 1233 n.9 (allowing the plaintiff's constitutional claim to proceed even though he "appear[ed] to concede that his claim does not satisfy the APA's requirement of 'final agency action'").

### D. The January 20 Proclamation and DHS's actions implementing it are contrary to the Take Care Clause of the Constitution, in violation of the APA.

DHS's actions implementing the January 20 Proclamation also violate the APA because they are contrary to the Take Care Clause of the Constitution, the constitutional obligation that the President and his subordinates "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. By refusing to follow Congress's commands in the 2020 and 2021 CAAs, the President (and DHS through its implementation of the January 20 Proclamation) has violated the Constitution independent of the separation-of-powers violation.[9]

The President and those who work for him in the Executive Branch are obligated to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3; *San Francisco*, 897 F.3d at 1234. This constitutional limitation is binding on agencies and officers exercising executive power. *See* U.S. CONST. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President).

The January 20 Proclamation and DHS's actions implementing it violate that constitutional obligation. As explained above, the Proclamation and June 11 and

---

[9] Like the separation-of-powers violation, the Take-Care violation is actionable under the APA and independent of the APA. *See supra* Part I.C.

October 8 announcements implementing it contradict federal law and undermine Congress's exclusive power of the purse.

"Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations." *San Francisco*, 897 F.3d at 1233-34. "Moreover, the obligation is an affirmative one, meaning that failure to act may be an abdication of the President's constitutional role." *Id.*

"As then-Assistant Attorney General William Rehnquist noted in 1969, '[w]ith respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.'" *Id.* (quoting Office of Legal Counsel, Memorandum Opinion on Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, at 8 (Dec. 1, 1969)).

"And, even if the President's duty to execute appropriations laws was once unclear, Congress has affirmatively and authoritatively spoken" through the Impoundment Control Act of 1974. *Id.* (citing 2 U.S.C. §§ 681–688 (establishing congressional oversight when the Executive proposes to defer or rescind budget authority)).[10]

---

[10] Through the ICA, Congress sought "to restore responsibility for the spending policy of the United States to the legislative branch. ... No matter how prudently Congress discharges its appropriations responsibility, legislative decisions have no meaning if they can be unilaterally abrogated by executive impoundments." H.R. Rep. No. 93-658, *as reprinted in* 1974 U.S.C.C.A.N. 3462, 3463; *see also* S. Rep. No. 93-688, *as reprinted in* 1974 U.S.C.C.A.N. 3504, 3572–3575 (collecting cases "consistently den[ying]" the Executive Branch's attempts to refuse spending as a

President Biden's and DHS's refusal to spend funds appropriated by Congress mandating the construction of a wall along the southwest border, and DHS's subsequent termination of contracts to perform work on construction projects to build the wall, violate the President's affirmative obligation to faithfully execute the 2020 and 2021 CAAs, in violation of the Take Care Clause.  Thus, by canceling the border wall contracts and otherwise refusing to spend any money on actual construction of border barriers, DHS is precluded from complying with Congress's mandate in the 2020 and 2021 CAAs because cancelation of those contracts ensures that the southwest border wall will be left unfinished.  Failure to comply with Congress's mandate is unlawful, and thus DHS acted without legal authority.

### E.    No Procedural Issue Precludes this Court's Review.

Defendants cannot avoid this Court's review by raising non-merits arguments.

### 1.    <u>The Plaintiff States have standing to bring these claims.</u>

The Plaintiff States have standing to challenge Defendants' refusal to spend congressional appropriations mandating the construction of the southwest border wall and the termination of contracts regarding the same for the same reasons these same States had standing to challenge the termination of the Migrant Protection Protocols.  *See Texas*, 10 F.4th at 545-49.

Plaintiffs also have standing to challenge Defendants' actions for the same reasons that Texas has had standing to challenge other federal agency actions related to immigration.  *See Texas v. United States*, 809 F.3d 134, 150-62 (5th Cir. 2015)

---

means "to achieve less than the full objectives and scope of programs enacted and funded by Congress").

(DAPA); *Texas*, 524 F. Supp. 3d at 617-29 (100-day pause on removals); *Texas v. United States*, 328 F. Supp. 3d 662, 690-705 (S.D. Tex. 2018) (Hanen, J.) (DACA).

Missouri and Texas can establish significant injuries, including millions of dollars of financial harm, but the magnitude of those injuries is not relevant to the standing inquiry. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an injury.") (internal quotation marks omitted). Plaintiffs' standing is especially clear in light of the "special solicitude" federal courts give States when considering standing. *Massachusetts v. EPA*, 549 U.S. 497, 520, 520 (2007) (cited in *Texas*, 10 F.4th at 548).

Missouri and Texas are entitled to special solicitude here because they both (1) have a procedural right under the APA to challenge Defendants' actions, 5 U.S.C. § 702; *see Texas*, 809 F.3d at 152 ("In enacting the APA, Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, [5 U.S.C. § 702] and the states fall well within that definition."), and (2) the challenged actions affect their quasi-sovereign interests. *Texas*, 10 F.4th at 549 (quoting *Massachusetts*, 549 U.S. at 520). Indeed, the States have a quasi-sovereign interest because their challenge "involve[s] an agency's alleged failure to protect certain formerly 'sovereign prerogatives [that] are now lodged in the Federal Government.' " *Id.* Missouri and Texas here, like Massachusetts, have "surrendere[d] certain sovereign prerogatives" and "cannot invade" or "negotiate [a] treaty" to address the problems created by the Executive Branch's actions. *Massachusetts*, 549 U.S. at 519.

35

Defendants' refusal to spend congressional appropriations mandating the construction of the southwest border wall and the termination of contracts regarding the same will lead to additional illegal aliens being present in Missouri and Texas. Indeed, DHS's 2018 assessment concluded that border wall construction in a single sector had decreased border apprehensions by 90 percent.  App.008.  And DHS's 2020 assessment concluded that illegal entries significantly decreased in at least three different sectors along the southwest border.  App.011-12.

Thus, termination of border wall construction necessarily increases the number of aliens admitted into the United States.  Some of those aliens present in Missouri and Texas will apply for driver's licenses, and will use state-funded healthcare and public education services.  *Texas*, 10 F.4th at 546-48.  "The causal chain is easy to see[.]"  *Id.* at 548 (citing *Massachusetts*, 549 U.S. at 523) (traceability present where EPA's challenged action might cause individuals to drive less fuel-efficient cars, which in turn may contribute to a rise in sea levels, which may then cause erosion of coastline)).  Defendants' illegal cessation of border-wall construction causes Missouri and Texas to incur unrecoverable increased costs from the influx of additional illegal aliens who would have otherwise been deterred by the "extremely effective" border wall from crossing the border in the first place.

It is not "mere speculation" that at least some individuals who otherwise would not have illegally crossed the border because of the "extremely effective" border wall both have and will come to the States and seek a driver's license, medical care, or public education.  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019); App.003

36

¶11, 064-83, 098–128, 129-63; 098–128.   Rather it is the "predictable effect of government action on the decisions of third parties." *Dep't of Com.*, 139 S. Ct. at 2566.

There's no question illegal aliens not prevented or deterred from crossing into the United States by border barriers will settle in Texas and Missouri.  "Texas is a border state" and "[s]tatistically, for every 1,000 aliens who remain unlawfully in the United States, fifty-six end up residing in Missouri." *Texas*, 2021 WL 3603341, at *9 (citing Pew Research Center, *U.S. unauthorized immigrant population estimates by state, 2016* (Feb. 5, 2019), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/); App.067, 098–110.   This injures Missouri and Texas because, like other States, they "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397.

It's also indisputable that these States will incur additional costs due to the increase of illegal aliens undeterred from crossing the border.

First, consider the costs that additional illegal aliens impose on the States' driver's license programs—i.e., "the driver's-license rationale" the Fifth Circuit has approved as a basis for Article III standing.  *See, e.g.*, *Texas*, 809 F.3d at 150, 155.

Recently, Defendants submitted a report in another case—required by a permanent injunction—showing that, of almost 90,000 aliens arriving at the border for the month of September 2021, they had released over 45,000 into the United States, including over 24,000 through parole.  *See* ECF No. 112-1, *Texas v. Biden*, No. 2:21-cv-067-Z (N.D. Tex.).  "And parole *does* create affirmative benefits for aliens such as work authorization."  *Texas*, 2021 WL 3603341, at *16 (emphasis in original);

37

App.089. Texas law subsidizes driver's licenses, including for noncitizens who have "documentation issued by the appropriate United States agency that authorizes [them] to be in the United States." *Texas*, 10 F.4th at 547 (quoting TEX. TRANSP. CODE § 521.142(a)); App.129-41. Aliens unlawfully present in Texas thus will be eligible for subsidized driver's licenses.[11] The Chief of the Texas Department of Public Safety's Driver License Division has submitted a declaration estimating the costs of issuing additional licenses to aliens. App. 129-41. If Defendants' termination of border wall construction results in some additional aliens seeking licenses, it will cost Texas money. App.131-32 ¶8; *cf. Texas*, 809 F.3d at 155 ("Even a modest estimate would put the loss at 'several million dollars.'"). "Paroled and released aliens seeking to obtain driver's licenses is the 'the predictable effect of Government action on the decisions of third parties.'" *Texas*, 2021 WL 3603341, at *11 (quoting *Dep't of Com.*, 139 S. Ct. at 2566).

Thus, by enabling more aliens to secure subsidized licenses, terminating "extremely effective" security measures such as border wall construction injures Texas. *See Texas*, 10 F.4th at 545-49.

"Missouri likewise faces a cost of verifying lawful immigration status for each additional customer seeking a Missouri driver's license." *Texas*, 2021 WL 3603341, at *10; App.070.

"Driver's licenses aside," the States here have "equally strong bases for"

---

[11] Tex. Dep't of Public Safety, *Verifying Lawful Presence* 4 (Rev. 7-13), https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifying lawfulpresence.pdf, App.135-41. (listing "Parolees" as eligible for driver's licenses).

standing with respect to educational and healthcare costs when additional illegal aliens are present. *Texas*, 10 F.4th at 547-48. Courts have found these injuries sufficient to support standing in other challenges to federal agency actions related to immigration. *See, e.g.*, *Texas*, 524 F. Supp. 3d at 617-29; *Texas*, 328 F. Supp. 3d at 690-705. They likewise support standing in this case. Texas and Missouri "bear the costs of providing these social services required by federal law, and the [termination of border wall construction] increases the volume of individuals to whom they must provide these services." *Texas*, 328 F. Supp. 3d at 700.

*Education*. The termination of border wall construction injures Missouri and Texas by increasing their public-education costs. *See, e.g.*, *Texas*, 2021 WL 3603341, at *10 ("The total costs to Texas (and Missouri) of providing public education for illegal alien children will rise in the future as the number of illegal alien children present in the State increases."); *accord Texas*, 10 F.4th at 545-49. Under Supreme Court precedent, federal law requires States to provide public education to illegal alien children. *See Plyler v. Doe*, 457 U.S. 202, 205, 230 (1982) (Constitution prohibits States from "deny[ing] to undocumented school-age children the free public education that it provides to children who are citizens of the United States or legally admitted aliens"). Thus, some aliens and the children of those aliens receive education benefits from the States at taxpayer expense.

The annual cost of educating unaccompanied alien children—a subset of illegal aliens eligible for public education—cost Texas tens of millions of dollars each year from FY 2016 through FY 2019, more than $112 million in FY 2020, almost $27

39

million in FY 2021, and more than $151 million projected for FY 2022.  App.143-44

¶4.  The Associate Commissioner for School Finance/Chief School Finance Officer at

the Texas Education Agency "anticipate[s] that the total costs to the State of

providing public education to [unaccompanied alien children] will rise in the future

to the extent that the number of [unaccompanied alien children] enrolled in the

State's public school system increases."  App.144 ¶7.  "Texas incurs real financial

costs in providing public education to unaccompanied children.  And the harm is

imminent because Texas is currently providing public education to unaccompanied

children and demonstrates plans to continue doing so in the future." *Texas*, 524 F.

Supp. 3d at 621.

Missouri is similarly injured.  It spent an average of $10,654 per student in

school year 2019-2020 regardless of immigration status.  App.072 ¶3, 080.  A 2018

study shows that 3,000 illegal alien school-aged children were enrolled in Missouri

schools.  App.060.  Missouri's public-education costs on unlawful aliens is not pocket

change.  And if Defendants continue allowing additional illegal aliens into the country

rather than implementing security measures that deter illegal crossings (such as

construction of border walls), Missouri's education costs will continue to rise.

These education costs are independently sufficient for standing.  They have

repeatedly supported standing to challenge federal agency action relating to

immigration. *See Texas*, 10 F.4th at 548; *Texas*, 524 F. Supp. 3d at 626-27; *Texas*,

328 F. Supp. 3d at 700.

*Healthcare*.  Additionally, some aliens unlawfully present in the United States

40

"will use state-funded healthcare services or benefits in Texas and Missouri." *Texas*, 2021 WL 3603341, at *10.  Indeed,

> Texas funds three healthcare programs that require significant expenditures to cover illegal aliens: the Emergency Medicaid Program, the Family Violence Program, and the Texas Children's Health Insurance Program.  Texas is required by federal law to include illegal aliens in its Emergency Medicaid Program.  42 C.F.R. § 440.255(c). Texas also incurs costs for uncompensated care provided by state public hospital districts to illegal aliens.  The total costs to the State will increase as the number of aliens within the state increases.  Missouri is similarly situated.

*Id.* (citations omitted); *see also* App.155-58 ¶¶6–10 (Texas healthcare costs), App.071 (Missouri healthcare costs).  So long as Missouri and Texas spend *some* money (and they undoubtedly do spend money), they have established injury in fact.  These healthcare costs are independently sufficient injuries in fact.  *See, e.g.*, *Texas*, 10 F.4th at 547–548; *Texas*, 328 F. Supp. 3d at 700.[12]

*Tax revenue*.  Texas also faces loss of specific tax revenues from the termination of contracts for the construction of the southwest border wall within the State.  As in *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), DHS's terminations here "directly affect[]" Texas's "ability to collect" specific taxes, including franchise taxes.  *Id.* at 451.

Texas imposes a franchise tax on each taxable entity that does business in, or is chartered or organized in, the State.  *See* TEX. TAX. CODE § 171.001(a).  Codified in Chapter 171 of the Tax Code, *see id.* §§ 171.0001–.908, the franchise tax represents a

---

[12] Texas has provided more recent and more detailed information concerning healthcare expenses than it did in *Texas*, 524 F. Supp. 3d at 621.

tax on the value and privilege of doing business in Texas. *Combs v. Newpark Res., Inc.*, 422 S.W.3d 46, 47 (Tex. App.—Austin 2013, no pet.). The franchise tax is "based primarily on revenue." *In re Nestle USA*, 387 S.W.3d 610, 614 (Tex. 2012).

Generally, a taxable entity's franchise-tax liability is calculated by first determining the entity's "margin," which is the lesser of 70% of the taxable entity's total revenue, or the entity's total revenue minus certain expenditures as allowed by Chapter 171. *See* TEX. TAX CODE §§ 171.101(a)(1) (determination of taxable entity's "margin"), 171.1011(c) (calculation of total revenue). "[D]oing more business in Texas generally results in higher franchise taxes." *OGCI Training, Inc. v. Hegar*, No. 03-16-00704-CV, 2017 WL 4899015 at *1 (Tex. App.—Austin Oct. 27, 2017, no pet.) (mem. op.) (citing *Southwestern Bell Tel. Co. v. Combs*, 270 S.W.3d 249, 258 (Tex. App.—Amarillo 2008, pet. denied)). The entity's franchise-tax obligation is determined by multiplying the "taxable margin" by the applicable tax rate. *See* TEX. TAX CODE § 171.002 ("Rates; Computation of Tax"). As the termination of construction of the border wall in Texas results in lower margins for activity facing the franchise tax, this will lead to reduced revenue to the State of Texas.

*Mitigation Measures.* Texas has also had to spend its own money on border barriers as a direct result of the federal government's continued failure to build the wall, and specifically due to the Biden Administration's unlawful termination of border-wall contracts and refusal to spend money as directed by Congress.

The failure of DHS to perform its duties has led to Texas having to mitigate the damage through its own funds and actions. The Texas Legislature passed and

Governor Abbott recently signed House Bill 9, which allocates $1.8 billion in funding for border security personnel, equipment, jail space, and, most relevant here, a border wall.[13]   Of that $1.8 billion, about $750 million is dedicated to the construction of border barriers.[14]   This is on top of the $250 million Texas transferred in June 2021 from the Texas Department of Criminal Justice to assist with construction.[15]   What's more, the Texas Department of Transportation in June 2021 awarded a $25 million contract for a barrier in Eagle Pass.[16]   And in September 2021, the Texas Facilities Commission approved an $11 million contract to manage border-wall construction budgets, identify state land appropriate for wall construction, and find private landowners to facilitate construction.[17]

> 2.   DHS's actions implementing the January 20 Proclamation are subject to judicial review.

DHS's actions implementing the January 20 Proclamation are reviewable under the APA.  *See* 5 U.S.C. § 701.

---

[13] Text of HB 9, Texas Legislature, 87th Session, Second Special Session, https://capitol.texas.gov/BillLookup/Text.aspx?LegSess=872&Bill=HB9#.

[14] *Senate Panel Approves Almost $2 Billion in Border Security Funding*, TEXAS SENATE NEWS, (Aug. 30, 2021), https://senate.texas.gov/news.php?id=20210830a.

[15] June 16, 2021, Letter from Gov. Greg Abbott to Bryan Collier, https://gov.texas.gov/uploads/files/press/O-CollierBryan202106162544.pdf.

[16] *See* Uriel J. García, State agency recommends two firms to oversee construction of Gov. Greg Abbott's Texas–Mexico border wall, SAN ANTONIO EXPRESS-NEWS, (Sept. 9, 2021, 6:39 p.m. CST), https://www.expressnews.com/news/border-mexico/article/State-agency-recommends-two-firms-to-oversee-16447399.php.

[17] *See* Uriel J. García, *State agency awards $11 million contract to oversee construction of Gov. Greg Abbott's Texas–Mexico border wall*, TEXAS TRIBUNE, Sept. 16, 2020, 10:00 a.m. CST), https://www.texastribune.org/2021/09/16/texas-mexico-border-wall-contract/.

*First*, no "statutes preclude judicial review." 5 U.S.C. § 701(a)(1); *see Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 n.4 (1986). "Establishing *un*reviewability is a 'heavy burden' and 'where substantial doubt about congressional intent exists, the general presumption favoring judicial review of administrative action is controlling.' " *Texas*, 809 F.3d at 164 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984) (emphasis added)). "The APA creates a 'basic presumption of judicial review.' " *Texas*, 10 F.4th at 550 (quoting *Regents*, 140 S. Ct. at 1905). "And to vindicate that presumption, the Supreme Court has read § 701(a)(2) 'quite narrowly.' " *Id.* Section 701(a)(2) is confined "to those rare administrative decisions traditionally left to agency discretion." *Regents*, 140 S. Ct. at 1905 (cleaned up). These limited categories include: (1) a "decision not to institute enforcement proceedings," *id.* (citing *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985)); (2) "a decision not to reconsider a final action," *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (citing *ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987)); (3) "a decision . . . to terminate an employee in the interests of national security," *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (citing *Webster v. Doe*, 486 U.S. 592, 599-601 (1988)); and (4) "[t]he allocation of funds from a lump-sum appropriation." *Id.* None of those limited categories apply here.

Further, no provision of the 2020 and 2021 CAAs prohibits judicial review here. The Court may review Defendants' refusal to spend appropriated funds and termination of border wall construction just as much as the Fifth Circuit found rescission of MPP was reviewable, *Texas*, 10 F.4th at 549-52, and found DAPA

reviewable, *Texas*, 809 F.3d at 164, and the Supreme Court found rescission of DACA was reviewable. *See Regents*, 140 S. Ct. at 1907. Plaintiff States, like the Plaintiff States in MPP and DAPA, want Defendants to comply with federal statutes and cease implementation of an unlawful Proclamation.

Thus, any reviewability argument made by Defendants would fail for the reasons explained above. But even if Defendants' actions were not reviewable under the APA, that would not preclude the Court from considering claims based on Separation of Powers and the Take Care Clause. Those claims are properly before the Court even without the APA, so Section 701 cannot be an obstacle. *See* 5 U.S.C. § 701(a) (establishing a rule for "[t]his chapter").

### 3. DHS's actions implementing the January 20 Proclamation constitute final agency action.

The refusal to spend appropriated funds to build the southwest border wall and cancelation of the remaining contracts regarding the same constitute final agency action under the APA. *See* 5 U.S.C. § 704 (the APA allows judicial review for "final agency action for which there is no other adequate remedy in a court").

Agency action is "final" for the purposes of judicial review if two conditions are met: "First, the action must mark the consummation of the agency's decision making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation marks omitted). "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as flexible." *Texas v.*

*EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (cleaned up).

The January 20 Proclamation "immediately" paused "the obligation of funds related to construction of the southern border wall"—including for "direct appropriations" such as the 2020 and 2021—and "pause[d] "as soon as possible" but "no … later than seven days" from the date the Proclamation was issued any "work on each construction project on the southern border wall[.]" App.021-22.   The Proclamation issued these directives to DHS personnel and, on October 8, DHS canceled "the remaining border barrier contracts" and declared that its future "activities will not involve any construction of new border barrier or permanent land acquisition." App.055.

None of these actions is tentative.  "The immediacy of the implementation . . . demonstrates DHS's decision . . . is final." *Texas*, 524 F. Supp. 3d at 642.

The January 20 Proclamation and DHS's actions implementing it also determine rights and obligations.  Federal officials were immediately obligated to expend appropriated funds to build a border wall in the southwest to reduce illegal alien crossings, but the Proclamation "alter[ed]" that obligation.  *Id.* at 643.  The cancelation of contracts with vendors who would have constructed border barriers also determines rights and obligations under those contracts—by terminating them. The Proclamation also relieves illegal aliens from the prospect of being apprehended and removed and thus constitutes a significant benefit to them.  *See id.* (finding final agency action where a memorandum affected aliens).  And Plaintiffs will be obligated to provide social services to illegal aliens who remain unlawfully in the United States.

46

*See Texas*, 328 F. Supp. 3d at 731, 737 (DACA "impacts the obligations of the individual States" because "the program requires states to spend money on various social services" and "the program affects the obligations of the United States Government" because "it obligates the Government to forebear from implementing immigration enforcement proceedings"). Additionally, the January 20 Proclamation causes "legal consequences" such as taking away an "extremely effective" tool previously available to DHS to reduce illegal crossings. *See Texas*, 10 F.4th at 550. No more is required.

In any event, "final agency action" is a requirement of the APA, not the Constitution, so it does not affect Plaintiffs' other claims. 5 U.S.C. § 704.

## II. Missouri and Texas Will Suffer Irreparable Harm if an Injunction Is Not Granted.

Each of the foregoing numerous flaws renders DHS's decisions legally invalid. Yet those invalid acts will cause Missouri and Texas irreparable injury that cannot be remedied adequately at law. Texas and Missouri are therefore entitled to injunctive relief to enforce DHS's obligations under the applicable law.

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, "[t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.* (footnote omitted).

Plaintiffs can readily make this showing. They face significant financial costs.

*See supra* Part I.E.1.  These increased financial expenditures will irreparably harm the States because they cannot recover the money from the federal government. *See Texas*, 10 F.4th at 559 ("The district court concluded that the States have suffered, and will continue to suffer, harms as a result of the termination of MPP. We agree.  A stay would enable aliens released into the interior to apply for driver's licenses and other benefits, and it would be difficult for the states to retract those benefits or recoup their costs even if they won on the merits.") (cleaned up); *Texas*, 809 F.3d at 186; *Texas*, 524 F. Supp. 3d at 663 ("[N]o Party has suggested that Texas could recover any of its likely financial injury here, and the Court cannot conceive of any path for Texas to pierce the federal government's usual sovereign immunity or contrive a remedial cause of action sufficient to recover from its budgetary harm."); *Texas*, 328 F. Supp. 3d at 737 (state's financial injury was irreparable because "there is no source of recompense").

The January 20 Proclamation deprived the States of the ability to adjust their policies in light of the sudden federal shift from "walls work" to "walls [don't] work." The harms to Missouri and Texas are particularly acute where their budgets have been set months or years in advance and they have no time to adjust their budgets to respond to DHS's policy changes.

## III.   The Equities and Public Interest Overwhelmingly Favor an Injunction.

The States have satisfied "the first two factors," and they can readily satisfy the last two—which call for "assessing the harm to the opposing party and weighing the public interest." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  "These factors merge

48

when the Government is the opposing party." *Id.*

The threat of injury to Missouri and Texas outweighs any potential harm to Defendants. In fact, Defendants face no cognizable harm from a preliminary injunction. They have no legitimate interest in the implementation of an unlawful Proclamation. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.") (cited in *Texas*, 10 F.4th at 560); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (recognizing that government officials "do[] not have an interest in the enforcement of an unconstitutional law"); *Texas*, 524 F. Supp. 3d at 665. But even if Defendants had a legitimate interest in implementing the January 20 Proclamation, they face no substantial prejudice from a delayed implementation. And they face no conceivable injury from expending funds to construct border barriers in accord with Congress's unambiguous instructions—indeed, they are prohibited by law from using those funds for any other purpose.

Further, the public interest strongly favors Plaintiffs. First, the public interest is served "in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994) (cited in *Texas*, 10 F.4th at 559-60). That includes following the APA and the 2020 and 2021 CAAs. Put another way, "the public is served when the law is followed, and the public will indeed be served if DHS is enjoined from suspending the law." *Texas*, 524 F. Supp. 3d at 665 (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)).

49

Second, "the public interest favors Plaintiffs because the public has an 'interest in stemming the flow of illegal immigration.' " *Texas*, 2021 WL 3603341, at *26 (quoting *United States v. Escobar*, No. 2:17-CR-529, 2017 WL 5749620 at *2 (S.D. Tex. Nov. 28, 2017) (citing *United States v. Martinez–Fuerte*, 428 U.S. 543, 556–58 (1976)). As DHS acknowledged in both 2018 and 2020, border walls remove a powerful incentive in favor of illegal border crossings.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for preliminary-injunctive relief.

Date: November 8, 2021

ERIC S. SCHMITT
Attorney General of Missouri

D. JOHN SAUER, #58720MO*
Solicitor General

/s/ *Jesus A. Osete*
JESUS A. OSETE, #69267MO*
Deputy Attorney General
for Special Litigation

MADDIE M. GREEN, #73724MO*
Assistant Attorney General
for Special Litigation

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-1800
Fax (573) 751-0774
John.Sauer@ago.mo.gov
Jesus.Osete@ago.mo.gov
Maddie.Green@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

*Admitted pro hac vice*

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Tex. State Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

AARON F. REITZ
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
Southern Dist. of Texas Bar No. 3653771

/s/ *Ryan D. Walters*
RYAN D. WALTERS
*Attorney-in-Charge*
Special Counsel, Special Litigation Unit Texas
Bar No. 24105085
Southern Dist. of Texas Bar No. 3369185

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
aaron.reitz@oag.texas.gov
ryan.walters@oag.texas.gov

*Counsel for Plaintiff State of Texas*

## CERTIFICATE OF CONFERENCE

I certify that, on November 8, 2021, I conferred with Defendants' counsel, who represented that Defendants oppose this motion.

/s/ *Jesus A. Osete*
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that on November 8, 2021, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

/s/ *Jesus A. Osete*
Counsel for Plaintiffs