## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSOURI, and | § § § | |
| THE STATE OF TEXAS, | § § | |
| Plaintiffs, | § § | Case No. 7:21-cv-00420 (formerly 6:21-cv-00052) |
| v. | § § | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*, | § § § § | |
| Defendants. | § § | |

## APPENDIX IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

| Description | Page(s) |
|---|---|
| Declaration of Maddie M. Green | App. 001–003 |
| Exhibit A to Green Declaration – Department of Homeland Security's publication dated December 12, 2018: "Walls Work" | App. 004–008 |
| Exhibit B to Green Declaration – Department of Homeland Security's publication dated October 29, 2020: "The Border Wall System is Deployed, Effective, and Disrupting Criminals and Smugglers" | App. 009–013 |
| Exhibit C to Green Declaration – Fiscal Year 2020 Department of Homeland Security Appropriations Act, P.L. 116-93, 133 Stat. 2511, Div. D, § 209 | App. 014–016 |
| Exhibit D to Green Declaration – Fiscal Year 2021 Department of Homeland Security Appropriations Act, P.L. 116-260, 134 Stat. 1182, Div. F, § 210 | App. 017–019 |
| Exhibit E to Green Declaration – Proclamation 10142 dated January 20, 2021: "Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction" | App. 020–023 |
| Exhibit F to Green Declaration – Department of Homeland Security's publication dated June 11, 2021: "DHS Releases Plan for Use of Border Barrier Funds" | App. 024–026 |

| | |
|---|---|
| Exhibit G to Green Declaration – U.S. Government Accountability Office's decision in "Matter of Office of Management and Budget and U.S. Department of Homeland Security-Pause of Border Barrier Construction and Obligations," B-333110.1, dated June 15, 2021 | App. 027–053 |
| Exhibit H to Green Declaration – Department of Homeland Security's publications dated October 8, 2021: "DHS to Terminate Border Barrier Contracts in Laredo and Rio Grande Valley" | App. 054–056 |
| Exhibit I to Green Declaration – Migration Policy Institute publication | App. 057–063 |
| Exhibit J to Green Declaration – Pew Research Center publication | App. 064–069 |
| Declaration of Joseph Plaggenberg | App. 070 |
| Declaration of Jennifer Tidball | App. 071 |
| Declaration of Kari Monsees | App. 072 |
| Exhibit A to Monsees Declaration – Missouri Department of Elementary and Secondary Education State Report Card | App. 073–083 |
| Declaration of Ryan D. Walters | App. 084–085 |
| Exhibit A to Walters Declaration – U.S. Citizenship and Immigration Services Description of Parole | App. 086–097 |
| Exhibit B to Walters Declaration – U.S. Census Bureau Table – Geographic Mobility by Citizenship Status | App. 098–110 |
| Exhibit C to Walters Declaration – Foreign-Born Population in Texas | App. 111–126 |
| Exhibit D to Walters Declaration – Gone To Texas | App. 127–128 |
| Declaration of Sheri Gipson | App. 129–133 |
| Exhibit A to Gipson Declaration – Texas Department of Public Safety Verifying Lawful Presence | App. 134–141 |
| Declaration of Leonardo R. Lopez | App. 142–145 |
| Exhibit A to Lopez Declaration – Department of Health and Human Services Office of Refugee Resettlement publication dated June 24, 2021: "Unaccompanied Children Released to Sponsors by State" | App. 146–153 |
| Declaration of Lisa Kalakanis | App. 154–159 |
| Exhibit A to Kalakanis Declaration – Texas Health and Human Services Commission methodology for estimating the percent for undocumented clients | App. 160–163 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| THE STATE OF MISSOURI; and | ) |
| | ) |
| THE STATE OF TEXAS, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )   Case No. 6:21-cv-00052 |
| | ) |
| JOSEPH R. BIDEN, JR., | ) |
| in his official capacity as | ) |
| President of the United States of | ) |
| America, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |

## DECLARATION OF MADDIE M. GREEN

1. My name is Maddie M. Green.  I am an Assistant Attorney General for Special Litigation in the Office of the Missouri Attorney General.  I am over 21 years of age and competent to testify to the matters asserted herein.

2. Attached hereto as **Exhibit A** is a true and correct copy of the Department of Homeland Security's publication entitled *Walls Work*, dated December 12, 2018, which is publicly available on DHS's website at https://www.dhs.gov/news/2018/12/12/walls-work.

3. Attached hereto as **Exhibit B** is a true and correct copy of the Department of Homeland Security's publication entitled *The Border Wall System is Deployed, Effective, and Disrupting Criminals and Smugglers*, dated October 29, 2020, which is publicly available on DHS's website at https://www.dhs.gov/news/2020/10/29/border-wall-system-deployed-effective-and-disrupting-criminals-and-smugglers.

4. Attached hereto as **Exhibit C** is a true and correct copy of the relevant pages of the Fiscal Year 2020 Department of Homeland Security Appropriations Act, P.L. 116-93, 133 Stat. 2511, Div. D, § 209, which was passed as part of the Consolidated Appropriations Act of 2020, and is publicly available on the U.S. Government Publishing Office's website at https://www.govinfo.gov/content/pkg/PLAW-116publ93/pdf/PLAW-116publ93.pdf.

5. Attached hereto as **Exhibit D** is a true and correct copy of the relevant pages of the Fiscal Year 2021 Department of Homeland Security Appropriations Act, P.L. 116-260, 134 Stat. 1182, Div. F, § 210, which was passed as part of the Consolidated Appropriations Act of 2021, and is publicly available on the U.S. Government Publishing Office's website at https://www.govinfo.gov/content/pkg/BILLS-116hr133enr/pdf/BILLS-116hr133enr.pdf.

6. Attached hereto as **Exhibit E** is a true and correct copy of Proclamation 10142 entitled *Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction*, dated January 20, 2021, which is publicly available on the *Federal Register* at https://www.federalregister.gov/documents/2021/01/27/2021-01922/termination-of-emergency-with-respect-to-the-southern-border-of-the-united-states-and-redirection-of.

7. Attached hereto as **Exhibit F** is a true and correct copy of the Department of Homeland Security's publication entitled *DHS Releases Plan for Use of Border Barrier Funds*, dated June 11, 2021, which is publicly available on DHS's website at https://www.dhs.gov/news/2021/06/11/dhs-releases-plan-use-border-barrier-funds.

8. Attached hereto as **Exhibit G** is a true and correct copy of the U.S. Government Accountability Office's decision in *Matter of Office of Management and Budget and U.S. Department of Homeland Security-Pause of Border Barrier Construction and Obligations*, B-333110.1, dated June 15, 2021, which is publicly available on GAO's website at https://www.gao.gov/assets/b-333110.pdf.

9. Attached hereto as **Exhibit H** is a true and correct copy of the Department of Homeland Security's publication entitled *DHS to Terminate Border Barrier Contracts in Laredo and Rio Grande Valley*, dated October 8, 2021, which is publicly available on DHS's website at https://www.dhs.gov/news/2021/10/08/dhs-terminate-border-barrier-contracts-laredo-and-rio-grande-valley.

10. A 2018 study shows that an estimated 3,000 illegal alien school-aged children were enrolled in Missouri schools. Migration Policy Institute, *Profile of the Unauthorized Population: Missouri*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/MO. A true and correct copy of this publication is attached hereto as **Exhibit I**.

11. Statistically, for every 1,000 aliens who remain unlawfully in the United States, fifty-six end up residing in Missouri. Pew Research Center, *U.S. unauthorized immigrant population estimates by state, 2016* (Feb. 5, 2019), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/. A true and correct copy of this publication is attached hereto as **Exhibit J**.

I swear or affirm under penalty of perjury that the foregoing is true and correct.

Dated: 10-28-21

*Maddie M. Green*
Maddie M. Green

App.003

# EXHIBIT A

 Official website of the Department of Homeland Security



**U.S. Department of Homeland Security**

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Walls Work

**Release Date:** December 12, 2018

**WE ARE BUILDING THE FIRST NEW BORDER WALL IN A DECADE**.

DHS is committed to building a wall at our southern border and building a wall quickly. Under this President, we are building a new wall for the first time in a decade that is 30-feet high to prevent illegal entry and drug smuggling.

**FACT:** Prior to President Trump taking office, we have never built a border wall that high.

Once funding was provided, DHS began construction of a border wall quickly, in some locations in as little as nine months from funding to building – a process that commonly takes two years or more in other parts of Government. By the end of FY 2019, DHS expects to have construction completed or underway for more than 120 miles in the areas it's most needed by the U.S. Border Patrol. The pace of construction has picked up as initial limiting factors like land acquisition and funding have been addressed.

*Before*                                    *After*



*The El Centro Sector built approximately two miles of 30' steel bollard wall west of the Calexico West Port of Entry. The contract was awarded in November 2017, construction started in February 2018 and was completed in October 2018.*

In FY 2017 Congress provided DHS $292 million to build 40 miles of a steel bollard wall in the San Diego, El Centro and El Paso Sectors – Border Patrol's highest priority locations – in place of an outdated and operationally ineffective barrier. DHS received its FY17 funding for border wall construction in May 2017. DHS awarded the first contract against that funding in November 2017 and began construction three months later in February 2018. As of November 21, 2018, CBP has constructed more than 31 of the 40 miles with the remaining 9 miles scheduled for completion by early 2019.

- **El Centro Project (2.25 miles):** Completed.
- **El Paso Project (20 miles):** Completed
- **San Diego Primary Project (14 miles):** Completion anticipated in May 2019.
- **El Paso Project (4 miles):** Construction started in September.

*Before*                                    *After*



*The El Centro Sector built approximately two miles of 30' steel bollard wall west of the*

*Calexico West Port of Entry. The contract was awarded in November 2017, construction started in February 2018 and was completed in October 2018.*

*How effective is this new border wall?* On Sunday, when a violent mob of 1,000 people stormed our Southern border, we found the newly constructed portions of the wall to be very effective.  In the area of the breach, a group of people tore a hole in the old landing mat fence constructed decades ago and pushed across the border.  U.S. Border Patrol agents who responded to the area ultimately dispersed the crowd, which had become assaultive, and apprehended several individuals.  All of the individuals were either apprehended or retreated into Mexico.  That evening, the fence was repaired.  There were no breaches along the newly constructed border wall areas.

In FY18, Congress provided $1.375B for border wall construction which equates to approximately 84 miles of border wall in multiple locations across the Southwest border, including:

- $251M for a secondary border wall in the San Diego Sector
- $445M to construct a new levee wall system in the Rio Grande Valley Sector
- $196M to construct a new steel bollard wall system in Rio Grande Valley Sector
- $445M for a primary pedestrian wall in San Diego, El Centro, Yuma and Tucson Sectors

*What's next you might ask?* When combined with the funds provided in FY 2017 and FY 2018, if funded at $5B in FY 2019 DHS expects to construct more than 330 miles of border wall in the U.S. Border Patrol's highest priority locations across the Southwest border.

DHS is positioned to construct 215 miles of Border Patrol's highest priority border wall miles including:

- ~5 miles in San Diego Sector in California
- ~14 miles in El Centro Sector in California
- ~27 miles in Yuma Sector in Arizona
- ~9 miles in El Paso Sector in New Mexico
- ~55 miles in Laredo Sector in Texas
- ~104 miles in Rio Grande Valley Sector in Texas

**The Bottom Line:** Walls Work. When it comes to stopping drugs and illegal aliens from crossing our borders, border walls have proven to be extremely effective. Border security relies on a combination of border infrastructure, technology, personnel and partnerships with law enforcement at the state, local, tribal, and federal level. For example, when we installed a

App.007

border wall in the Yuma Sector, we have seen border apprehensions decrease by 90 percent. In San Diego, we saw on Sunday that dilapidated, decades-old barriers are not sufficient for today's threat and need to be removed so new – up to 30 foot wall sections can be completed.

Topics: <u>Border Security</u> (/topics/border-security) , <u>Immigration and Customs Enforcement</u> (/topics/immigration-enforcement)

Keywords: <u>Border Security</u> (/keywords/border-security) , <u>Border Wall</u> (/keywords/border-wall) , <u>Immigration Enforcement</u> (/keywords/immigration-enforcement)

Last Published Date: December 12, 2018

App.008

# EXHIBIT B

   

## News Archive

 Search

Blog Archive  Events & Media Advisories Archive

Fact Sheets Archive  Press Release Archive

Speeches Archive

### Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

## The Border Wall System is Deployed, Effective, and Disrupting Criminals and Smugglers



**Release Date:**  October 29, 2020

Effective physical infrastructure works to secure our Southwest Border. Since the U.S. Border Patrol began constructing border barriers nearly 30 years ago, these barriers have proved to be a critical component in gaining operational control of the border.

Deploying the wall system in high priority areas—particularly urban areas where illegal border crossers can quickly vanish into the surrounding community—allows the USBP to decide where border crossings take place, not smugglers, and the USBP can deploy personnel and technology in complement to the border barrier.

In 2006, the U.S. Senate voted in a bipartisan 80 to 19 majority to pass the Secure Fence Act, which authorized construction of physical infrastructure to secure the border. Securing our Southwest Border was once a bipartisan issue.

Neglected, easily compromised, and sparsely constructed, the border fence concept needed a reinvestment in 2017. From day one, President Trump prudently recognized that America must have an effective border wall system that delivers first-of-its kind capabilities to the men and women of the USBP.

Today, CBP is constructing a border wall system which includes a combination of various types of infrastructure including:

- Internally hardened steel-bollard barriers from 18' to 30' high
- New and improved all-weather access roads

App.010

- Perimeter lighting
- Enforcement cameras
- Other related technology

The border wall system deploys the right mix of personnel, technology, and infrastructure to meet the challenges of a dynamic border threat environment and ultimately achieve operational control of the border.

## DEPLOYED:

As of October 23, 2020, construction of the wall system breaks down as follows:

- FUNDED: 738 miles
- COMPLETED CONSTRUCTION: 386 miles
- UNDER CONSTRUCTION: 195 miles
- PRE-CONSTRUCTION PHASE: 157 miles

Bottom line: The Trump administration is well on its way to meet the goal of having 450 miles of new border wall system deployed by December 31, 2020.

## EFFECTIVE – DISRUPTING CRIMINALS AND SMUGGLERS

The results speak for themselves: illegal drug, border crossings, and human smuggling activities have decreased in areas where barriers are deployed. For example:

**San Diego Sector:**

- In one short 12 mile section in the San Diego Sector, the wall reduced CBP manpower requirements by 150 agents every 24 hours. That is approximately a $28 million return on investment per year in salaries and benefits. These agents were redeployed to fill resource gaps in other areas of the border -- further improving our security.
- CBP's San Diego Field Office continues to be a significant source of narcotics seizures. From FY 19 to FY 20, seizures of fentanyl, marijuana, and methamphetamine all increased, with meth seizures jumping at alarming rates in the past several years – demonstrating that the border wall is forcing drug smugglers to where we are best prepared to catch them – our ports of entry.

**Yuma Sector:**

- Illegal entries in areas with new border wall system plummeted over 87% in FY 20 compared to FY 19.
- In FY 19, CBP deployed a temporary barrier, which it has replaced with a permanent system, at the Sanchez Canal, which resulted in illegal entries decreasing in this area by more than 1,000 per month.
- In FY 19, in areas of older existing border fencing or barriers, Yuma Sector apprehended 12 large groups (over a 100 persons) compared to zero large groups in FY 20 with new border wall system.
  - Family Unit entries have decreased over 95%
    - FY 19: 51,961 vs. FY 20: 2,940

**RGV Sector:**

- In a section of RGV (Zone 1) apprehensions have decreased since the construction of the border wall system. This is a location that has never had any border infrastructure.

App.011

- CBP has seen 79% decrease in apprehensions in this area (Zone 1) since the completion of border wall system.
- CBP has seen a 26% decrease in narcotics seizures since the completion of border wall system in this area.

- In another section of RGV, prior to construction of the border wall system it was common to see illegal aliens running across a heavily traveled road, putting themselves and members of the community at risk.
  - Smugglers are now forced to take their groups further west into areas that are less dense with brush and easier for CBP surveillance cameras to detect illicit activity.

**El Paso Sector:**

- El Paso Sector has experienced a significant reduction in drug and smuggling activities in areas where the new border wall system was built.
  - Most notably, in Zones 14 and 15 of the Santa Teresa (STN) AOR where apprehensions have decreased by 60% and 81% respectively when comparing the last half of fiscal year FY 20 to the first half of FY 20.

- El Paso Station has experienced similar results from the new border wall in Zones 20 – 23, with a reduction in apprehensions of 70% during the same timeframe.

## WHAT OUR CRITICS ARE SAYING:

Rather than working in a bipartisan manner to secure our border, our critics have advocated for:

- Ending construction of the border wall system
- Defunding the border wall system
- Destroying already constructed sections of the border wall

Destroying the wall would put needless strain on DHS resources, lead to increases in crime, and make it nearly impossible for us to determine who is coming into our country.

Topics: Border Security
Keywords: Border Security, Border Wall, Customs and Border Protection (CBP)

Last Published Date: October 29, 2020



Official website of the Department of Homeland Security

App.012

App.013

# EXHIBIT C

PUBLIC LAW 116–93—DEC. 20, 2019          133 STAT. 2511

drug, not to exceed a 90-day supply: *Provided further*, That the prescription drug may not be—

(1) a controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802); or

(2) a biological product, as defined in section 351 of the Public Health Service Act (42 U.S.C. 262).

SEC. 206. Notwithstanding any other provision of law, none of the funds provided in this or any other Act shall be used to approve a waiver of the navigation and vessel-inspection laws pursuant to section 501(b) of title 46, United States Code, for the transportation of crude oil distributed from and to the Strategic Petroleum Reserve until the Secretary of Homeland Security, after consultation with the Secretaries of the Departments of Energy and Transportation and representatives from the United States flag maritime industry, takes adequate measures to ensure the use of United States flag vessels: *Provided*, That the Secretary shall notify the Committees on Appropriations of the Senate and the House of Representatives, the Committee on Commerce, Science, and Transportation of the Senate, and the Committee on Transportation and Infrastructure of the House of Representatives within 2 business days of any request for waivers of navigation and vessel-inspection laws pursuant to section 501(b) of title 46, United States Code, with respect to such transportation, and the disposition of such requests.

*Consultation.*

*Notification.*
*Deadline.*
*Waivers.*

SEC. 207. (a) Beginning on the date of enactment of this Act, the Secretary of Homeland Security shall not—

(1) establish, collect, or otherwise impose any new border crossing fee on individuals crossing the Southern border or the Northern border at a land port of entry; or

(2) conduct any study relating to the imposition of a border crossing fee.

(b) In this section, the term "border crossing fee" means a fee that every pedestrian, cyclist, and driver and passenger of a private motor vehicle is required to pay for the privilege of crossing the Southern border or the Northern border at a land port of entry.

*Effective date.*

*Definition.*

SEC. 208. Not later than 90 days after the date of enactment of this Act, the Secretary of Homeland Security shall submit an expenditure plan for any amounts made available for "U.S. Customs and Border Protection—Procurement, Construction, and Improvements" in this Act and prior Acts to the Committees on Appropriations of the Senate and the House of Representatives: *Provided*, That no such amounts may be obligated prior to the submission of such plan.

*Deadline.*
*Expenditure plan.*

SEC. 209. (a) Of the total amount made available under "U.S. Customs and Border Protection—Procurement, Construction, and Improvements", $1,904,468,000 shall be available only as follows:

(1) $1,375,000,000 for the construction of barrier system along the southwest border;

(2) $221,912,000 for the acquisition and deployment of border security technologies and trade and travel assets and infrastructure;

(3) $62,364,000 for facility construction and improvements;

(4) $199,519,000 for integrated operations assets and infrastructure; and

(5) $45,673,000 for mission support and infrastructure.

133 STAT. 2512          PUBLIC LAW 116–93—DEC. 20, 2019

(b) The amount designated in subsection (a)(1) shall only be available for barrier systems that—

(1) use—

(A) operationally effective designs deployed as of the date of enactment of the Consolidated Appropriations Act, 2017 (Public Law 115–31), such as currently deployed steel bollard designs, that prioritize agent safety; or

(B) operationally effective adaptations of such designs that help mitigate community or environmental impacts of barrier system construction, including adaptations based on consultation with jurisdictions within which barrier system will be constructed; and

(2) are constructed in the highest priority locations as identified in the Border Security Improvement Plan.

Deadlines.
Plan.

(c) The Chief of the U.S. Border Patrol shall—

(1) provide a plan to the Committees on Appropriations of the Senate and the House of Representatives for the use of the amounts provided in subsection (a)(1) within 30 days of the date of enactment of this Act; and

Notification.

(2) notify such Committees of any amendment to the highest priority locations identified for the use of the amount provided in subsection (a)(1) within 5 days of such amendment.

Consultation.
Time period.

(d) Consultation with a jurisdiction under subsection (b)(2) shall not exceed 90 calendar days after such jurisdiction has been notified that U.S. Customs and Border Protection is entering into such consultation, unless an extension of time is agreed to by such agency and such jurisdiction.

Deadline.
Plan.
Evaluation.

(e) Not later than 180 days after the date of enactment of this Act, the Secretary of Homeland Security shall submit to the Committee on Appropriations of the Senate, the Committee on Appropriations of the House of Representatives, and the Comptroller General of the United States an updated risk-based plan for improving security along the borders of the United States that includes the elements required under subsection (a) of section 231 of division F of the Consolidated Appropriations Act, 2018 (Public Law 115–141), which shall be evaluated in accordance with subsection (b) of such section.

SEC. 210. Federal funds may not be made available for the construction of fencing—

(1) within the Santa Ana Wildlife Refuge;

(2) within the Bentsen-Rio Grande Valley State Park;

(3) within La Lomita Historical park;

(4) within the National Butterfly Center;

(5) within or east of the Vista del Mar Ranch tract of the Lower Rio Grande Valley National Wildlife Refuge; or

(6) within historic cemeteries.

SEC. 211. Funds made available in this Act may be used to alter operations within the National Targeting Center of U.S. Customs and Border Protection: *Provided*, That none of the funds provided by this Act, provided by previous appropriations Acts that remain available for obligation or expenditure in fiscal year 2020, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the components funded by this Act, may be used to reduce anticipated or planned vetting operations at existing locations unless specifically authorized by a statute enacted after the date of enactment of this Act.

App.016

# EXHIBIT D

H. R. 133—275

drug, not to exceed a 90-day supply: *Provided further*, That the prescription drug may not be—

(1) a controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802); or

(2) a biological product, as defined in section 351 of the Public Health Service Act (42 U.S.C. 262).

SEC. 206. Notwithstanding any other provision of law, none of the funds provided in this or any other Act shall be used to approve a waiver of the navigation and vessel-inspection laws pursuant to section 501(b) of title 46, United States Code, for the transportation of crude oil distributed from and to the Strategic Petroleum Reserve until the Secretary of Homeland Security, after consultation with the Secretaries of the Departments of Energy and Transportation and representatives from the United States flag maritime industry, takes adequate measures to ensure the use of United States flag vessels: *Provided*, That the Secretary shall notify the Committees on Appropriations of the Senate and the House of Representatives, the Committee on Commerce, Science, and Transportation of the Senate, and the Committee on Transportation and Infrastructure of the House of Representatives within 2 business days of any request for waivers of navigation and vessel-inspection laws pursuant to section 501(b) of title 46, United States Code, with respect to such transportation, and the disposition of such requests.

SEC. 207. (a) Beginning on the date of enactment of this Act, the Secretary of Homeland Security shall not—

(1) establish, collect, or otherwise impose any new border crossing fee on individuals crossing the Southern border or the Northern border at a land port of entry; or

(2) conduct any study relating to the imposition of a border crossing fee.

(b) In this section, the term "border crossing fee" means a fee that every pedestrian, cyclist, and driver and passenger of a private motor vehicle is required to pay for the privilege of crossing the Southern border or the Northern border at a land port of entry.

SEC. 208. Not later than 90 days after the date of enactment of this Act, the Secretary of Homeland Security shall submit an expenditure plan for any amounts made available for "U.S. Customs and Border Protection—Procurement, Construction, and Improvements" in this Act and prior Acts to the Committees on Appropriations of the Senate and the House of Representatives: *Provided*, That no such amounts may be obligated prior to the submission of such plan.

SEC. 209. Of the total amount made available under "U.S. Customs and Border Protection—Procurement, Construction, and Improvements", $464,634,000 shall be available only as follows:

(1) $160,530,000 for the acquisition and deployment of border security technologies and trade and travel assets and infrastructure;

(2) $142,399,000 for facility construction and improvements;

(3) $119,076,000 for integrated operations assets and infrastructure; and

(4) $42,629,000 for mission support and infrastructure.

SEC. 210. Of the total amount made available under "U.S. Customs and Border Protection—Procurement, Construction, and

H. R. 133—276

Improvements", an amount equal to the amount made available in section 209(a)(1) of division D of the Consolidated Appropriations Act, 2020 (Public Law 116–93) shall be made available for the same purposes as the amount provided under such section in such Act.

SEC. 211. Federal funds may not be made available for the construction of fencing—

(1) within the Santa Ana Wildlife Refuge;
(2) within the Bentsen-Rio Grande Valley State Park;
(3) within La Lomita Historical park;
(4) within the National Butterfly Center;
(5) within or east of the Vista del Mar Ranch tract of the Lower Rio Grande Valley National Wildlife Refuge; or
(6) within historic cemeteries.

SEC. 212. Funds made available in this Act may be used to alter operations within the National Targeting Center of U.S. Customs and Border Protection: *Provided*, That none of the funds provided by this Act, provided by previous appropriations Acts that remain available for obligation or expenditure in fiscal year 2021, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the components funded by this Act, may be used to reduce anticipated or planned vetting operations at existing locations unless specifically authorized by a statute enacted after the date of enactment of this Act.

SEC. 213. Without regard to the limitation as to time and condition of section 503(d) of this Act, the Secretary may reprogram within and transfer funds to "U.S. Immigration and Customs Enforcement—Operations and Support" as necessary to ensure the detention of aliens prioritized for removal.

SEC. 214. None of the funds provided under the heading "U.S. Immigration and Customs Enforcement—Operations and Support" may be used to continue a delegation of law enforcement authority authorized under section 287(g) of the Immigration and Nationality Act (8 U.S.C. 1357(g)) if the Department of Homeland Security Inspector General determines that the terms of the agreement governing the delegation of authority have been materially violated.

SEC. 215. (a) None of the funds provided under the heading "U.S. Immigration and Customs Enforcement—Operations and Support" may be used to continue any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than "adequate" or the equivalent median score in any subsequent performance evaluation system.

(b) Beginning not later than January 1, 2021, the performance evaluations referenced in subsection (a) shall be conducted by the U.S. Immigration and Customs Enforcement Office of Professional Responsibility.

SEC. 216. The reports required to be submitted under section 218 of the Department of Homeland Security Appropriations Act, 2020 (division D of Public Law 116–93) shall continue to be submitted with respect to the period beginning 15 days after the date of the enactment of this Act and semimonthly thereafter, and each matter required to be included in such report by such section 218 shall apply in the same manner and to the same extent during the period described in this section, except that for purposes of reports submitted with respect to such period described, the following additional requirements shall be treated

# EXHIBIT E

Federal Register

Vol. 86, No. 16

Wednesday, January 27, 2021

# Presidential Documents

Title 3—

The President

Proclamation 10142 of January 20, 2021

## Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction

### By the President of the United States of America

### A Proclamation

Like every nation, the United States has a right and a duty to secure its borders and protect its people against threats. But building a massive wall that spans the entire southern border is not a serious policy solution. It is a waste of money that diverts attention from genuine threats to our homeland security. My Administration is committed to ensuring that the United States has a comprehensive and humane immigration system that operates consistently with our Nation's values. In furtherance of that commitment, I have determined that the declaration of a national emergency at our southern border in Proclamation 9844 of February 15, 2019 (Declaring a National Emergency Concerning the Southern Border of the United States), was unwarranted. It shall be the policy of my Administration that no more American taxpayer dollars be diverted to construct a border wall. I am also directing a careful review of all resources appropriated or redirected to construct a southern border wall.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including section 202 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*), hereby declare that the national emergency declared by Proclamation 9844, and continued on February 13, 2020 (85 *Fed. Reg.* 8715), and January 15, 2021, is terminated and that the authorites invoked in that proclamation will no longer be used to construct a wall at southen border. I hereby futher direct as follows:

**Section 1**. *Pause in Construction and Obligation of Funds.* (a) The Secretary of Defense and the Secretary of Homeland Security, in consultation with the Director of the Office of Management and Budget, shall direct the appropriate officials within their respective departments to:

(i) pause work on each construction project on the southern border wall, to the extent permitted by law, as soon as possible but in no case later than seven days from the date of this proclamation, to permit:

(A) assessment of the legality of the funding and contracting methods used to construct the wall;

(B) assessment of the administrative and contractual consequences of ceasing each wall construction project; and

(C) completion and implementation of the plan developed in accordance with section 2 of this proclamation;

(ii) pause immediately the obligation of funds related to construction of the southern border wall, to the extent permitted by law; and

(iii) compile detailed information on all southern border wall construction contracts, the completion status of each wall construction project, and the funds used for wall construction since February 15, 2019, including directly appropriated funds and funds drawn from the Treasury Forfeiture Fund (31 U.S.C. 9705(g)(4)(B)), the Department of Defense Drug Interdiction and Counter-Drug Activities account (10 U.S.C. 284), and the Department

of Defense Military Construction account (pursuant to the emergency authorities in 10 U.S.C. 2808(a) and 33 U.S.C. 2293(a)).

(b) The pause directed in subsection (a)(i) of this section shall apply to wall projects funded by redirected funds as well as wall projects funded by direct appropriations. The Secretary of Defense and the Secretary of Homeland Security may make an exception to the pause, however, for urgent measures needed to avert immediate physical dangers or where an exception is required to ensure that funds appropriated by the Congress fulfill their intended purpose.

**Sec. 2.** *Plan for Redirecting Funding and Repurposing Contracts.* The Secretary of Defense and the Secretary of Homeland Security, in coordination with the Secretary of the Treasury, the Attorney General, the Director of the Office of Management and Budget, and the heads of any other appropriate executive departments and agencies, and in consultation with the Assistant to the President for National Security Affairs, shall develop a plan for the redirection of funds concerning the southern border wall, as appropriate and consistent with applicable law. The process of developing the plan shall include consideration of terminating or repurposing contracts with private contractors engaged in wall construction, while providing for the expenditure of any funds that the Congress expressly appropriated for wall construction, consistent with their appropriated purpose. The plan shall be developed within 60 days from the date of this proclamation. After the plan is developed, the Secretary of Defense and the Secretary of Homeland Security shall take all appropriate steps to resume, modify, or terminate projects and to otherwise implement the plan.

**Sec. 3.** *Definition.* Consistent with Executive Order 13767 of January 25, 2017 (Border Security and Immigration Enforcement Improvements), for the purposes of this proclamation, ''wall'' means a contiguous, physical wall or other similarly secure, contiguous, and impassable physical barrier.

**Sec. 4.** *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**Federal Register** / Vol. 86, No. 16 / Wednesday, January 27, 2021 / Presidential Documents      **7227**

IN WITNESS WHEREOF, I have hereunto set my hand this twentieth day of January, in the year of our Lord two thousand twenty-one, and of the Independence of the United States of America the two hundred and forty-fifth.

[FR Doc. 2021–01922
Filed 1–26–21; 8:45 am]
Billing code 3295–F1–P

# EXHIBIT F





**U.S. Department of Homeland Security**

# DHS Releases Plan for Use of Border Barrier Funds

**Release Date:** June 11, 2021

*Biden Administration Reaffirms Commitment to Serious Policy Solutions for Border Management*

WASHINGTON – Today, the Department of Homeland Security (DHS) released the agency's plan for funds the previous administration was planning to use for construction of a border wall at the Southwest border of the United States. The plan fulfills a requirement of President Biden's Proclamation ending the diversion of funds for border wall, and outlines steps DHS will take to end wall expansion to the extent permitted by law and address life, safety, and environmental concerns.

The prior administration planned to spend over $15 billion on wall construction, and diverted over $10 billion of those funds from military projects and other sources. The Department of Defense is terminating all border wall projects using the diverted funds, and returning the remaining, unobligated funds to their original sources.

Congress provided DHS with some funding for border barrier projects, which the agency is legally required to use consistent with their appropriated purpose. In doing so, DHS will prioritize the remaining border barrier funds to address and remediate urgent life, safety, and environmental issues resulting from the previous administration's border wall construction.

For instance, DHS has started repair projects to:

- **Close Breaches in the Rio Grande Valley Levee System.** Low-lying regions in Hidalgo County, Texas face threats of serious flooding after the previous administration excavated the Rio Grande Valley's flood barrier system to make way for the border wall. DHS has authorized work to close the breaches in the levee system.

App.025

- **Remediate Soil Erosion in San Diego.** Improper compaction of soil and construction materials along a wall segment constructed under the previous administration are causing dangerous erosion in San Diego. DHS has authorized necessary backfill projects to ensure the safety of nearby border communities.

DHS will also prioritize using the remaining funds consistent with their appropriated purposes for necessary clean-up of construction sites previously funded by the Department of Defense, including drainage, erosion control, site remediation, and material disposal. Appropriated funds may also be used for mitigating some environmental damage caused by border wall construction.

For those projects that are not urgently needed to avert immediate physical dangers, DHS will first engage in a comprehensive review that includes detailed environmental impact analysis and remediation and robust and substantive engagement with relevant stakeholders, including border community residents, their elected representatives, tribal communities, and environmental and other interested non-governmental organizations and advocates.

The administration also continues to call on Congress to cancel funds it previously appropriated for border barrier projects so that these resources can instead be used for modern, effective border measures to improve safety and security.

Keywords: Border Wall (/keywords/border-wall)

Last Published Date: June 11, 2021

App.026

# EXHIBIT G

**GAO@100** **U.S. GOVERNMENT ACCOUNTABILITY OFFICE**
*A Century of Non-Partisan Fact-Based Work*

441 G St. N.W.
Washington, DC  20548

# Decision

**Matter of:**   Office of Management and Budget and U.S. Department of Homeland
Security—Pause of Border Barrier Construction and Obligations

**File:**   B-333110

**Date:**   June 15, 2021

---

**DIGEST**

Congress has appropriated funds to the Department of Homeland Security (DHS)
specifically for constructing fencing or barrier system at the southern border of the
United States, commonly referred to as the border wall.  On January 20, 2021, the
President issued a Proclamation directing a pause in the construction of the border
wall and a pause in obligation of funds for the wall.

DHS has almost fully obligated funds appropriated in previous fiscal years for border
fence or barrier construction projects, and suspended work on some projects.  DHS
has not yet obligated funds appropriated in fiscal year 2021.

We conclude that delays in the obligation and expenditure of DHS's appropriations
are programmatic delays, not impoundments.  DHS and the Office of Management
and Budget (OMB) have shown that the use of funds is delayed in order to perform
environmental reviews and consult with various stakeholders, as required by law,
and determine project funding needs in light of changes that warrant using funds
differently than initially planned.  As explained below, because the delay here is
precipitated by legal requirements, the delay is distinguishable from the withholding
of Ukraine security assistance funds.

In order to facilitate Congress's oversight of executive spending and its
Constitutional power of the purse, the congressional oversight and appropriations
committees should consider requiring OMB and DHS to submit a timeline detailing
the planned uses and timeframes for obligating DHS's fiscal year 2021
appropriation.  A detailed timeline could serve as a tool for rigorous oversight to
ensure the President does not substitute his own policies and priorities in place of
those established through the legislative process.

App.028

**DECISION**

On January 20, 2021, President Biden issued a Proclamation[1] terminating a previous declaration of national emergency concerning the southern border of the United States issued by President Trump.[2]  Among other things, the Proclamation directs officials to "pause work on each construction project on the southern border wall, to the extent permitted by law . . . [and to] pause immediately the obligation of funds related to construction of the southern border wall, to the extent permitted by law."[3]  Pursuant to our role under the Congressional Budget and Impoundment Control Act of 1974 (ICA), we are issuing this decision on whether a violation of the ICA occurred.[4]

As explained below, we conclude that neither the Proclamation nor its implementation violate the ICA.  Funds appropriated to the Department of Homeland Security (DHS) in previous fiscal years are almost fully obligated on border barrier construction projects.  Construction has been suspended for some projects in order to rescope the projects to mitigate environmental damage and minimize the impact on border communities, consistent with statutory requirements under environmental and other laws.  Delays in spending these funds in order to satisfy applicable statutory requirements are programmatic delays, not impoundments.

Funds appropriated in fiscal year 2021 have not yet been obligated.  Prior to obligating these funds for new construction projects, DHS must comply with environmental, procurement, and other statutory prerequisites because the Secretary of Homeland Security has decided not to exercise discretionary statutory waiver authority.  In addition, before DHS obligates these funds, it must determine project needs, as initial plans for these funds presupposed the continued waiver of statutory prerequisites and continued participation of the Department of Defense (DOD) in barrier construction.  Delays associated with meeting statutory prerequisites and determining funding needs in light of changed circumstances constitute programmatic delays, not impoundments.

The delays here are factually and legally distinguishable from the delay considered in our decision regarding the impermissible withholding of funds for Ukraine security

---

[1] Proclamation No. 10142, *Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction*, 86 Fed. Reg. 7225 (Jan. 20, 2021) (Proclamation).

[2] Proclamation No. 9844, *Declaring a National Emergency Concerning the Southern Border of the United States*, 84 Fed. Reg. 4949 (Feb. 15, 2019).

[3] 86 Fed. Reg. 7225.

[4] Pub. L. No. 93-344, title X, § 1015, 88 Stat. 297, 336 (July 12, 1974); 2 U.S.C. § 686.

App.029

assistance.[5]  OMB did not justify the withholding of Ukraine security assistance funding by presenting evidence of any statutory prerequisites that needed to be satisfied before funds could be obligated.  Here, delays in the obligation and expenditure of DHS's border barrier appropriations stem from the time required to meet applicable statutory requirements and develop plans for the use of the funds that consider current circumstances.

In accordance with our regular practice, we contacted OMB and DHS to seek factual information and their legal views on this matter.[6]  OMB and DHS each responded with relevant information and their legal views.[7]  We also received supplemental information from Members of Congress seeking our views.[8]

---

[5] B-331564, Jan. 16, 2020.

[6] GAO, *Procedures and Practices for Legal Decisions and Opinions*, GAO-06-1064SP (Washington, D.C.: Sept. 2006), *available at* www.gao.gov/legal/resources.html; Letter from General Counsel, GAO, to General Counsel, OMB (Apr. 7, 2021); Letter from General Counsel, GAO, to Principal Deputy General Counsel and Acting General Counsel, DHS (Apr. 7, 2021).

[7] Letter from General Counsel, OMB, to General Counsel, GAO (May 6, 2021) (OMB Response); Letter from Assistant General Counsel for Appropriations and Fiscal Law, DHS, to Managing Associate General Counsel for Appropriations Law, GAO (May 10, 2021) (DHS Response).  OMB's Response included the apportionment schedules for the relevant DHS appropriations.  OMB also responded to follow-up questions via e-mail.  E-mail from Deputy General Counsel, OMB, to Senior Attorney, GAO, *Subject:  RE: GAO letter regarding Proclamation on Border Wall Funds and Impoundment Control Act* (May 20, 2021) (OMB Response Follow-Up E-mail).  DHS's Response included an Appendix with obligations and expenditure data for the relevant DHS appropriations.  DHS also responded to some follow-up questions via e-mail.  E-mail from Assistant General Counsel for Appropriations and Fiscal Law, DHS, to Assistant General Counsel for Appropriations Law, GAO, *Subject:  RE: GAO letter regarding Proclamation on Border Wall Funds and Impoundment Control Act* (May 20, 2021) (DHS Response Follow-Up E-mail).

[8] On March 17, 2021, we received a letter from Members of the United States Senate to the Comptroller General regarding this matter.  The signatories to that letter are listed at the end of this decision.  We received two additional letters from Members of the House of Representatives and the United States Senate requesting to join the original letter seeking our views.  The signatories for each additional letter are also listed at the end of this decision.  We received an additional letter from Senators Shelley Moore Capito and Richard Shelby to supplement the record on May 12, 2021.  We also received and responded to a letter from Members of Congress regarding the status of this decision on May 25, 2021.  B-333110, June 2, 2021.

We note that this is our second decision related to funding for and construction of border barriers.[9]  In our earlier decision we examined whether it was permissible for DOD to transfer and use its fiscal year 2019 appropriations to construct border fencing.  There we concluded that DOD's transfer of funds for border fence construction was consistent with DOD's statutory transfer authority and that use of these amounts for border fence construction was permissible.

BACKGROUND

DHS Border Barrier Authorities and Activities

DHS has statutory authority to control and guard the borders of the United States.[10]  Within DHS, responsibility for border security is carried out by the United States Customs and Border Protection (CBP).[11]  Under CBP's Border Wall System Program, it plans for and executes deployment of barriers and other assets intended to prevent the illegal entry of people, drugs, and other contraband along the southern border.[12]

---

[9] B-330862, Sept. 5, 2019.

[10] 8 U.S.C. § 1103(a)(5).  Specifically, DHS is required to take "actions as may be necessary to install additional physical barriers . . . in the vicinity of the United States border . . . [and] construct reinforced fencing along not less than 700 miles of the southwest border . . . and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border."  Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, title I, § 102, 110 Stat. 3009, 3009-546, 3009-554 (Sept. 30, 1996) (IIRIRA), *as amended by* DHS Appropriations Act, 2008, Pub. L. No. 110-161, div. E, title V, § 564, 121 Stat. 1844, 2042, 2090–2091 (Dec. 26, 2007).  Notwithstanding this mandate, the law further provides that DHS is not required to install fencing, physical barriers, or other resources in a particular location, if the Secretary of Homeland Security determines that the use or placement of such resources is not the most appropriate means to achieve and maintain control of the border at that location.  *Id*.

[11] 6 U.S.C. § 211.

[12] GAO, *Southwest Border Security: CBP Is Evaluating Designs and Locations for Border Barriers but Is Proceeding Without Key Information*, GAO-18-614 (Washington, D.C.: Aug. 6, 2018); GAO, *DHS Annual Assessment: Most Acquisition Programs Are Meeting Goals but Data Provided to Congress Lacks Context Needed For Effective Oversight*, GAO-21-175 (Washington, D.C.: Jan. 19, 2021).  For purposes of this decision, we adopt the term "southern border" as used in Proclamation No. 10142, in reference to the United States-Mexico land border, which is generally referred to in statute as the "southwest border."  *See*, *e.g.*, DHS

The Secretary of Homeland Security has statutory authority to waive all legal requirements where determined necessary to ensure expeditious construction of barriers along the border.[13]  The previous Secretary of Homeland Security waived a variety of environmental and natural resource laws, such as the National Environmental Policy Act of 1969 (NEPA),[14] to ensure expeditious construction of barriers at the border.[15]  Note, this authority is discretionary, and the Secretary is not required to waive these requirements.  In addition, the Secretary of Homeland Security is required by law to consult with the Secretary of the Interior, Secretary of Agriculture, states, local governments, Indian tribes, and property owners to "minimize the impact on the environment, culture, commerce, and quality of life" at sites where barriers are to be constructed.[16]

Each year, CBP receives a lump sum appropriation, available for multiple fiscal years, for its construction activities in its Procurement, Construction, and Improvements (PC&I) account.  For example, for fiscal year 2019, CBP received about $2.5 billion in its PC&I account.[17]

For fiscal years 2018, 2019, 2020, and 2021, the respective appropriation act designates a certain amount of funding from the PC&I lump sum that is specifically available for fencing or barrier system.  For example, for fiscal year 2019, of the $2.5 billion appropriated to CBP, $1.375 billion is available for border fencing.[18]  Each year, the appropriations acts vary in the extent to which they include requirements

---

Appropriations Act, 2020, Pub. L. No. 116-93, div. D, title II, § 209(a)(1), 133 Stat. 2317, 2502, 2511 (Dec. 20, 2019).

[13] IIRIRA, *as amended by* REAL ID Act of 2005, Pub. L. No. 109-13, div. B, title I, § 102, 119 Stat. 231, 302, 306 (May 11, 2005).

[14] Pub. L. No. 91-190, 83 Stat. 852 (1970).  NEPA requires federal agencies to consider and disclose the environmental impacts of a proposed major federal action. 42 U.S.C. § 4332(C).  Generally, NEPA requires agencies to prepare an environmental impact statement for a major federal action significantly affecting the quality of the human environment.  *Id.*  To determine if an environmental impact statement is necessary, an agency may also perform an environmental assessment, a document that briefly considers whether a more detailed environmental impact statement is required.  40 C.F.R. §§ 1501.3, 1501.5.

[15] DHS Response, footnote 13.

[16] IIRIRA, *as amended by* Pub. L. No. 110-161, § 564.

[17] DHS Appropriations Act, 2019, Pub. L. No. 116-6, div. A, title II, 133 Stat. 13, 15, 18 (Feb. 19, 2019).

[18] Pub. L. No. 116-6, § 230(a)(1); DHS Response, at 3.

App.032

regarding the design of fencing or barriers and/or the specific geographic areas along the southern border where fencing or barriers may be constructed.[19] Appropriations for border fencing or barriers are available for obligation for five fiscal years.[20]  This means that these amounts can be used for needs that arise any time during the five-year period of availability, consistent with the purposes of the appropriation.[21]

---

[19] For fiscal year 2018, $251 million was made available for secondary fencing, all of which provides for cross-barrier visual situational awareness, in the San Diego Sector; $445 million was made available for primary pedestrian levee fencing in the Rio Grande Valley Sector; $196 million was made available for primary pedestrian fencing in the Rio Grande Valley Sector; and $445 million was made available for replacement of primary pedestrian fencing along the southwest border.  All but the $251 million was available only for operationally effective designs deployed as of the date of the Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135, which was enacted May 5, 2017 (Consolidated Appropriations Act, 2017).  DHS Appropriations Act, 2018, Pub. L. No. 115-141, div. F, title II, § 230, 132 Stat. 348, 605, 616-617 (Mar. 23, 2018); DHS Response, at 2–3.  For fiscal year 2019, $1.375 billion was made available for primary pedestrian fencing, including levee fencing, in the Rio Grande Valley Sector, and this amount was available only for operationally effective designs deployed as of the date of the Consolidated Appropriations Act, 2017.  Pub. L. No. 116-6, § 230; DHS Response, at 3.  For fiscal year 2020, $1.375 billion was made available for barrier system along the southwest border, and this amount was available only for operationally effective designs deployed as of the date of the Consolidated Appropriations Act, 2017, or operationally effective adaptations of such designs.  Pub. L. No. 116-93, § 209; DHS Response, at 3.  For fiscal year 2021, the appropriation act provided that an amount equal to the amount made available in section 209 of Public Law 116-93 (the DHS Appropriations Act, 2019) is available for the same purposes as the amount provided under such section in such act.  DHS Appropriations Act, 2021, Pub. L. No. 116-260, div. F, title II, § 210, 134 Stat. 1182, 1448, 1456-1457 (Dec. 27, 2020); DHS Response, at 3.  Thus, for 2021, $1.375 billion is available for barrier system along the southwest border.  DHS Response, Appendix, at 9–10.  Before obligating amounts provided for 2021, or amounts provided previously that remained available for obligation, DHS was required to submit an expenditure plan to the congressional appropriations committees.  Pub. L. No. 116-260, § 208; DHS Response, at 3.  The appropriations acts for each year prohibit construction of fencing or barriers in certain wildlife refuges and parks.  Pub. L. No. 115- 141, § 230(c); Pub. L. No. 116-6, § 231; Pub. L. No. 116-93, § 210; Pub. L. No. 116-260, § 211.

[20] DHS Response, Appendix, at 1.

[21] 31 U.S.C. § 1502.  When the five-year period of availability ends, the funds expire.  Expired funds are not available to incur new obligations, but are available for five fiscal years for disbursement of obligations incurred during the period of availability, and for adjustments to obligations incurred during the period of availability.  GAO, *A*

DHS obligates funds appropriated for fencing or barriers by entering into contracts for border barrier construction activities, or by placing orders for border barrier projects under interagency agreements with other federal agencies, such as the U.S. Army Corps of Engineers (USACE).[22]  DHS incurs an obligation when it enters into contracts, and when it places orders under the interagency agreements.[23]  DHS has obligated fiscal year 2018, 2019, and 2020 fencing or barrier appropriations by entering into contracts and placing orders under interagency agreements for border barrier construction, and the majority of this funding was obligated by August 2020.[24]  DHS has not yet obligated its fiscal year 2021 barrier system appropriation.[25]

To support border barrier construction, DHS also requested and received assistance from DOD.[26]  DOD transferred and used its appropriations to construct border fencing in support of DHS.[27]  In addition, following the declaration of national

_Glossary of Terms Used in the Federal Budget Process_, GAO-05-734SP (Washington, D.C.: Sept. 2005), at 23.

[22] The interagency agreements here were entered into pursuant to the Economy Act, 31 U.S.C. § 1535, and authorities under 40 U.S.C. §§ 321, 501, 502.  DHS Response, Appendix (table showing data on border barrier contracts, interagency agreements, obligations, and expenditures).

[23] An obligation is a "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received."  _Glossary_, at 70.  An agency incurs an obligation, for example, when it enters into a contract or takes an action requiring the government to make payments from one government account to another. _Id._; _see also_ 31 U.S.C. § 1535(d) (for interagency agreements under the authority of the Economy Act, the placement of an order under the agreement obligates the appropriation of the ordering agency); 31 U.S.C. § 1501(a)(1) (an agency shall record an obligation when supported by documentary evidence of a binding agreement between the agency and another agency); DHS Response, at 8.  An expenditure is the actual spending of money, such as making a payment.  _Glossary_, at 48.

[24] DHS Response, at 3, Appendix, at 2.

[25] DHS Response, Appendix, at 2–3.

[26] DOD has authority under 10 U.S.C. § 284(b)(7) to provide support for the counterdrug activities of other departments to include the "[c]onstruction of . . . fences . . . to block drug smuggling corridors across international boundaries of the United States."  _See also_ GAO, _Southwest Border Security: Actions Are Needed to Address the Cost and Readiness Implications of Continued DOD Support to U.S. Customs and Border Protection_, GAO-21-356 (Washington, D.C.: Feb. 2021).

[27] In B-330862, Sept. 5, 2019, we concluded that DOD's transfer of fiscal year 2019 amounts into its Drug Interdiction account for border fence construction was consistent with DOD's transfer authority and that use of these amounts for the

emergency concerning the southern border,[28] the Secretary of Defense exercised statutory authority made available by the declaration of emergency to use unobligated military construction appropriations to undertake border barrier projects necessary to support the armed forces.[29]  Also, DHS used amounts in the Treasury Forfeiture Fund for border barrier construction.[30]

Proclamation Pausing Border Barrier Construction and Obligations

On January 20, 2021, President Biden issued a Proclamation terminating the previous declaration of national emergency concerning the southern border issued by President Trump.[31]  The Proclamation also directs officials to "pause work on each construction project on the southern border wall, to the extent permitted by law . . . [and to] pause immediately the obligation of funds related to construction of the southern border wall, to the extent permitted by law."[32]  The Proclamation also requires the Secretary of Homeland Security, in coordination with other relevant agencies, to develop a plan within 60 days of the Proclamation that both redirects funds used for border barriers and provides for the continued use of funding expressly appropriated for border barriers consistent with that appropriated purpose.[33]  In addition, the President's Budget for Fiscal Year 2022 proposes the cancellation of all prior year border barrier construction funding that remains unobligated at the time of enactment of the Appropriations Act for Fiscal Year 2022.[34]

---

purpose of border fence construction was permissible under various statutory provisions.  The Court of Appeals for the Ninth Circuit held that the transfer of amounts was not authorized by DOD's transfer authority.  *California v. Trump*, 963 F.3d 926, 949 (9th Cir.), *cert. granted*, 141 S. Ct. 618 (2020).

[28] 84 Fed. Reg. 4949.

[29] 10 U.S.C. § 2808; GAO, *Southwest Border: Information on Federal Agencies' Process for Acquiring Private Land for Barriers*, GAO-21-114 (Washington, D.C.: Nov. 2020).

[30] *See* 86 Fed. Reg. 7225; 31 U.S.C. § 9705(g)(4)(B).

[31] 86 Fed. Reg. 7225.

[32] *Id*.

[33] 86 Fed. Reg. 7226.

[34] *Appendix, Budget of the United States Government for Fiscal Year 2022*, at 517, *available at* https://www.whitehouse.gov/wp-content/uploads/2021/05/appendix_fy22.pdf (last visited June 1, 2021) (FY22 Budget Request).

DHS and USACE issued suspension of work orders on existing barrier construction contracts.[35]  In addition, DOD announced it was cancelling all border barrier construction projects funded with appropriations originally intended for military missions and functions.[36]

DISCUSSION

At issue here is whether the Proclamation and actions taken by OMB and DHS to implement the Proclamation violate the ICA.  We first address DHS's fiscal year 2018, 2019, and 2020 appropriations, and then, separately, its fiscal year 2021 appropriation.  We also address how the factual and legal circumstances here are distinguishable from our decision on Ukraine security assistance funding.[37]  Lastly, we address President Biden's proposed cancellation of unobligated border barrier funding.

<u>Analysis of Funding Appropriated In Previous Fiscal Years for Border Fencing and Barriers</u>

DHS has almost fully obligated the approximately $4 billion appropriated across fiscal years 2018, 2019, and 2020, for barrier construction projects.[38]  DHS and

---

[35] DHS Response, at 5; DHS Response Follow-Up E-mail.

[36] DOD, *DOD Release Regarding Cancellation of Border Barrier Project Cancellation* (Apr. 30, 2021), *available at* https://www.defense.gov/Newsroom/Releases/Release/Article/2591993/dod-release-regarding-cancellation-of-border-barrier-project-cancellation/ (last visited June 2, 2021).  OMB and DOD announced that military construction appropriations previously planned for border barrier construction projects that remain unobligated (about $2 billion) will be used instead for other DOD military construction projects, such as a ships maintenance facility in Virginia and a mission training complex in Germany.  White House, Fact Sheet:  *Department of Defense and Department of Homeland Security Plans for Border Wall Funds* (June 11, 2021), *available at* FACT SHEET: Department of Defense and Department of Homeland Security Plans for Border Wall Funds | The White House (last visited June 14, 2021); Department of Defense, Deputy Secretary of Defense Memorandum for Director, Office of Management and Budget, *Department of Defense Plan for the Redirection of Border Wall Funds* (June 10, 2021).

[37] B-331564, Jan. 16, 2020.

[38] Specifically, as of March 31, 2021, DHS obligated approximately 95 percent, 98 percent, and 96 percent of its fencing or barrier appropriations for fiscal years 2018, 2019, and 2020, respectively.  *See* DHS Response, Appendix, at 4–5.  Much of the amount appropriated for fiscal year 2018 was obligated during 2018, 2019, and 2020, on an interagency agreement with USACE for construction projects.  DHS Response, at 3, Appendix (table showing data on border barrier contracts,

USACE issued suspension of work orders for some construction projects.[39] However, expenditures (payments) are continuing because construction work continues on some projects to "avert immediate physical dangers," and work continues under other contracts in order to monitor the work areas where construction has been suspended.[40]  In addition, DHS and USACE continue to make progress payments to contractors for work that occurred prior to issuance of the suspension of work orders.[41]

DHS explains that construction work is suspended so that it can take steps necessary to comply with statutory requirements under environmental laws and for stakeholder consultation.[42]  Specifically, for existing projects funded with fiscal year 2018, 2019, or 2020 appropriations, DHS will engage in the standard environmental planning and compliance process, including compliance with NEPA.[43]  This process will include remediating or mitigating environmental damage caused by construction, to the extent possible.[44]  The Secretary of Homeland Security is considering rescinding or revising previously issued waivers of environmental and other laws, but DHS will engage in the standard compliance process, regardless of whether a previously issued waiver is in place.[45]

In addition, DHS suspended construction work to engage in more substantive consultation with stakeholders, such as property owners and border community

---

interagency agreements, obligations, and expenditures).  A majority of amounts appropriated for fiscal year 2019 was obligated in May 2019 on an interagency agreement with USACE for construction projects.  *Id*.  A majority of amounts appropriated for fiscal year 2020 was obligated in May, June, and August of 2020, on an interagency agreement with USACE for construction projects, or on construction contracts awarded by DHS.  *Id*.  GAO is separately conducting a performance audit examining characteristics, including funding, of USACE's contracts for border barrier construction, among other things.  USACE's obligations for border barriers is not the subject of this decision.

[39] *See* DHS Response, at 10; DHS Response Follow-Up E-mail; Federal Acquisition Regulation (FAR) § 52.242-14 (standard clause for inclusion in construction contracts stating that the government may suspend all or any part of the work called for under a contract for the period of time that the government determines appropriate, "for the convenience of the Government").

[40] DHS Response, at 10, 12; DHS Response Follow-Up E-mail.

[41] DHS Response, at 10.

[42] *See* DHS Response, at 12.

[43] DHS Response, at 12.

[44] *Id*.

[45] *Id*.

residents, as required under the Secretary's statutory consultation provision.[46]  DHS states that consultation will be robust, and will inform both environmental planning and execution of barrier construction projects.[47]  As a result of the need to comply with stakeholder consultation requirements, NEPA, and other environmental and natural resource laws, DHS states that it will rescope existing construction projects accordingly.[48]

Any delays in expenditures here result from ensuring that requirements under environmental and stakeholder consultation laws are satisfied for border barrier projects.  We have previously concluded that delays associated with the review of whether statutory prerequisites were satisfied are programmatic delays outside the reach of the ICA, not impoundments.[49]  Following our previous decisions, delays of this nature are programmatic delays.

The fact that small amounts of unobligated sums remain in DHS's appropriation accounts here does not indicate an impoundment.[50]  These appropriations are

---

[46] *Id.*

[47] *Id*.

[48] *See* DHS Response, at 12–13.

[49] B-290659, July 24, 2002 (delay in obligation of appropriations for the United Nations Population Fund (UNFPA) to review whether UNFPA satisfied certain statutory prerequisites to receiving the funding was programmatic because the agency was reviewing whether the required legal conditions for use of the funds had been met).  *See also* B-291241, Oct. 8, 2002 (delay in apportioning funds was programmatic because OMB was reviewing whether a statutory limit on the transfer of funds applied to the appropriation at issue).  We have also previously concluded that delays stemming from changes to project design or scope are programmatic delays.  B-221412, Feb. 12, 1986 (delays in the obligation of Veterans Administration appropriations were programmatic because they resulted from changes to project design or scope and there was no evidence of an intent to refrain from obligating the funds).

[50] B-200685, Dec. 23, 1980, at 2 ("[T]he mere failure to obligate the full amount of an appropriation before it expires does not necessarily mean that there has been an impoundment.  There must be sufficient evidence of an intention to refrain from obligating or expending available budget authority, based on the facts and circumstances of each case.").  As previously described, DHS has obligated a majority of its fiscal year 2018, 2019, and 2020 appropriations for construction projects.  In previous decisions where we found obligation rates were comparable across the years, and there was no evidence of an intent to withhold funds from obligation, we concluded that there was not an impoundment.  Dec. 23, 2020 (The National Weather Service obligated funds "at a robust yet measured pace that [gave]

available for multiple fiscal years before they expire, and DHS can obligate additional amounts consistent with current project requirements.  Additionally, DHS stated that it will maintain some unobligated balances in the accounts, pursuant to departmental funds control practices, in order to cover unanticipated liabilities that may arise in the future.[51]  We have recognized that sound administrative funds control practices may reasonably result in small amounts of expired, unobligated balances.[52]

Furthermore, the apportionment schedules for each DHS appropriation reflect that amounts are apportioned and available for obligation.[53]  OMB and DHS stated that no instructions to withhold these appropriations have been given.[54]

DHS asserts that it is not impounding funds because it is not withholding funds from obligation or expenditure, and we agree.[55]  Prior year funding for border fencing or barriers remains obligated for construction projects, and continues to be spent.  Any delayed expenditures stem from DHS taking necessary steps to comply with statutory environmental and stakeholder consultation requirements for these construction projects and do not constitute an impoundment.  Therefore, there is no violation of the ICA with regard to DHS's appropriations for fiscal years 2018, 2019, and 2020.

<u>Analysis of Funding Appropriated In Fiscal Year 2021 for Border Barriers</u>

For fiscal year 2021, DHS received $1.375 billion in appropriations for the construction of barrier system along the southern border, and has not yet obligated

---

no indication that the agency withheld amounts from obligation."); B-320091, July 23, 2010; B-331298.

[51] *See* DHS Response, Appendix, at 2.

[52] B-331298, Dec. 23, 2020.

[53] OMB Response, Attachment.

[54] OMB Response, Attachment; DHS Response, at 5–6, Appendix, at 7.

[55] DHS Response, at 10.

these funds.[56]  DHS explains that this funding will be obligated for new construction projects once statutory prerequisites have been satisfied.[57]

Specifically, the previous Secretary of Homeland Security exercised statutory authority to waive laws such as NEPA to expedite construction of barriers along the border.[58]  The current Secretary of Homeland Security will not exercise authority to waive any laws with respect to barrier construction.[59]  Therefore, prior to obligating 2021 barrier funds on contracts for new projects, DHS must first comply with applicable laws.  For example, DHS must undertake environmental reviews and analysis, including compliance with NEPA and the Endangered Species Act, and consult with stakeholders.[60]  Once those processes are complete, or nearly complete, DHS can finalize designs and begin the contracting process which, under the Competition in Contracting Act of 1984 (CICA),[61] requires full and open competition.[62]  Indeed, DHS has no legal basis to proceed with contract awards without meeting these legal prerequisites.

---

[56] Pub. L. No. 116-260, § 210; DHS Response, Appendix, at 3.  Unlike most of the amounts appropriated in previous fiscal years, the 2021 appropriation is not restricted in terms of the location where barriers may be constructed.  Also, DHS explains that there are no statutory design restrictions with respect to fiscal year 2021 barrier funding, since the appropriation does not reference or incorporate the design restriction from the DHS Appropriations Act, 2020.  DHS Response, Appendix, at 9–10.

[57] DHS Response, at 14.

[58] Pursuant to a law enacted in 2005, the Secretary of Homeland Security "shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of . . . barriers . . . [which] shall be effective upon being published in the Federal Register."  IIRIRA, *as amended by* Pub. L. No. 109-13, § 102.  Under a statute in effect prior to enactment of the 2005 law, the Secretary of Homeland Security was authorized to waive the Endangered Species Act of 1973, Pub. L. No. 93-205, 87 Stat. 883 (Dec. 28, 1973), and NEPA, as necessary to ensure expeditious construction of barriers.  Pub. L. No. 104-208, § 102(c).

[59] OMB Response, at 5–6; DHS Response, at 11, Appendix, at 4.  The authority that Congress has provided to the Secretary of Homeland Security to waive legal requirements for barrier construction provides the Secretary with a choice of whether to waive any laws and, if so, which laws to waive.  The statute could, of course, be amended by Congress to change the discretion afforded to the Secretary.

[60] OMB Response, at 5–6; DHS Response, at 11, 14, Appendix, at 4.

[61] Pub. L. No. 98-369, div. B, title VII, 98 Stat. 494, 1175 (July 18, 1984).

[62] DHS Response, at 14, Appendix, at 4.

A delay in the obligation of DHS's 2021 border barrier funding caused by steps DHS is taking to ensure compliance with environmental, stakeholder consultation, and procurement statutes is a programmatic delay, not an impoundment under the ICA.[63] By law, these requirements must be satisfied before DHS can obligate the funds, and OMB and DHS have shown that they intend to spend the funds for new construction projects once applicable legal processes and procedures have taken place.[64]  Accordingly, the circumstances reflect a programmatic delay, not an impoundment.

DHS states that some of its 2021 border barrier funding will be obligated for existing barrier construction projects, once DHS has determined existing projects' needs.[65] Specifically, DHS is reviewing existing projects, and will use some of its 2021 funding for projects previously constructed by DOD, for the costs associated with bringing DHS's existing projects into compliance with statutory requirements under environmental laws, and for stakeholder consultation.[66]  DHS asserts it has substantial discretion in determining the projects that will be funded with the 2021 appropriation.[67]

A delay in obligation of funds while DHS determines project needs in light of changed circumstances is a programmatic delay, not an impoundment.  We have previously concluded that delays associated with certain project changes are programmatic delays.[68]  Here, there have been changes to existing projects, subsequent to enactment of the 2021 appropriation.  In particular, DOD cancelled its barrier projects, and DHS decided that its approach to existing, previously funded projects will include standard environmental planning and compliance and robust stakeholder consultation.

On January 13, 2021, DHS submitted a statutorily required expenditure plan to the congressional appropriations committees regarding CBP's PC&I lump-sum appropriation.[69]  With regard to the fiscal year 2021 appropriation for barrier system, the plan stated that the funds would be used for construction of 56 miles of border

---

[63] Under our previous decisions, delays associated with the review of whether statutory prerequisites were satisfied, or whether a statutory transfer limit applied, are programmatic delays.  B-291241, Oct. 8, 2002; B-290659, July 24, 2002.

[64] DHS Response, at 14.

[65] OMB Response, at 9; DHS Response, at 13, Appendix, at 6.

[66] OMB Response, at 8; DHS Response, at 12.

[67] DHS Response, at 13.

[68] B-221412, Feb. 12, 1986.

[69] DHS Response, Appendix, at 3.

barrier system in top-priority locations.[70]  Specifically, DHS planned to use its 2021 barrier appropriation for construction in California, and to award a contract by January 19, 2021, which would have required waiving NEPA and other laws to proceed on this timeline.[71]  DHS's plans presupposed continued DOD participation in existing barrier construction and waiver of environmental and natural resources laws.

We additionally note that the apportionment schedule for DHS's fiscal year 2021 border barrier appropriation reflects that amounts are available and that OMB has not created a reserve with respect to this funding.[72]  Also, OMB stated that it has not directed the withholding of this appropriation.[73]  And DHS likewise stated that OMB has not instructed DHS to withhold funding from obligation or expenditure, pursuant to the Proclamation or otherwise.[74]  Lastly, DHS stated it has not, and is not, withholding this funding in a manner prohibited by the ICA.[75]

OMB and DHS assert that any delay in obligating fiscal year 2021 funding is programmatic, not an impoundment.[76]  As explained, based on the information before us, we conclude that there is not an impoundment of DHS's fiscal year 2021 barrier appropriation and no violation of the ICA with respect to these funds.  OMB and DHS have met their burden to justify why the funds have not been obligated: meeting the conditions of applicable laws, absent their waiver, must precede obligation of funds for new projects, and determination of existing projects' funding needs in light of changed circumstances must precede obligation of funds for current projects.  We see nothing to indicate that either OMB or DHS is attempting to override congressional intent that these funds be used for constructing barriers at the southern border.

---

[70] DHS Response, footnote 17.

[71] DHS Response, at 4.

[72] OMB Response, at 10, Attachment, at 12; DHS Response, Appendix, at 7.  The apportionment for the 2021 funds reflects a restriction in the DHS Appropriations Act, 2021, that CBP's lump-sum appropriation for PC&I is not available for obligation until DHS submits an expenditure plan to the congressional appropriations committees.  Pub. L. No. 116-260, § 208 (statutory requirement to submit an expenditure plan); OMB Response, Attachment (fiscal year 2021 apportionment). DHS submitted the expenditure plan on January 13, 2021.  DHS Response, at 3.

[73] OMB Response, Attachment, at 12.

[74] DHS Response, Appendix, at 7.

[75] *Id*.

[76] OMB Response Follow-Up E-mail; DHS Response, at 13–14.

However, we are sensitive to the fact that this appropriation was provided several months ago, and none of the funds have yet been obligated.  Neither OMB nor DHS provided us with a detailed timeframe in which this appropriation will be obligated for new and/or existing barrier construction.[77]  Therefore, in order to facilitate Congress's oversight of executive spending and its Constitutional power of the purse, the congressional oversight and appropriations committees should consider requiring OMB and DHS to submit a timeline detailing the planned uses and timeframes for obligating this appropriation.

Distinguishing the Withholding of Ukraine Security Assistance

Any delay in obligation or expenditure of border barrier funding is factually and legally distinguishable from OMB's impermissible withholding of funds appropriated to DOD for security assistance to Ukraine in B-331564, Jan. 16, 2020.  In our decision regarding Ukraine security assistance funding, the uses of the funding had been planned for by DOD, and DOD even certified to Congress that statutory prerequisites had been satisfied.  When OMB made the funds unavailable for obligation, it did not identify any circumstances to justify taking a different approach from the one planned for and certified by DOD.  OMB asserted that the delay was associated with a need "to determine the best use of such funds," but OMB did not provide any support for why DOD's plan for the funds did not reflect the best use of the funds.[78]  Nor did OMB identify any other legal requirements that needed to be met before the Ukraine security assistance funding could be spent.  Instead, in its response to us, OMB described the withholding as necessary to ensure that the funds were not spent "in a manner that could conflict with the President's foreign policy."[79]

Here, laws such as NEPA, CICA, and the stakeholder consultation statute constrain the obligation of DHS's barrier appropriations.  While previous Secretaries of Homeland Security waived these laws under discretionary statutory authority, the current Secretary will not issue waivers, and the terms of legal prerequisites must be satisfied,[80] also resulting possibly in rescoping existing projects to mitigate environmental damage,[81] for example.

---

[77] DHS noted that activities such as environmental reviews and requests for proposals may affect the timeline for contract execution, and that for large, complex, construction projects, full NEPA review and full and open competition for contract award can take several months to several years.  DHS Response, at 14, footnote 57.

[78] B-331564, Jan. 16, 2020, at 6 (citation omitted).

[79] *Id*.

[80] OMB Response, at 9.

[81] DHS Response, at 12.

App.043

<u>Proposed Cancellation of Border Barrier Funding in Budget Request</u>

We note that President Biden's FY22 Budget Request proposed cancellation of border barrier funding that remains unobligated.[82]  Cancellation of this funding can only be accomplished through a duly enacted law.[83]  Withholding unobligated funding based on the FY22 Budget Request would violate the ICA.[84]   Here, OMB stated that the Administration will continue obligating and expending DHS's border barrier funding "unless and until" Congress acts on the requested cancellation.[85]  A proposed cancellation through the budget request, without being coupled with an impermissible withholding or delay, does not violate the ICA.  As explained, we conclude that DHS's barrier appropriations are apportioned as available, and there is no indication of an impermissible delay in the obligation of funds.

CONCLUSION

President Biden announced a policy choice through the Proclamation that funding not be diverted for border barrier construction, and through the Budget Request that proposes cancellation of unobligated border barrier funding.  However, making a policy choice through the Proclamation and Budget Request, without more, does not constitute an impoundment in violation of the ICA.  Here, funds appropriated to DHS in previous fiscal years remain almost fully obligated for barrier construction projects.  DHS and USACE suspended work after the current Secretary of Homeland Security exercised statutorily provided discretion to require that existing projects now comply with environmental and stakeholder consultation laws.  Though DHS has not yet obligated its fiscal year 2021 appropriation, it must first comply with statutory prerequisites and finalize determinations for barrier project funding requirements in light of current circumstances.  Delays in the obligation and expenditure of funds

---

[82] FY22 Budget Request, at 517.  OMB describes a cancellation proposal as "a proposal by the President to reduce budgetary resources that are not subject to the requirements of Title X of the Congressional Budget and Impoundment Control Act." OMB Circular No. A-11, *Preparation Submission, and Execution of the Budget*, pt. 3, § 112.2 (Arp. 2021), *available at* https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf (last visited June 2, 2021).  The Circular further states that amounts proposed for cancellation in the President's Budget Request are not to be withheld from obligation.  *Id.*

[83] The Constitution sets forth the procedures of bicameralism and presentment, which are the only mechanism for enacting federal law.  B-330330, Dec. 10, 2018.

[84] For example, we concluded that the withholding of appropriations for the Advanced Research Projects Agency-Energy based on the President's Budget Request, which proposed cancellation of the funds, violated the ICA.  B-329092, Dec. 12, 2017.

[85] OMB Response, at 9.

here, associated with meeting statutory requirements and finalizing plans for the uses of funding, are programmatic delays, not impoundments.

To facilitate Congress's oversight of executive spending on border barrier construction, Congress should consider requiring OMB and DHS to submit a timeline detailing the planned uses and timeframes for obligation and expenditure of DHS's barrier appropriations.  Having detailed information about the timeframes for spending these funds will help assure Congress that executive action is aligned with the policies and priorities it established in the legislative process.

*Thomas H. Armstrong*

Thomas H. Armstrong
General Counsel

*List of Signatories of March 17, 2021 Letter*

Shelley Morre Capito
United States Senate

Richard Shelby
United States Senate

Mitch McConnell
United States Senate

John Thune
United States Senate

Thom Tillis
United States Senate

Bill Hagerty
United States Senate

Jim Risch
United States Senate

John Kennedy
United States Senate

James M. Inhofe
United States Senate

Marco Rubio
United States Senate

Marsha Blackburn
United States Senate

Deb Fischer
United States Senate

Cindy Hyde-Smith
United States Senate

Roy Blunt
United States Senate

John Hoeven
United States Senate

B-333110
App.046

Jerry Moran
United States Senate

Rand Paul, M.D.
United States Senate

John Barrasso, M.D.
United States Senate

Richard Burr
United States Senate

Lindsey O. Graham
United States Senate

James Lankford
United States Senate

Mike Braun
United States Senate

Joni K. Ernst
United States Senate

Pat Toomey
United States Senate

Mike Crapo
United States Senate

Roger W. Marshall
United States Senate

Roger F. Wicker
United States Senate

Rick Scott
United States Senate

John Boozman
United States Senate

M. Michael Rounds
United States Senate

B-333110

App.047

Steve Daines
United States Senate

Rob Portman
United States Senate

Cynthia M. Lummis
United States Senate

Susan M. Collins
United States Senate

Tommy Tuberville
United States Senate

Kevin Cramer
United States Senate

Mitt Romney
United States Senate

Todd Young
United States Senate

John Cornyn
United States Senate

Tom Cotton
United States Senate

*List of Signatories of March 23, 2021 Letter*

John Katko
House of Representatives

Kay Granger
House of Representatives

Jason Smith
House of Representatives

Kevin McCarthy
House of Representatives

Steve Scalise
House of Representatives

B-333110

App.048

Clay Higgins
House of Representatives

Michael Guest
House of Representatives

Dan Bishop
House of Representatives

Jeff Van Drew
House of Representatives

Ralph Norman
House of Representatives

Mariannette Miller-Meeks
House of Representatives

Diana Harshbarger
House of Representatives

Andrew S. Clyde
House of Representatives

Carlos A. Gimenez
House of Representatives

Jake Laturner
House of Representatives

Peter Meijer
House of Representatives

Kat Cammack
House of Representatives

August Pfluger
House of Representatives

Andrew Garbarino
House of Representatives

Harold Rogers
House of Representatives

Robert B. Aderholt
House of Representatives

Mike Simpson
House of Representatives

John Carter
House of Representatives

Ken Calvert
House of Representatives

Tom Cole
House of Representatives

Mario Diaz-Balart
House of Representatives

Steve Womack
House of Representatives

Jeff Fortenberry
House of Representatives

Charles Fleischmann
House of Representatives

David P. Joyce
House of Representatives

Andy Harris, M.D.
House of Representatives

Mark Amodei
House of Representatives

Chris Stewart
House of Representatives

Steven Palazzo
House of Representatives

David G. Valadao
House of Representatives

B-333110

App.050

Dan Newhouse
House of Representatives

John Moolenaar
House of Representatives

John Rutherford
House of Representatives

Ben Cline
House of Representatives

Guy Reschenthaler
House of Representatives

Mike Garcia
House of Representatives

Ashley Hinson
House of Representatives

Tony Gonzales
House of Representatives

Tom McClintock
House of Representatives

Glenn Grothman
House of Representatives

Chris Jacobs
House of Representatives

Michael C. Burgess, M.D.
House of Representatives

Earl "Buddy" Carter
House of Representatives

Randy Feenstra
House of Representatives

Tedd Budd
House of Representatives

B-333110
App.051

Anthony Gonzalez
House of Representatives

Christopher H. Smith
House of Representatives

Mo Brooks
House of Representatives

Barry Moore
House of Representatives

Andy Biggs
House of Representatives

Burgess Owens
House of Representatives

Scott DesJarlais, M.D.
House of Representatives

Michael Cloud
House of Representatives

Mike Rogers
House of Representatives

Dan Crenshaw
House of Representatives

Matt Rosendale
House of Representatives

Brian Babin, D.D.S.
House of Representatives

Doug Lamalfa
House of Representatives

Darrell Issa
House of Representatives

Rick W. Allen
House of Representatives

Bob Good
House of Representatives

Jaime Herrera Beutler
House of Representatives

Dan Sullivan
United States Senate

Mike Lee
United States Senate

Josh Hawley
United States Senate

Ron Johnson,
United States Senate

*Signatory of April 16, 2021 Letter*

James R. Comer
House of Representatives

# EXHIBIT H



Official website of the Department of Homeland Security



**U.S. Department of
Homeland Security**

# DHS to Terminate Border Barrier Contracts in Laredo and Rio Grande Valley

**Release Date:** October 8, 2021

WASHINGTON – Consistent with the Department of Homeland Security's (DHS) border barrier plan (https://www.dhs.gov/news/2021/06/11/dhs-releases-plan-use-border-barrier-funds) , U.S. Customs and Border Protection (CBP), in coordination with the U.S. Army Corps of Engineers (USACE), intends to cancel the remaining border barrier contracts located within U.S. Border Patrol's (USBP) Laredo Sector and all border barrier contracts located in the Rio Grande Valley Sector.

CBP will then begin environmental planning and actions consistent with the National Environmental Policy Act (NEPA) for previously planned border barrier system projects located within the Rio Grande Valley, Laredo, and El Centro Sectors.

Environmental planning activities will cover projects funded with DHS's Fiscal Year 2018-2021 barrier system appropriations where construction had not started. These activities include additional biological, cultural, and natural resource surveys for project areas where no data have been previously collected. CBP will also conduct comprehensive and targeted outreach with interested stakeholders, including impacted landowners, tribes, state and local elected officials, and federal agencies.

These activities will not involve any construction of new border barrier or permanent land acquisition.

The Administration continues to call on Congress to cancel remaining border wall funding and instead fund smarter border security measures, like border technology and modernization of land ports of entry, that are proven to be more effective at improving safety and security at the border. Until and unless Congress cancels those funds, the law requires DHS to use the

App.055

funds consistent with their appropriated purpose, and beginning environmental planning activities is part of the Department's plan to do so.

This announcement has no impact on previously approved (https://www.dhs.gov/news/2021/07/27/dhs-address-life-safety-environmental-and-operational-considerations-specific-border) remediation projects necessary to address life, safety, and environmental restoration issues in the Rio Grande Valley, San Diego, and El Centro Sectors in accordance with the Department's plan (https://www.dhs.gov/news/2021/06/11/dhs-releases-plan-use-border-barrier-funds) .

Keywords: Southwest Border (/keywords/southwest-border)

Last Published Date: October 8, 2021

# EXHIBIT I



All MPI ▼



Home » Data Hub » Unauthorized Immigrant Population

# Profile of the Unauthorized Population: Missouri



▼ DEMOGRAPHICS

▼ FAMILY

▼ EDUCATION AND LANGUAGE

▼ WORKFORCE

▼ ECONOMICS

| Demographics | Estimate | % of Total |
|---|---|---|
| Unauthorized Population | 50,000 | 100% |
| **Top Countries of Birth** | | |
| Mexico | 19,000 | 38% |
| Guatemala | 4,000 | 8% |
| China/Hong Kong | 3,000 | 6% |
| Honduras | 2,000 | 5% |
| - | - | - |
| **Regions of Birth** | | |
| Mexico and Central America | 28,000 | 55% |
| Caribbean | - | - |
| South America | - | - |
| Europe/Canada/Oceania | 4,000 | 8% |
| Asia | 12,000 | 24% |
| Africa | 4,000 | 8% |
| **Years of U.S. Residence** | | |

App.058

| | Estimate | % of Total |
|---|---|---|
| Less than 5 | 13,000 | 27% |
| 5 to 9 | 9,000 | 19% |
| 10 to 14 | 11,000 | 21% |
| 15 to 19 | 10,000 | 21% |
| 20 or more | 6,000 | 13% |
| **Age** | | |
| Under 16 | 3,000 | 6% |
| 16 to 24 | 9,000 | 18% |
| 25 to 34 | 16,000 | 31% |
| 35 to 44 | 13,000 | 25% |
| 45 to 54 | 6,000 | 12% |
| 55 and over | 4,000 | 8% |
| **Gender** | | |
| Female | 24,000 | 48% |

| **Family** | Estimate | % of Total |
|---|---|---|
| **Parental Status** | | |
| Population ages 15 and older | 48,000 | 100% |
| Reside with at least one U.S.-citizen child under 18 | 18,000 | 37% |
| Reside with noncitizen children only under 18 | 3,000 | 7% |
| Reside with no children | 27,000 | 56% |
| **Marital Status** | | |
| Population ages 15 and older | 48,000 | 100% |
| Never married | 17,000 | 37% |
| Married to a U.S. citizen | 9,000 | 18% |
| Married to a legal permanent resident (LPR) | 3,000 | 6% |
| Married to non-U.S. citizen/non-LPR | 12,000 | 25% |
| Divorced, separated, widowed | 7,000 | 14% |

| **Education and Language** | Estimate | % of Total |
|---|---|---|

App.059

## School Enrollment of Children and Youth

| | | |
|---|---|---|
| Population ages 3 to 17 | 4,000 | 100% |
| Enrolled | 3,000 | 85% |
| Not enrolled | - | - |
| Population ages 3 to 12 | - | - |
| Enrolled | - | - |
| Not enrolled | - | - |
| Population ages 13 to 17 | - | - |
| Enrolled | - | - |
| Not enrolled | - | - |
| Population ages 18 to 24 | 9,000 | 100% |
| Enrolled | 4,000 | 47% |
| Not enrolled | 5,000 | 53% |

## Educational Attainment of Adults

| | | |
|---|---|---|
| Population ages 25 and older | 38,000 | 100% |
| 0-5 grade | 5,000 | 12% |
| 6-8 grade | 4,000 | 12% |
| 9-12 grade | 4,000 | 11% |
| High school diploma or equivalent | 9,000 | 23% |
| Some college or associate's degree | 5,000 | 14% |
| Bachelor's, graduate, or professional degree | 11,000 | 28% |

## English Proficiency

| | | |
|---|---|---|
| Population ages 5 and older | 50,000 | 100% |
| Speak only English | 6,000 | 13% |
| Speak English "very well" | 16,000 | 32% |
| Speak English "well" | 11,000 | 22% |
| Speak English "not well"/"not at all" | 16,000 | 32% |

## Top 5 Languages Spoken at Home

| | | |
|---|---|---|
| Population ages 5 and older | 50,000 | 100% |

App.060

| | Estimate | % of Total |
|---|---|---|
| Spanish | 27,000 | 54% |
| English | 7,000 | 13% |
| Chinese | 3,000 | 6% |
| - | - | - |
| - | - | - |

## Workforce

| | Estimate | % of Total |
|---|---|---|
| **Labor Force Participation** | | |
| Civilian population ages 16 and older | 47,000 | 100% |
| Employed | 29,000 | 63% |
| Unemployed | - | - |
| Not in the labor force | 15,000 | 33% |
| **Top Industries of Employment** | | |
| Civilian employed population ages 16 and older | 29,000 | 100% |
| Accommodation and food services, arts, entertainment, and recreation | 6,000 | 20% |
| Construction | 5,000 | 16% |
| Manufacturing | 5,000 | 16% |
| Professional, scientific, management, administrative, and waste management services | 3,000 | 11% |
| Health services and social assistance | 2,000 | 8% |

## Economics

| | Estimate | % of Total |
|---|---|---|
| **Family Income** | | |
| Below 50% of the poverty level | 9,000 | 17% |
| 50-99% of the poverty level | 7,000 | 14% |
| 100-149% of the poverty level | 8,000 | 15% |
| 150-199% of the poverty level | 6,000 | 11% |
| At or above 200% of the poverty level | 21,000 | 42% |
| **Access to Health Insurance** | | |
| Uninsured | 26,000 | 52% |
| **Home Ownership*** | | |

| Homeowner | | 17,000 | 34% |

*Source*: These 2019 data result from Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the pooled 2015-19 American Community Survey (ACS) and the 2008 Survey of Income and Program Participation (SIPP), weighted to 2019 unauthorized immigrant population estimates provided by Jennifer Van Hook of The Pennsylvania State University.

*Note*: For U.S. and state estimates of the unauthorized population potentially eligible for the Deferred Action for Childhood Arrivals (DACA) program, click here.

Data-related notes
* "Homeowners" are unauthorized immigrants residing in homes that are owned, not rented.

+ Includes the following Colorado counties: Adams, Broomfield, Clear Creek, Douglas, Elbert, Gilpin, and Jefferson, as well as portions of Arapahoe, Boulder, and Weld counties.

++ NECTAs refer to New England City and Town Areas, geographic entities defined by the U.S. Census Bureau for use as alternatives to counties in the six-state New England region.

Estimate for China includes Hong Kong but excludes Taiwan; estimate for Korea includes South Korea and North Korea.

"School Enrollment of Children and Youth" refers to unauthorized immigrants who reported attending school or college at any time in the three months prior to the survey.

For languages, "Chinese" includes Mandarin, Cantonese, and other Chinese languages; "English" includes English, Jamaican Creole, Krio, Pidgin Krio, and other English-based Creole languages; "French" includes French, Patois, and Cajun; "Pacific Island languages" includes Ilocano, Samoan, Hawaiian, Sebuano, Chamorro, Guamanian, Marshallese, Trukese, Tongan, and other Austronesian languages, but excludes Tagalog and Filipino, which are reported separately; "Portuguese" includes Portuguese and Cape Verdean Creole; "Sub-Saharan African" includes Swahili or other Bantu languages, Mande, Fulani, Kru, and other unspecified African languages; "Tagalog" includes Tagalog and Filipino.

For industries, "Other services" are miscellaneous services, not including the following services listed separately: (1) professional, scientific, management, administrative, and waste management services; (2) educational services; (3) health and social services; and (4) accommodation and food services, arts, entertainment, and recreation.

 "-" estimates are zero, not applicable, or not displayed due to small sample size.

Percentages may not add up to 100 due to rounding.

*Methodology in Brief*:

App.062

MPI's method uses information from the SIPP to assign legal status to noncitizens in the ACS. In the SIPP, noncitizens report whether they currently have lawful permanent resident (LPR) status—i.e., a green card. Those without LPR status may be recent refugees, temporary visitors (e.g., international students or high-skilled H-1B workers), or unauthorized immigrants. Our method maps characteristics such as country of birth, year of U.S. entry, age, gender, and educational attainment between the two surveys, and those noncitizens in the ACS who have characteristics similar to those reporting LPR status in the SIPP are coded as LPRs in the ACS. The remaining noncitizens—who are similar in characteristics to those not reporting LPR status in the SIPP—are classified as either unauthorized or legal temporary migrants, depending on whether they meet the qualifications for H-1B and the other temporary visa classifications. Estimates of unauthorized immigrants are weighted to match control totals (benchmarks) for immigrants from a set of origin countries and world regions. These control totals are calculated by subtracting the number of legal immigrants from the total of all immigrants for each country and region that are captured in the ACS data. The number of legal immigrants is estimated by adding up all legal admissions from each country and region in every year—using Department of Homeland Security administrative data—and then reducing this number to account for deaths and emigration of legal immigrants. Finally, the unauthorized immigrant population estimates are adjusted upward slightly to account for the undercount of this population in the ACS.

MPI's overall method was developed in consultation with James Bachmeier of Temple University and Jennifer Van Hook of The Pennsylvania State University, Population Research Institute. For more detail on the methods, see MPI, "MPI Methodology for Assigning Legal Status to Noncitizen Respondents in U.S. Census Bureau Survey Data." The control totals were developed by Van Hook. These estimates have the same sampling and coverage errors as any other survey-based estimates that rely on ACS and other Census Bureau data.



**RESEARCH & INITIATIVES** | **PUBLICATIONS** | **EVENTS** | **NEWS** | **ABOUT**          **CONTACT US** | **SITE MAP** | **PRIVACY POLICY** | **EXPERTS** | **EMAIL SIGN UP**

1275 K St. NW, Suite 800, Washington, DC 20005 | ph. 202-266-1940 | fax. 202-266-1900



Copyright © 2001-2021 Migration Policy Institute. All rights reserved.

App.063

# EXHIBIT J

U.S. unauthorized immigrant population estimates by state, 2016 | Pew Research Center

NUMBERS, FACTS AND TRENDS SHAPING YOUR WORLD

NEWSLETTERS | DONATE | MY ACCOUNT

See our research on: Climate Change | Social Media | COVID-19

RESEARCH TOPICS

ALL PUBLICATIONS METHODS SHORT READS TOOLS & RESOURCES EXPERTS ABOUT

Home ❑ Research Topics

FEATURE | FEBRUARY 5, 2019

# U.S. unauthorized immigrant population estimates by state, 2016

Pew Research Center estimates that 10.7 million unauthorized immigrants, the lowest level in a decade, lived in the U.S. in 2016. Select a measure from the dropdown below to view state by state data on unauthorized immigration.

**Population** | Labor Force

Unauthorized immigrant population, 2016

A majority of U.S. unauthorized immigrants live in just six states – including California (with the largest population at 2.2 million), Texas, Florida, New York, New Jersey and Illinois. There are eight states with 5,000 or fewer unauthorized immigrants. For more, see our report, "U.S. Unauthorized Immigrant Total Dips to Lowest Level in a Decade," and our interactive charts on unauthorized immigrant population trends.

❑ **Methodology**

Unauthorized immigrant population, 2016

Created with Highmaps 6.1.0Unauthorized immigrant populationIllinois: 400,000U.S.: 10,700,000

App.065

U.S.: 10,700,000
400,000 – 2,200,000
170,000 – 399,999
75,000 – 169,999
25,000 – 74,999
<25,000

Note: All numbers are rounded; see Methodology for rounding rules.

Source: Pew Research Center estimates based on augmented U.S. Census Bureau data. See Methodology for details.

| State | Unauthorized immigrant population | Unauthorized immigrant % of population | Unauthorized immigrant % of all immigrants | % of K-12 students with unauthorized immigrant parent(s) | Mexican % of unauthorized immigrants | % of unauthorized immigrant adults in U.S. 5 years or less | Change in unauthorized immigrant population, 2007 to 2016 |
|---|---|---|---|---|---|---|---|
| U.S. | 10,700,000 | 3.3% | 24% | 7.6% | 51% | 18% | -1,550,000 |
| Alabama | 55,000 | 1.2% | 34% | 3.3% | 59% | 13% | -15,000 |
| Alaska | 5,000 | 1.0% | 13% | 0.5% | 23% | 43% | Not sig. |
| Arizona | 275,000 | 3.9% | 28% | 10.7% | 78% | 13% | -220,000 |
| Arkansas | 55,000 | 1.9% | 41% | 6.3% | 64% | 15% | -10,000 |
| California | 2,200,000 | 5.6% | 20% | 13.3% | 69% | 10% | -550,000 |
| Colorado | 190,000 | 3.4% | 34% | 10.6% | 70% | 14% | Not sig. |
| Connecticut | 120,000 | 3.5% | 23% | 6.9% | 14% | 21% | Not sig. |
| Delaware | 30,000 | 3.0% | 31% | 7.0% | 38% | 29% | Not sig. |

App.066

| | | | | | | |
|---|---|---|---|---|---|---|
| District of Columbia | 25,000 | 3.8% | 28% | 9.0% | 5% | 21% | Not sig. |
| Florida | 775,000 | 3.8% | 18% | 7.1% | 15% | 29% | -240,000 |
| Georgia | 400,000 | 3.8% | 36% | 8.6% | 49% | 17% | Not sig. |
| Hawaii | 45,000 | 3.3% | 17% | 7.0% | 6% | 34% | Not sig. |
| Idaho | 35,000 | 2.2% | 37% | 5.7% | 79% | 19% | Not sig. |
| Illinois | 400,000 | 3.2% | 22% | 7.8% | 71% | 11% | -140,000 |
| Indiana | 100,000 | 1.5% | 29% | 4.2% | 59% | 23% | Not sig. |
| Iowa | 50,000 | 1.7% | 31% | 4.2% | 56% | 26% | Not sig. |
| Kansas | 75,000 | 2.6% | 35% | 7.6% | 69% | 16% | Not sig. |
| Kentucky | 35,000 | 0.8% | 22% | 1.6% | 48% | 24% | Not sig. |
| Louisiana | 70,000 | 1.5% | 36% | 2.7% | 28% | 23% | +15,000 |
| Maine | <5,000 | 0.4% | 9% | 0.5% | – | – | Not sig. |
| Maryland | 275,000 | 4.5% | 29% | 8.5% | 9% | 22% | +60,000 |
| Massachusetts | 250,000 | 3.8% | 22% | 6.1% | 2% | 29% | +35,000 |
| Michigan | 100,000 | 1.0% | 15% | 2.2% | 29% | 27% | -45,000 |
| Minnesota | 95,000 | 1.7% | 20% | 3.8% | 50% | 21% | Not sig. |
| Mississippi | 20,000 | 0.7% | 35% | 1.8% | 59% | 21% | Not sig. |
| Missouri | 60,000 | 1.0% | 23% | 2.7% | 45% | 20% | Not sig. |
| Montana | <5,000 | 0.3% | 12% | 0.1% | – | – | Not sig. |
| Nebraska | 60,000 | 3.1% | 41% | 9.2% | 62% | 14% | Not sig. |
| Nevada | 210,000 | 7.1% | 35% | 20.2% | 66% | 12% | -35,000 |
| New Hampshire | 10,000 | 0.7% | 13% | 0.9% | 6% | 36% | Not sig. |

App.067

| New Jersey | 475,000 | 3.2% | 22% | 8.8% | 23% | 21% | -90,000 |
| New Mexico | 60,000 | 2.8% | 29% | 7.9% | 91% | 12% | -25,000 |
| New York | 725,000 | 3.6% | 15% | 6.6% | 24% | 20% | -300,000 |
| North Carolina | 325,000 | 3.1% | 39% | 8.9% | 56% | 16% | Not sig. |
| North Dakota | 5,000 | 0.7% | 23% | 1.7% | – | – | Not sig. |
| Ohio | 90,000 | 0.8% | 17% | 1.4% | 25% | 33% | Not sig. |
| Oklahoma | 85,000 | 2.2% | 38% | 6.4% | 78% | 15% | Not sig. |
| Oregon | 110,000 | 2.6% | 26% | 8.2% | 69% | 16% | -40,000 |
| Pennsylvania | 170,000 | 1.3% | 19% | 2.4% | 21% | 31% | Not sig. |
| Rhode Island | 30,000 | 2.8% | 19% | 6.8% | 8% | 28% | Not sig. |
| South Carolina | 85,000 | 1.7% | 35% | 4.4% | 54% | 20% | Not sig. |
| South Dakota | 5,000 | 0.7% | 19% | 1.2% | – | – | Not sig. |
| Tennessee | 130,000 | 2.0% | 38% | 5.2% | 56% | 23% | Not sig. |
| Texas | 1,600,000 | 5.7% | 33% | 13.3% | 73% | 16% | Not sig. |
| Utah | 95,000 | 3.2% | 38% | 7.5% | 71% | 14% | Not sig. |
| Vermont | <5,000 | 0.1% | 4% | 0.2% | – | – | Not sig. |
| Virginia | 275,000 | 3.4% | 27% | 6.9% | 12% | 23% | Not sig. |
| Washington | 240,000 | 3.3% | 23% | 8.9% | 56% | 17% | Not sig. |
| West Virginia | <5,000 | 0.2% | 14% | 0.5% | – | – | Not sig. |
| Wisconsin | 75,000 | 1.3% | 24% | 3.6% | 70% | 15% | Not sig. |
| Wyoming | 5,000 | 1.2% | 32% | 3.9% | – | – | Not sig. |

App.068

EMBED    REPORT    DATA

© PEW RESEARCH CENTER

[?]

1615 L St. NW, Suite 800
Washington, DC 20036
USA
(+1) 202-419-4300 | Main
(+1) 202-857-8562 | Fax
(+1) 202-419-4372 | Media Inquiries

## RESEARCH TOPICS

Politics & Policy

Family & Relationships

International Affairs

Economy & Work

Immigration & Migration

Science

Internet & Technology

Race & Ethnicity

News Habits & Media

Religion

Methodological Research

Generations & Age

Gender & LGBT

Full topic list

## FOLLOW US

☐ Email Newsletters

☐ Facebook

☐ Twitter

☐ Tumblr

☐ YouTube

☐ RSS

**ABOUT PEW RESEARCH CENTER** Pew Research Center is a nonpartisan fact tank that informs the public about the issues, attitudes and trends shaping the world. It conducts public opinion polling, demographic research, media content analysis and other empirical social science research. Pew Research Center does not take policy positions. It is a subsidiary of The Pew Charitable Trusts.

Copyright 2021 Pew Research Center   About   Terms & Conditions   Privacy Policy   Reprints, Permissions & Use Policy   Feedback   Careers

App.069

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSOURI; and | ) | |
| | ) | |
| THE STATE OF TEXAS, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 6:21-cv-00052 |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States of | ) | |
| America, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |

### DECLARATION OF JOSEPH PLAGGENBERG

1. My name is Joseph G. Plaggenberg.  I am Acting Director for the Missouri Department of Revenue (DOR).  I am over 21 years of age and competent to testify to the matters asserted herein.

2. DOR is the state agency responsible for issuing driver's licenses in Missouri.

3. In issuing driver's licenses, DOR uses the Systemic Alien Verification of Entitlements (SAVE) system to verify individuals' lawful immigration status at a cost of $0.50 for the initial inquiry and $0.50 for any additional inquiries.

4. In state fiscal year 2020, DOR paid $30,114.11 for SAVE inquiries.

5. While applicants for drivers' licenses are charged a fee, no part of that fee is specifically designated for SAVE costs, and DOR must annually request appropriations from the state legislature to cover the costs of SAVE inquiries.

I swear or affirm under penalty of perjury that the foregoing is true and correct.

Dated: 10/28/21

Joseph G. Plaggenberg

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSOURI; and | ) | |
| | ) | |
| THE STATE OF TEXAS, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 6:21-cv-00052 |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States of | ) | |
| America, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |

## DECLARATION OF JENNIFER TIDBALL

1. My name is Jennifer Tidball.  I am Chief Operating Officer for the Missouri Department of Social Services (DSS).  I am over 21 years of age and competent to testify to the matters asserted herein.

2. DSS is the single state agency responsible for administering Missouri's Medicaid healthcare programs.

3. According to internal data pulled on October 21, 2021, Missouri expended $361,702 in emergency medical care costs for treatment of ineligible aliens during Fiscal Year 2020.

I swear or affirm under penalty of perjury that the foregoing is true and correct.

Dated:

Jennifer Tidball

App.071

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSOURI; and | ) | |
| | ) | |
| THE STATE OF TEXAS, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 6:21-cv-00052 |
| | ) | |
| JOSEPH R. BIDEN, JR., | ) | |
| in his official capacity as | ) | |
| President of the United States of | ) | |
| America, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |

### DECLARATION OF KARI MONSEES

1. My name is Kari Monsees. I am Deputy Commissioner for Finance and Administrative Services for the Missouri Department of Elementary and Secondary Education (DESE). I am over 21 years of age and competent to testify to the matters asserted herein.

2. DESE is the administrative arm of the Missouri State Board of Education that works with school officials, legislators, government agencies, community leaders, and citizens to maintain a strong public education system.

3. According to internal data, Missouri spent an average of $10,654 in state and local expenditures per student in school year 2019-2020, regardless of immigration status. *See* Missouri Department of Elementary and Secondary Education, State Report Card - 2020 Data, https://apps.dese.mo.gov/MCDS/Reports/SSRS_Print.aspx?Reportid=84 d85ca8-c722-4f9b-9935-70d36a53cf54 (last accessed Oct. 27, 2021). A true and correct copy of this publication is attached hereto as **Exhibit A**.

I swear or affirm under penalty of perjury that the foregoing is true and correct.

Dated: *10/28/2021*

Kari Monsees



# Missouri State Report Card

[Missouri School Improvement Program - Annual Performance Report for 2019](#)

[ESSA Accountability Plan for 2019](#)

Beginning in 2020, Report Card calculates based on a fixed dataset derived from the current school year to produce a static report; therefore, it may not match other reports on the MCDS portal. Report Card is intended to represent a fixed period of time, while all other reports use live data.

**(1) Preschool Enrollment**  (Data as of 11/28/2020)

| Missouri | 2020 |
|----------|------|
| Total | 37,664 |

**Definition**

- \* - Indicates data has been suppressed due to small cell size < 5.
- N/A denotes data not applicable.
- Progress toward the long-term goals and interim measures of progress included in Appendix A of Missouri's Consolidated State Plan will be available for the first time in the 2019 Report Card.



# Missouri State Report Card

**(2) K-12 Enrollment**     (Data as of 11/28/2020)

| Missouri | 2020 |
|---|---|
| Total | 879,661 |
| American Indian/Alaska Native | 0.4% |
| Asian | 2.1% |
| Black | 15.5% |
| Hawaiian/Pacific Islander | 0.3% |
| Hispanic | 7.0% |
| Multi-Race | 4.6% |
| White | 70.1% |
| Female | 48.6% |
| Male | 51.4% |
| Free and Reduced Lunch | 49.3% |
| English Learner | 3.9% |
| Special Education | 13.7% |
| Homeless | 2.5% |
| Migrant | 0.1% |
| Gifted | 4.3% |
| Foster | 0.6% |
| Military | 1.4% |

**Definition**

- \* - Indicates data has been suppressed due to small cell size < 5.
- N/A denotes data not applicable.
- Progress toward the long-term goals and interim measures of progress included in Appendix A of Missouri's Consolidated State Plan will be available for the first time in the 2019 Report Card.

*Report as of: 10/28/2021*



# Missouri State Report Card

### (3) Proportional Attendance Rate

(Data as of 11/28/2020)

| Missouri | 2020 |
|---|---|
| All Students | 85.3% |
| American Indian/Alaska Native | 80.4% |
| Asian | 92.0% |
| Black | 76.5% |
| Hawaiian/Pacific Islander | 78.2% |
| Hispanic | 84.0% |
| Multi-Race | 83.0% |
| White | 87.4% |
| Female | 85.3% |
| Male | 85.3% |
| Free and Reduced Lunch | 79.2% |
| English Learner | 86.6% |
| Special Education | 79.4% |

Definition

Attendance targets use the individual student's attendance rate and set the expectation that 90% of the students are in attendance 90% of the time per federal guidelines.  This rate will not be reflected the same on the APR for district/charter proportional attendance.

### (4) Students Eligible for Free and Reduced-Price Lunch

(Data as of 11/28/2020)

| Missouri | 2020 |
|---|---|
| Percent | 49.3% |
| Number | 425,218 |

Definition

- * - Indicates data has been suppressed due to small cell size < 5.
- N/A denotes data not applicable.
- Progress toward the long-term goals and interim measures of progress included in Appendix A of Missouri's Consolidated State Plan will be available for the first time in the 2019 Report Card.



# Missouri State Report Card

### (5) Four-Year Graduation Rate

(Data as of 11/28/2020)

| Missouri | 2020 |
|---|---|
| All Students | 89.38% |
| American Indian/Alaska Native | 87.91% |
| Asian | 94.24% |
| Black | 78.22% |
| Hawaiian/Pacific Islander | 84.53% |
| Hispanic | 86.44% |
| Multi-Race | 87.38% |
| White | 92.09% |
| Female | 91.49% |
| Male | 87.40% |
| Free and Reduced Lunch | 82.13% |
| Limited English Proficient | 72.08% |
| Special Education | 76.99% |
| Homeless | 77.97% |
| Migrant | 86.67% |
| Gifted | 98.47% |
| Foster | 68.75% |
| Military | 93.92% |

**Definition**

\* - Indicates the percent was 25 percent or below and has been suppressed from this report.

- \* - Indicates data has been suppressed due to small cell size < 5.
- N/A denotes data not applicable.
- Progress toward the long-term goals and interim measures of progress included in Appendix A of Missouri's Consolidated State Plan will be available for the first time in the 2019 Report Card.



# Missouri State Report Card

## (5) Five-Year Graduation Rate

(Data as of 11/28/2020)

| Missouri | 2020 |
|---|---|
| All Students | 91.30% |
| American Indian/Alaska Native | 87.92% |
| Asian | 95.40% |
| Black | 83.17% |
| Hawaiian/Pacific Islander | 85.63% |
| Hispanic | 88.37% |
| Multi-Race | 90.58% |
| White | 93.27% |
| Female | 93.15% |
| Male | 89.52% |
| Free and Reduced Lunch | 85.38% |
| Limited English Proficient | 80.38% |
| Special Education | 80.99% |
| Homeless | 80.29% |
| Migrant | 100.00% |
| Gifted | 99.17% |
| Foster | 75.32% |
| Military | 95.19% |

**Definition**

\* - Indicates the percent was 25 percent or below and has been suppressed from this report.

- \* - Indicates data has been suppressed due to small cell size < 5.
- N/A denotes data not applicable.
- Progress toward the long-term goals and interim measures of progress included in Appendix A of Missouri's Consolidated State Plan will be available for the first time in the 2019 Report Card.



# Missouri State Report Card

**(6) Dropout Rate**   (Data as of 11/28/2020)

| Missouri | 2020 |
|---|---|
| Total | 1.3% |
| American Indian/Alaska Native | 1.4% |
| Asian | 0.4% |
| Black | 3.4% |
| Hawaiian/Pacific Islander | 2.2% |
| Hispanic | 1.9% |
| Multi-Race | 1.5% |
| White | 0.9% |

**Definition**

**(7) Where Our Graduates Go**   (Data as of 11/28/2020)

| Missouri | 2020 |
|---|---|
| Entering a 4yr. College/University | 36.2% |
| Entering a 2yr. College | 25.2% |
| Entering a Postsecondary (Technical) Institution | 2.5% |
| Entering Employment | 24.7% |
| Entering Military | 3.2% |

**Definition**

- * - Indicates data has been suppressed due to small cell size < 5.
- N/A denotes data not applicable.
- Progress toward the long-term goals and interim measures of progress included in Appendix A of Missouri's Consolidated State Plan will be available for the first time in the 2019 Report Card.

*Report as of: 10/28/2021*



# Missouri State Report Card

### (9) Staffing Ratios
(Data as of 11/28/2020)

| Missouri | 2020 |
|---|---|
| Students to classroom teachers | 17 |
| Students to administrators | 174 |

**Definition**

### (10) Years of Experience of Professional Staff
(Data as of 11/28/2020)

| Missouri | 2020 |
|---|---|
| All Staff | 13.0 |

**Definition**

### (11) Disproportionate Rates of Access to Educators
(Data as of 11/24/2020)

| Missouri | 2020 | | | |
|---|---|---|---|---|
| | Title I | | Non-Title I | |
| | High > 75% Minority | High > 75% Poverty | Low < 25% Minority | Low < 25% Poverty |
| **TEACHERS** | | | | |
| Inexperienced Teachers | 13.7% | 10.6% | 5.4% | 3.8% |
| Out-of-Field Teachers | 14.0% | 11.5% | 9.7% | 2.8% |
| Ineffective Teachers | 2.7% | 1.6% | 0.5% | 0.2% |
| **PRINCIPALS** | | | | |
| Inexperienced Principals | 15.9% | 16.3% | 11.2% | 8.2% |
| Out-of-Field Principals | 11.3% | 10.1% | 8.5% | 2.1% |

**Definition**

### (12) Professional Staff with Advanced Degrees
(Data as of 11/28/2020)

| Missouri | 2020 |
|---|---|
| All Staff | 61.9% |

**Definition**

- * - Indicates data has been suppressed due to small cell size < 5.
- N/A denotes data not applicable.
- Progress toward the long-term goals and interim measures of progress included in Appendix A of Missouri's Consolidated State Plan will be available for the first time in the 2019 Report Card.

*Report as of: 10/28/2021*



# Missouri State Report Card

### (13) Average Teacher Salaries
(Data as of 11/28/2020)

| Missouri | 2020 |
|---|---|
| Average Regular Term Salary | $50,757 |
| Average Total Salary | $51,980 |

**Definition**

### (14) Average Administrator Salaries
(Data as of 11/28/2020)

| Missouri | 2020 |
|---|---|
| All Administrators | $95,539 |

**Definition**

### (15) Current Expenditures per Pupil - State Level
(Data as of 1/25/2021)

| Missouri | 2020 |
|---|---|
| A.   Membership * | 875,043.19 |
| **State Level Per-Pupil Expenditures** | |
| B.   Federal | $782 |
| C.   State/Local | $10,654 |
| D.   State Level Per-Pupil Total (Sum of B+C) | $11,436 |

(Excluded expenditures include capital outlay, debt service, community services, non-instruction/support, adult education, and Title I expenditures. Impact aid is considered local expenditures.)

**Definition**

### (16) Average Tax Rate Per District
(Data as of 11/17/2020)

| MISSOURI | 2020 |
|---|---|
| Incidental | $3.4392 |
| Teachers | $0.1214 |
| Debt Service | $0.4951 |

- * - Indicates data has been suppressed due to small cell size < 5.
- N/A denotes data not applicable.
- Progress toward the long-term goals and interim measures of progress included in Appendix A of Missouri's Consolidated State Plan will be available for the first time in the 2019 Report Card.



# Missouri State Report Card

## (16) Average Tax Rate Per District
(Data as of 11/17/2020)

| | |
|---|---|
| Capital Projects | $0.0890 |

**Definition**

## (17) Assessed Valuation
(Data as of 11/17/2020)

| MISSOURI | 2020 |
|---|---|
| Total | $110,589,446,990 |

**Definition**

## (18) Sources of Revenue
(Data as of 11/17/2020)

| MISSOURI | 2020 |
|---|---|
| Local | 48.19% |
| State | 40.74% |
| Federal | 11.07% |

**Definition**

## (19) Missouri Assessment Program (MAP) Results

On March 19, 2020, in response to the COVID-19 pandemic, the Department of Elementary and Secondary Education (DESE) announced the spring 2020 Missouri Assessment Program (MAP) assessments would not be administered, including Grade-Level (GLA), End-of-Course (EOC) and Missouri Assessment Program-Alternate (MAP-A) exams. Assessment data is not available for the 2020 school year.

## (20) Missouri Performance on National Assessment of Educational Progress (NAEP)

Missouri Performance on NAEP Report for 2019

**Definition**

- * - Indicates data has been suppressed due to small cell size < 5.
- N/A denotes data not applicable.
- Progress toward the long-term goals and interim measures of progress included in Appendix A of Missouri's Consolidated State Plan will be available for the first time in the 2019 Report Card.

*Report as of: 10/28/2021*

App.081



# Missouri State Report Card

## (21) ACT Results
(Data as of 11/28/2020)

| MISSOURI | 2020 |
|---|---|
| Percent of Graduates Taking the ACT | 75.10% |
| Composite ACT Score | 20.70 |

**Definition**

## (22) Disciplinary Actions
(Data as of 11/28/2020)

| Missouri | 2020 |
|---|---|
| Suspensions of 10 or More Consecutive Days (number \| rate) | 8,236 \| 0.9 |
| Expulsions (number \| rate) | 10 \| 0.0 |

**Definition**

## (24) How Do Student Groups Perform?
On March 19, 2020, in response to the COVID-19 pandemic, the Department of Elementary and Secondary Education (DESE) announced the spring 2020 Missouri Assessment Program (MAP) assessments would not be administered, including Grade-Level (GLA), End-of-Course (EOC) and Missouri Assessment Program-Alternate (MAP-A) exams. Assessment data is not available for the 2020 school year.

## (25) Students in Gifted Education Program
(Data as of 11/28/2020)

| Missouri | 2020 |
|---|---|
| Percent | 4.3% |
| Number | 37,638 |

**Definition**

- * - Indicates data has been suppressed due to small cell size < 5.
- N/A denotes data not applicable.
- Progress toward the long-term goals and interim measures of progress included in Appendix A of Missouri's Consolidated State Plan will be available for the first time in the 2019 Report Card.

*Report as of: 10/28/2021*



# Missouri State Report Card

## (26) English Learner Proficiency Status   (Data as of 11/28/2020)

| Missouri | 2018 | 2019 | 2020 |
|---|---|---|---|
| Number of English Learners | 23526 | 23970 | 23632 |
| Number Becoming Proficient | 7318 | 6537 | 6545 |
| Percent Becoming Proficient | 31.1% | 27.3% | 27.7% |

Definition

## (27) Comprehensive and Targeted Status

The U.S. Department of Education provided guidance to states regarding the identification of comprehensive and targeted schools in October 2020. Without spring 2020 assessment data, previously identified comprehensive and targeted schools will be in the second year of identification during the 2020-21 school year.

*State Comprehensive List for 2019*
*State Targeted List for 2019*
Definition

## (28) CRDC Information
*Civil Rights Data Collection report*
Definition

- • * - Indicates data has been suppressed due to small cell size < 5.
- • N/A denotes data not applicable.
- • Progress toward the long-term goals and interim measures of progress included in Appendix A of Missouri's Consolidated State Plan will be available for the first time in the 2019 Report Card.

*Report as of: 10/28/2021*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

|  |  |  |
|---|---|---|
| THE STATE OF MISSOURI, and | § § § | |
| THE STATE OF TEXAS, | § § | |
| Plaintiffs, | § § § | Case No. 6:21-cv-00052 |
| v. | § § | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*, | § § § § | |
| Defendants. | § § | |

**DECLARATION OF RYAN D. WALTERS
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION**

I, Ryan D. Walters, hereby declare as follows:

1.      I am over 18 years of age and am fully competent to make this declaration. I am Special Counsel in the Special Litigation Unit at the Texas Office of Attorney General, and I am admitted to practice law in this Court, and I represent the State of Texas in the above-captioned matter.

2.      Appended to this declaration are the following exhibits:

| Ex. No. | Title |
|---------|-------|
| A | U.S. Citizenship and Immigration Services Description of Parole |
| B | U.S. Census Bureau Table – Geographic Mobility by Citizenship Status |
| C | Foreign-Born Population in Texas |
| D | Gone to Texas |

     3.       The exhibits listed above are true and correct copies of what they purport  to be.

I declare under the penalty of perjury that the foregoing is true and correct.

                Executed on November 4, 2021

                */s/ Ryan D. Walters*
                Ryan D. Walters

App.085

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| THE STATE OF MISSOURI, and | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| Plaintiffs, | § | Case No. 6:21-cv-00052 |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United | § | |
| States of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

# EXHIBIT A


U.S. Citizenship
and Immigration
Services

[Home](#) > [Humanitarian](#) > Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States

# Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States

> ℹ️ Both the special parole policy for arriving Cuban nationals, commonly known as the "wet foot/dry foot" policy, and the Cuban Medical Professional Parole Program expired on January 12, 2017. [Read the announcement](#) on the DHS website. The Cuban Family Reunification Parole Program remains in effect.

Individuals who are outside of the United States may be able to request parole into the United States based on humanitarian or significant public benefit reasons.

**For information on the types of documents and evidence you should submit** in support of a request for parole, please see [Guidance on Evidence for Certain Types of Humanitarian or Significant Public Benefit Parole Requests](#).

This webpage does **not** cover the following types of parole requests:

- *Requests for individuals who are already in the United States and seek "advance parole" to leave and return*. For information on how an individual already in the United States may be considered for advance parole to return to the United States after departure, please see [Form I-131 instructions (PDF, 284.74 KB)](#).

- *Requests for individuals who are in the United States and seek parole in place*.  For more information, please contact the local USCIS office through [my.uscis.gov/appointment](#).

- *Requests for parole that are under the jurisdiction of Immigration and Customs Enforcement (ICE)*. ICE has primary jurisdiction over a person seeking parole who is in removal proceedings in the United States or who has previously been removed or deported. Requests to ICE for parole should be submitted to ICE via the USCIS address under [Humanitarian parole applicants](#). Please see the [Memorandum of Agreement between USCIS, ICE and CBP (PDF)](#) for more information about each agency's jurisdiction over parole requests.

- *Requests for individuals who apply under special parole programs such as*:

  - [The Haitian Family Reunification Parole Program](#)

  - [The Cuban Family Reunification Parole Program](#)

- The Central American Minor Refugee/Parole Program
- The Filipino World War II Veterans Parole Program
- International Entrepreneur Parole

 Close All     Open All

## Terminology

The following terms are used on this page:

- **Petitioner**: The person completing the Form I-131, Application for Travel Document, on behalf of an individual outside the United States who is seeking parole (or re-parole as explained below). The term "self-petitioner" refers to an individual who files Form I-131, Application for Travel Document for him or herself.
- **Beneficiary**: A beneficiary is an individual, residing outside the United States (or a person seeking re-parole as explained below) who receives parole.
- **Sponsor**: A sponsor is an individual who agrees to provide financial support for the beneficiary of a parole application by filing Form I-134, Affidavit of Support (PDF, 463.53 KB).
- **Parolee**: A parolee is an individual who is paroled into the United States.

## What is Parole? 

USCIS uses its discretion to authorize parole. Parole allows an individual, who may be inadmissible or otherwise ineligible for admission into the United States, to be paroled into the United States for a temporary period. The Immigration and Nationality Act (INA) allows the secretary of Homeland Security to use their discretion to parole any alien applying for admission into the United States temporarily for urgent humanitarian reasons or significant public benefit. (See INA section 212(d)(5)).

An individual who is paroled into the U.S. has not been formally admitted into the United States for purposes of immigration law.

Parole is not intended to be used solely to avoid normal visa processing procedures and timelines, to bypass inadmissibility waiver processing, or to replace established refugee processing channels.

**Length of Parole**

If authorized, we will specify the duration of parole for a temporary period of time to accomplish the purpose of the parole, as indicated in Part 3 of Form I-131, Application for Travel Document. For example, if parole is requested to attend a civil court proceeding between private parties, we may authorize parole for the period of time necessary to attend the proceedings. Parole is typically granted for no more than a year.

Parole ends on the date the parole period expires or when the beneficiary departs the United States or acquires an immigration status, whichever occurs first. In some cases, we may place conditions on

parole, such as reporting requirements. We may revoke parole at any time and without notice if it determines that parole is no longer warranted or the beneficiary fails to comply with any conditions of parole.

**Work Permits**

If not inconsistent with the purpose and duration of parole, we may, in our discretion, grant a parolee temporary employment authorization. The parolee may request employment authorization after being paroled into the United States by filing Form I-765, Application for Employment Authorization.

## Who Can Apply for Parole?                                      ⌄

Anyone may request parole for himself or herself, or on behalf of another individual, by filing Form I-131, Application for Travel Document. The petitioner is an individual or entity who is filing the Form I-131, Application for Travel Document, on behalf of an individual outside of the United States. The petitioner may also self-petition for parole. The petitioner does not have to be a resident of the United States or related to the beneficiary.

## The Need for a Sponsor                                         ⌄

One important factor we consider in determining whether to exercise discretion to authorize parole is whether the beneficiary will have a means of support while in the United States. We require evidence of a sponsor to provide financial support to the parolee in the United States. Lack of evidence of financial support while in the United States is a strong negative factor that may lead to a denial of parole. We will take into account the Health and Human Services Federal poverty guidelines along with any special circumstances related to the beneficiary's need for care in assessing whether there are sufficient funds in place to adequately support the beneficiary once in the United States.

**Requirements for Sponsors**

The sponsor is the individual who agrees to provide financial support to the beneficiary while they are in the United States for the duration of the parole authorization period. The financial sponsor may or may not be the same person or entity as the petitioner. The sponsor must submit a Form I-134, Affidavit of Support (PDF, 463.53 KB) for each parole request to establish whether they have enough financial resources to support the parolee during their stay in the United States, and if the funds are overseas, access to those funds for the parolee's stay in the United States.

Though there is no requirement regarding the sponsor's immigration status in the United States, a sponsor who has a more permanent status in the United States, such as lawful permanent residence or is a U.S. citizen, may more readily be able to establish the ability to support the parolee in the United States. Evidence of the sponsor's immigration status or citizenship in the United States may be relevant to the sponsor's ability to support the beneficiary. Therefore, the petitioner should generally include evidence of the sponsor's immigration status or citizenship in the United States, such as the sponsor's permanent residence card, naturalization certificate, birth certificate or passport with the parole request.

App.089

**It is important to read the Form I-134 instructions (PDF, 222.2 KB) carefully for information about what kind of evidence is required to demonstrate sufficient income and financial resources.** Some examples of evidence that is helpful in demonstrating financial resources include pay stubs, last filed tax return or a letter from a sponsor's employer.

*Multiple Sponsors*

When determining a sponsor, the petitioner must take into account the Health and Human Services Federal poverty guidelines, and any special needs of the beneficiary. If the petitioner is unable to identify a sponsor who alone has sufficient means to support the beneficiary in the United States, the petitioner may indicate more than one sponsor if they have the means and agree to support the beneficiary while paroled in the United States. In this situation, the petitioner must submit a Form I-134, Affidavit of Support (PDF, 463.53 KB), along with the proper supporting documentation, from each sponsor.

*Self-Sponsor*

A beneficiary may also demonstrate that he or she is financially self-sufficient by submitting a Form I-134, Affidavit of Support (PDF, 463.53 KB), with supporting financial documentation.

*Organization as a Sponsor*

Occasionally, a non-profit organization or medical institution may serve as a sponsor on a parole application. In those instances, if an employee of the organization cannot complete a Form I-134, Affidavit of Support (PDF, 463.53 KB), the petitioner should include with the parole application, a letter from the organization committing to support the beneficiary.

## Eligibility for Parole 

A USCIS officer considers each request and the evidence provided on a case-by-case basis, taking into account all of the circumstances. (See Section 212(d)(5) of the INA.) The burden of proof is on the petitioner to establish that parole should be authorized. Parole will be authorized only if we conclude, based on all the evidence the petitioner submits and any other relevant evidence available to us, that

- There are urgent humanitarian or significant public benefit reasons for the beneficiary to be in the United States; and
- The beneficiary merits a favorable exercise of discretion.

**Urgent Humanitarian Reasons**

There is no statutory or regulatory definition of "urgent humanitarian reasons." USCIS officers look at all of the circumstances, taking into account factors such as (but not limited to):

- Whether or not the circumstances are pressing;
- The effect of the circumstances on the individual's welfare and wellbeing; and
- The degree of suffering that may result if parole is not authorized.

App.090

An applicant may demonstrate urgency by establishing a reason to be in the United States that calls for immediate or other time-sensitive action, including (but not limited to) critical medical treatment, or the need to visit, assist or support a family member who is at an end of life stage of an illness or disease.

The factors considered in determining urgent humanitarian reasons are dependent on the type of parole request. See Guidance for Certain Types of Humanitarian or Significant Public Benefit Parole Requests for more information on factors often considered in some of the more common types of requests.

**Significant Public Benefit**

There is no statutory or regulatory definition of "significant public benefit." Parole based on significant public benefit  includes, but is not limited to, law enforcement and national security reasons or foreign or domestic policy considerations. USCIS officers look at all of the circumstances presented in the case.

While the beneficiary may personally benefit from the authorization of parole, the statutory standard focuses on the public benefit in extending parole. For example, a beneficiary's participation in legal proceedings may constitute a significant public benefit, because the opportunity for all relevant parties to participate in legal proceedings may be required for justice to be served.

There may be circumstances where a request is based on both urgent humanitarian reasons and significant public benefit reasons. For example, a person may be paroled if they have a request for medical care that involves experimental treatment or medical trials from which a larger community in the United States may benefit.

**Determining Who is Authorized Parole**

We exercise our discretion on a case-by-case basis, by evaluating positive factors in the record against any negative factors. Having an urgent humanitarian reason or a significant public benefit is a positive determining factor and it is evaluated against any negative factors present in a case. We evaluate the complete record.

Some common discretionary factors that we evaluate include (but are not limited to):

- Whether the purpose of the parole request may be accomplished within a specific, temporary period of time;

- Whether the beneficiary intends to leave the United States once their parole expires or has means to obtain lawful immigration status during the parole authorization period or any re-parole period that is envisioned (where applicable);

- Whether there is evidence of any national security concerns;

- Whether there is evidence of any criminal history or previous immigration violations;

- Whether there is evidence of any previous participation in fraud;

- Whether the beneficiary's presence would benefit a U.S. citizen or lawful permanent resident or community in the United States;

- Whether the beneficiary will have sufficient financial support while in the United States;

- Evidence of the beneficiary's character;

App.091

- The effect of the beneficiary's presence on a community in the United States; and

- Whether there are other means, other than parole, that are available to the beneficiary so they can travel to and remain in the United States for the stated parole purpose, such as the ability or inability to obtain a visa.

No one factor determines the outcome of the case. Each decision is based on all of the circumstances present in a case.

We may revoke parole at any time if it determines that parole is no longer warranted or the beneficiary fails to comply with any conditions on the parole.

## Parole Process 

**An overview of the parole process steps is as follows:**

*Step 1: Filing of Parole Request*

The petitioner files the following at the USCIS Lockbox in Dallas:

- [Form I-131, Application for Travel Document](#)
- [Form I-134, Affidavit of Support (PDF, 463.53 KB)](#)
- Supporting documentation
- The filing fee (or [Form I-912, Request for Fee Waiver](#))

(See the **Requesting Parole** section below for more specific information)

The Lockbox sends the parole request to USCIS International and Refugee Affairs Division (USCIS-IRAD) in Washington, D.C.

*Step 2: USCIS Reviews the Request for Urgency (Triage)*

Within 2 business days of receiving the request, (usually two weeks after Lockbox filing), USCIS-IO reviews each request to confirm jurisdiction and determine whether it warrants expedited processing because of an urgent or time-sensitive reason. All requests are reviewed initially to determine urgency, regardless of whether the petitioner specifically requests expedited consideration.

*Step 3: USCIS Officer Makes a Decision*

A USCIS officer considers the request. This includes:

- Reviewing the request and all supporting documents;
- Conducting all mandatory security checks and vetting;
- Issuing a Request for Evidence (RFE) or Notice of Intent to Deny, if necessary;
- Documenting the basis for the decision; and
- Preparing the decision notice(s).

App.092

*Step 4: Supervisor Reviews the Decision*

A supervisor reviews all parole decisions before any decision is finalized.

*Step 5: USCIS Provides Notification of the Decision*

**If authorized:** We will mail an approval letter to the petitioner, the beneficiary and any representative of record. The letter provides notice of the decision and next steps for obtaining travel documents. We will also notify the U.S. Embassy or U.S. Consulate closest to the beneficiary's residence.

**If denied:** We will mail a denial letter to the petitioner, beneficiary, and any representative of record.

*Step 6: Issuance of Travel Documents and Parole into the United States (Approvals Only)*

If a request is authorized, the approval notice will inform the beneficiary that he or she must complete a Form DS-160, Application for a Nonimmigrant Visa, and appear for an appointment with the Department of State consular section to verify their identity and collect biometrics for additional security vetting. All beneficiaries 14 years and older must provide biometrics. If no derogatory information or new identity information is identified during vetting, the U. S. Consulate issues a document referred to as a boarding foil that allows the beneficiary to travel to the United States within 30 days of it being issued.  Issuance of a boarding foil does not guarantee parole but allows the beneficiary to proceed to Step 7 below.

*Step 7: Customs and Border Protection (CBP) Paroles into the United States (Approvals Only)*

A CBP officer inspects the beneficiary at the port of entry. If CBP paroles the beneficiary, CBP will issue the parolee an I-94, Arrival/Departure Record, documenting the length of their parole period. The parole period begins when CBP paroles the beneficiary at the port of entry. After arriving in the United States, the parolee may request employment Form I-765, Application for Employment Authorization.

**Requesting Parole**

To request parole you must:

- Complete a Form I-131, Application for Travel Document, and, for each parole beneficiary, include the filing fee or Form I-912, Request for Fee Waiver.

- Complete a Form I-134, Affidavit of Support (PDF, 463.53 KB), for each beneficiary to show how each beneficiary will be financially supported in the United States.

  - If there is more than one sponsor, each sponsor must submit a Form I-134, Affidavit of Support (PDF, 463.53 KB).

- Include a detailed explanation, as well as supporting documentation, of the reasons parole is being requested for the beneficiary. (See the **Submitting Evidence** section below for more specific information.)

- If you are represented, you must include a completed Form G-28, Notice of Entry of Appearance as Attorney or Representative, for USCIS to communicate with your attorney or representative.

**Submitting Evidence**

App.093

The petitioner must show, through the parole request and supporting evidence, that the beneficiary qualifies for parole and merits a favorable exercise of discretion. Submitting all relevant supporting evidence will avoid delays. A USCIS officer may issue a Request for Evidence (RFE) to seek additional information. In addition to the Form I-131, Application for Travel Document, Form I-134, Affidavit of Support (PDF, 463.53 KB), and the filing fee or request for fee waiver, the petitioner should submit the following evidence to support their parole request:

- Detailed explanation of the reasons why the petitioner is requesting parole;

- Detailed explanation of the length of time for which the beneficiary needs parole;

- Detailed explanation of why the beneficiary cannot obtain a U.S. nonimmigrant or immigrant visa from the U.S. Department of State including:

  - When and where the beneficiary attempted to obtain visas, if applicable;

  - If a visa application was denied, include a copy of the denial letter; and

  - If applicable, a detailed explanation of the reasons why the beneficiary cannot obtain any required waiver of inadmissibility and a copy of any denial letter received.

- Copies of any previously filed immigrant petitions (Forms I-130, I-140, I-360, etc.) or nonimmigrant petitions filed by or for the beneficiary, if available;

- Copies of any documents that support the request, including a clear and legible copy of a government-issued identification that indicates the beneficiary's citizenship.

  - If a birth certificate is provided, please submit a copy of the front and back of the original birth certificate.

- Copies of a U.S. passport, lawful permanent resident card, birth certificate or other evidence of valid U.S. immigration status or citizenship for the petitioner and sponsor, where applicable.

- See Guidance for Certain Types of Humanitarian or Significant Public Benefit Parole Requests for information on what additional evidence may support specific types of parole requests.

**Requesting Parole for Children**

Depending on the circumstances, when parole is requested for a minor child (a child under the age of 18), we will require proof of parentage, and in addition may require the following types of evidence in the interest of protecting the child:

| Circumstance: | Type of evidence that may be requested: |
|---|---|
| Where the minor beneficiary is traveling with one parent and the other parent will remain outside the United States | Written authorization from the non-traveling parent for the minor to travel, to include:<br><br>- Permission from the non-traveling parent for the child to accompany the traveling parent;<br><br>- The duration of authorized travel; and<br><br>- If the parents of the child are divorced or separated, proof showing that the traveling parent has been awarded legal custody of the minor. |

App.094

| Circumstance: | Type of evidence that may be requested: |
|---|---|
| Where neither parent is traveling | Written authorization from both parents for the child to leave the country with an appointed guardian, to include:<br><br>• The duration of travel and<br>• Proof of legal guardianship issued by a government authority. |
| Where the parent or parents' consent cannot be obtained | • Written explanation from the petitioner or beneficiary explaining efforts to locate the parent; or<br>• The circumstances surrounding their unavailability; and<br>• Evidence of guardianship for the person who is accompanying the child on travel or receiving the child once he or she arrives. |

**Submitting a Request for Parole**

USCIS Dallas Lockbox
For U.S. Postal Service (USPS) Deliveries:
USCIS
P.O. Box 660865
Dallas, TX 75266

For Express Mail and courier deliveries:
USCIS
Attn: HP
2501 S. State Hwy 121, Business
Suite 400
Lewisville, TX 75067

Please see the I-131, Application for Travel Document website for instructions on submitting requests.

**Length of Parole Consideration Process**

While processing time varies according to case complexity and how thorough the supporting documentation is in the initial filing, we strive to complete requests for parole for applicants outside the United States (or seeking re-parole as explained below) within 3 months. Please see our processing times website for current processing times. To avoid delays in processing, **it is critical that applicants include all relevant supporting evidence at the time of application and in response to any request for evidence (RFE)**.

**Expedited Processing**

App.095

To request expedited processing, the petitioner should:

- Follow the guidance on the Form I-131 instructions (PDF, 284.74 KB).

- Write the word EXPEDITE in the top right corner of the application in black ink.

- Provide an email address, phone number, and fax number for the petitioner or representative with any expedite request.

- Include a detailed explanation of the reason for the expedite request along with any available supporting evidence.

  - Generally, all requests for parole are based on urgent needs; therefore, the petitioner must demonstrate significant reasons for expediting the request, such as a life threatening or other extremely urgent situation.

**If Parole is Denied**

The petitioner cannot appeal the denial of parole, as the grant of parole confers no substantive right or immigration status. However, if there are significant new facts that are relevant to the application for parole, the petitioner may file a new Form I-131, Application for Travel Document, packet with fee or request for fee waiver. There is no limit to the number of Forms I-131, Application for Travel Document a person may file.

## Travel for Parolees 

**Leaving the United States**

A parole document provided to an individual outside the United States is valid to be presented only once for parole at the port of entry. If the petitioner leaves the United States, their parole will end once the petitioner departs. If the petitioner wishes to travel abroad and then return to the United States as a parolee, they may file a separate application on a new Form I-131 for advance parole before traveling abroad. For information on how to apply for advance parole while in the United States, please see Form I-131 instructions (PDF, 284.74 KB). The petitioner may also apply for a visa or again request parole from outside of the United States in order to return.

## Re-Parole 

Parole ends on the date the parole period expires, is revoked, or when the parolee departs the United States or obtains an immigration status, whichever happens first. Although parole is temporary in nature, in some instances, a beneficiary may need to remain in the United States beyond the period of authorized parole. In such instances, an individual may request re-parole from within the United States.

The petitioner may request re-parole by:

- Filing a new Form I-131, Application for Travel Document;

App.096

- Checking box 1.e or 1.f in Part 2 of the form; and
- Writing "re-parole" across the top of the application.

In addition to required fees or request for fee waiver, the submission should include materials and evidence to support re-parole, including explaining and providing supporting documents on the need for an additional authorized parole period.

The request should be filed at least 90 days in advance of the expiration of the authorized parole period to allow for sufficient processing time and to avoid the potential for accruing time in unlawful status.

---

## Related Links 

- [Memorandum Of Agreement between CBP, ICE and USCIS regarding Parole Authority (PDF)](#)

**Forms**

- [I-134, Affidavit of Support](#)
- [I-765, Application for Employment Authorization](#)
- [I-131, Application for Travel Document](#)

---

⤢ Close All    ⤢ Open All

Last Reviewed/Updated: 03/31/2021

App.097

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| THE STATE OF MISSOURI, and | § | |
| | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| Plaintiffs, | § | Case No. 6:21-cv-00052 |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United | § | |
| States of America, *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

# EXHIBIT B

Table: ACSST1Y2019.S0701

| Label | Texas Total Estimate | Texas Total Margin of Error | Moved; within same county Estimate | Moved; within same county Margin of Error |
|---|---|---|---|---|
| Population 1 year and over | 28,642,658 | ±11,223 | 8.5% | ±0.2 |
| AGE | | | | |
| 1 to 4 years | 1,628,532 | ±13,105 | 11.6% | ±0.7 |
| 5 to 17 years | 5,414,876 | ±7,620 | 8.3% | ±0.3 |
| 18 to 24 years | 2,826,700 | ±9,587 | 12.9% | ±0.5 |
| 25 to 34 years | 4,242,661 | ±12,557 | 13.9% | ±0.4 |
| 35 to 44 years | 3,959,419 | ±12,322 | 8.4% | ±0.3 |
| 45 to 54 years | 3,556,845 | ±10,636 | 6.0% | ±0.3 |
| 55 to 64 years | 3,274,898 | ±6,891 | 4.6% | ±0.2 |
| 65 to 74 years | 2,259,341 | ±7,279 | 3.3% | ±0.3 |
| 75 years and over | 1,479,386 | ±5,575 | 3.9% | ±0.3 |
| Median age (years) | 35.5 | ±0.1 | 28.0 | ±0.3 |
| SEX | | | | |
| Male | 14,205,551 | ±12,331 | 8.4% | ±0.2 |
| Female | 14,437,107 | ±12,058 | 8.5% | ±0.2 |
| RACE AND HISPANIC OR LATINO ORIGIN | | | | |
| One race | 27,831,753 | ±29,803 | 8.4% | ±0.2 |
| White | 21,031,553 | ±47,146 | 7.9% | ±0.2 |
| Black or African American | 3,506,078 | ±23,226 | 11.1% | ±0.5 |
| American Indian and Alaska Native | 144,038 | ±8,743 | 9.3% | ±1.9 |
| Asian | 1,431,296 | ±11,251 | 7.1% | ±0.6 |
| Native Hawaiian and Other Pacific Islander | 26,595 | ±3,972 | 11.7% | ±7.3 |
| Some other race | 1,692,193 | ±44,598 | 9.4% | ±0.9 |
| Two or more races | 810,905 | ±27,487 | 10.7% | ±1.1 |

Table: ACSST1Y2019.S0701

| Label | Moved; from different county, same state | | Moved; from different state | |
|---|---|---|---|---|
| | Estimate | Margin of Error | Estimate | Margin of Error |
| Population 1 year and over | 3.8% | ±0.1 | 2.0% | ±0.1 |
| AGE | | | | |
| 1 to 4 years | 4.0% | ±0.4 | 2.3% | ±0.3 |
| 5 to 17 years | 2.6% | ±0.2 | 1.5% | ±0.1 |
| 18 to 24 years | 8.3% | ±0.4 | 3.5% | ±0.2 |
| 25 to 34 years | 6.5% | ±0.3 | 3.3% | ±0.2 |
| 35 to 44 years | 3.6% | ±0.2 | 2.0% | ±0.2 |
| 45 to 54 years | 2.9% | ±0.2 | 1.4% | ±0.1 |
| 55 to 64 years | 2.2% | ±0.2 | 1.1% | ±0.1 |
| 65 to 74 years | 1.7% | ±0.2 | 1.0% | ±0.1 |
| 75 years and over | 1.7% | ±0.2 | 0.8% | ±0.1 |
| Median age (years) | 28.1 | ±0.4 | 28.8 | ±0.5 |
| SEX | | | | |
| Male | 4.0% | ±0.1 | 2.0% | ±0.1 |
| Female | 3.7% | ±0.1 | 1.9% | ±0.1 |
| RACE AND HISPANIC OR LATINO ORIGIN | | | | |
| One race | 3.8% | ±0.1 | 1.9% | ±0.1 |
| White | 3.7% | ±0.1 | 1.7% | ±0.1 |
| Black or African American | 4.5% | ±0.3 | 2.4% | ±0.3 |
| American Indian and Alaska Native | 4.9% | ±1.7 | 2.7% | ±0.8 |
| Asian | 3.6% | ±0.5 | 3.7% | ±0.5 |
| Native Hawaiian and Other Pacific Islander | 3.2% | ±2.0 | 9.4% | ±8.3 |
| Some other race | 3.0% | ±0.4 | 0.9% | ±0.2 |
| Two or more races | 5.1% | ±0.6 | 3.9% | ±0.7 |

Table: ACSST1Y2019.S0701

| Label | Moved; from abroad | |
| --- | --- | --- |
| | Estimate | Margin of Error |
| Population 1 year and over | 0.8% | ±0.1 |
| AGE | | |
| 1 to 4 years | 1.0% | ±0.2 |
| 5 to 17 years | 0.7% | ±0.1 |
| 18 to 24 years | 1.2% | ±0.1 |
| 25 to 34 years | 1.3% | ±0.1 |
| 35 to 44 years | 0.8% | ±0.1 |
| 45 to 54 years | 0.5% | ±0.1 |
| 55 to 64 years | 0.4% | ±0.1 |
| 65 to 74 years | 0.4% | ±0.1 |
| 75 years and over | 0.3% | ±0.1 |
| Median age (years) | 27.9 | ±1.1 |
| SEX | | |
| Male | 0.8% | ±0.1 |
| Female | 0.7% | ±0.1 |
| RACE AND HISPANIC OR LATINO ORIGIN | | |
| One race | 0.8% | ±0.1 |
| White | 0.6% | ±0.1 |
| Black or African American | 0.4% | ±0.1 |
| American Indian and Alaska Native | 1.1% | ±0.6 |
| Asian | 2.9% | ±0.4 |
| Native Hawaiian and Other Pacific Islander | 1.0% | ±1.4 |
| Some other race | 1.8% | ±0.4 |
| Two or more races | 0.7% | ±0.2 |

Table: ACSST1Y2019.S0701

| Label | Texas | | | |
| | Total | | Moved; within same county | |
| | Estimate | Margin of Error | Estimate | Margin of Error |
| --- | --- | --- | --- | --- |
| Hispanic or Latino origin (of any race) | 11,363,374 | ±7,932 | 8.8% | ±0.3 |
| White alone, not Hispanic or Latino | 11,816,132 | ±8,528 | 7.5% | ±0.2 |
| NATIVITY AND CITIZENSHIP STATUS | | | | |
| Native | 23,694,288 | ±55,093 | 8.6% | ±0.2 |
| Foreign born | 4,948,370 | ±52,930 | 7.7% | ±0.4 |
| Naturalized U.S. citizen | 1,958,749 | ±30,459 | 5.2% | ±0.5 |
| Not a U.S. citizen | 2,989,621 | ±47,047 | 9.4% | ±0.5 |
| MARITAL STATUS | | | | |
| Population 15 years and over | 22,833,954 | ±7,734 | 8.2% | ±0.2 |
| Never married | 7,715,686 | ±41,287 | 11.1% | ±0.3 |
| Now married, except separated | 11,041,301 | ±50,997 | 6.0% | ±0.2 |
| Divorced or separated | 2,938,935 | ±31,574 | 10.0% | ±0.4 |
| Widowed | 1,138,032 | ±21,081 | 5.4% | ±0.4 |
| EDUCATIONAL ATTAINMENT | | | | |
| Population 25 years and over | 18,772,550 | ±10,843 | 7.5% | ±0.2 |
| Less than high school graduate | 2,882,388 | ±33,539 | 7.3% | ±0.4 |
| High school graduate (includes equivalency) | 4,734,422 | ±47,856 | 7.6% | ±0.3 |
| Some college or associate's degree | 5,379,207 | ±41,497 | 7.8% | ±0.3 |
| Bachelor's degree | 3,750,797 | ±35,494 | 7.6% | ±0.3 |
| Graduate or professional degree | 2,025,736 | ±29,709 | 7.1% | ±0.4 |

Table: ACSST1Y2019.S0701

| Label | Moved; from different county, same state | | Moved; from different state | |
| --- | --- | --- | --- | --- |
| | Estimate | Margin of Error | Estimate | Margin of Error |
| Hispanic or Latino origin (of any race) | 2.9% | ±0.1 | 1.0% | ±0.1 |
| White alone, not Hispanic or Latino | 4.6% | ±0.2 | 2.4% | ±0.1 |
| NATIVITY AND CITIZENSHIP STATUS | | | | |
| Native | 4.1% | ±0.1 | 2.0% | ±0.1 |
| Foreign born | 2.4% | ±0.2 | 1.8% | ±0.2 |
| Naturalized U.S. citizen | 2.4% | ±0.2 | 1.6% | ±0.2 |
| Not a U.S. citizen | 2.5% | ±0.3 | 1.8% | ±0.2 |
| MARITAL STATUS | | | | |
| Population 15 years and over | 4.0% | ±0.1 | 2.0% | ±0.1 |
| Never married | 5.7% | ±0.2 | 2.5% | ±0.1 |
| Now married, except separated | 2.8% | ±0.1 | 1.8% | ±0.1 |
| Divorced or separated | 4.6% | ±0.2 | 1.7% | ±0.2 |
| Widowed | 2.4% | ±0.3 | 1.1% | ±0.2 |
| EDUCATIONAL ATTAINMENT | | | | |
| Population 25 years and over | 3.5% | ±0.1 | 1.8% | ±0.1 |
| Less than high school graduate | 2.6% | ±0.2 | 0.7% | ±0.1 |
| High school graduate (includes equivalency) | 3.4% | ±0.2 | 1.2% | ±0.1 |
| Some college or associate's degree | 3.9% | ±0.2 | 1.9% | ±0.1 |
| Bachelor's degree | 3.7% | ±0.2 | 2.7% | ±0.2 |
| Graduate or professional degree | 3.6% | ±0.3 | 3.0% | ±0.3 |

Table: ACSST1Y2019.S0701

| Label | Moved; from abroad | |
| --- | --- | --- |
| | Estimate | Margin of Error |
| Hispanic or Latino origin (of any race) | 1.0% | ±0.1 |
| White alone, not Hispanic or Latino | 0.4% | ±0.1 |
| NATIVITY AND CITIZENSHIP STATUS | | |
| Native | 0.3% | ±0.1 |
| Foreign born | 3.1% | ±0.3 |
| Naturalized U.S. citizen | 0.6% | ±0.2 |
| Not a U.S. citizen | 4.7% | ±0.4 |
| MARITAL STATUS | | |
| Population 15 years and over | 0.8% | ±0.1 |
| Never married | 1.0% | ±0.1 |
| Now married, except separated | 0.7% | ±0.1 |
| Divorced or separated | 0.4% | ±0.1 |
| Widowed | 0.4% | ±0.1 |
| EDUCATIONAL ATTAINMENT | | |
| Population 25 years and over | 0.7% | ±0.1 |
| Less than high school graduate | 1.1% | ±0.2 |
| High school graduate (includes equivalency) | 0.5% | ±0.1 |
| Some college or associate's degree | 0.4% | ±0.1 |
| Bachelor's degree | 0.9% | ±0.1 |
| Graduate or professional degree | 1.0% | ±0.2 |

Table: ACSST1Y2019.S0701

| | Texas | | | |
| | Total | | Moved; within same county | |
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
|---|---|---|---|---|
| INDIVIDUAL INCOME IN THE PAST 12 MONTHS (IN 2019 INFLATION-ADJUSTED DOLLARS) | | | | |
| Population 15 years and over | 22,833,954 | ±7,734 | 8.2% | ±0.2 |
| $1 to $9,999 or loss | 3,203,558 | ±32,025 | 8.7% | ±0.3 |
| $10,00 to $14,999 | 1,713,105 | ±26,543 | 8.7% | ±0.5 |
| $15,000 to $24,999 | 2,959,404 | ±29,675 | 9.3% | ±0.4 |
| $25,000 to $34,999 | 2,407,403 | ±28,262 | 9.4% | ±0.4 |
| $35,000 to $49,999 | 2,631,883 | ±32,926 | 8.5% | ±0.3 |
| $50,000 to $64,999 | 2,041,160 | ±33,830 | 8.6% | ±0.4 |
| $65,000 to $74,999 | 861,911 | ±18,513 | 7.5% | ±0.6 |
| $75,000 or more | 3,355,247 | ±36,009 | 6.4% | ±0.3 |
| Median income (dollars) | 31,505 | ±139 | 29,297 | ±918 |
| POVERTY STATUS IN THE PAST 12 MONTHS | | | | |
| Population 1 year and over for whom poverty status is determined | 28,016,731 | ±12,536 | 8.3% | ±0.2 |
| Below 100 percent of the poverty level | 3,790,948 | ±67,495 | 12.6% | ±0.6 |
| 100 to 149 percent of the poverty level | 2,623,138 | ±67,036 | 9.9% | ±0.8 |
| At or above 150 percent of the poverty level | 21,602,645 | ±94,258 | 7.4% | ±0.2 |
| HOUSING TENURE | | | | |
| Population 1 year and over in housing units | 28,041,965 | ±11,223 | 8.3% | ±0.2 |

Table: ACSST1Y2019.S0701

| Label | Moved; from different county, same state | | Moved; from different state | |
|---|---|---|---|---|
| | Estimate | Margin of Error | Estimate | Margin of Error |
| INDIVIDUAL INCOME IN THE PAST 12 MONTHS (IN 2019 INFLATION-ADJUSTED DOLLARS) | | | | |
| Population 15 years and over | 4.0% | ±0.1 | 2.0% | ±0.1 |
| $1 to $9,999 or loss | 5.3% | ±0.3 | 2.1% | ±0.2 |
| $10,000 to $14,999 | 3.8% | ±0.3 | 1.9% | ±0.2 |
| $15,000 to $24,999 | 3.6% | ±0.2 | 2.1% | ±0.2 |
| $25,000 to $34,999 | 3.7% | ±0.2 | 1.8% | ±0.2 |
| $35,000 to $49,999 | 3.7% | ±0.2 | 2.0% | ±0.2 |
| $50,000 to $64,999 | 4.1% | ±0.3 | 1.9% | ±0.2 |
| $65,000 to $74,999 | 3.8% | ±0.5 | 2.2% | ±0.4 |
| $75,000 or more | 3.1% | ±0.2 | 2.2% | ±0.2 |
| Median income (dollars) | 28,266 | ±1,439 | 31,784 | ±946 |
| POVERTY STATUS IN THE PAST 12 MONTHS | | | | |
| Population 1 year and over for whom poverty status is determined | 3.4% | ±0.1 | 1.9% | ±0.1 |
| Below 100 percent of the poverty level | 4.4% | ±0.3 | 1.8% | ±0.2 |
| 100 to 149 percent of the poverty level | 3.1% | ±0.4 | 1.7% | ±0.3 |
| At or above 150 percent of the poverty level | 3.3% | ±0.1 | 1.9% | ±0.1 |
| HOUSING TENURE | | | | |
| Population 1 year and over in housing units | 3.4% | ±0.1 | 1.9% | ±0.1 |

Table: ACSST1Y2019.S0701

| Label | Moved; from abroad | |
| | Estimate | Margin of Error |
| --- | --- | --- |
| INDIVIDUAL INCOME IN THE PAST 12 MONTHS (IN 2019 INFLATION-ADJUSTED DOLLARS) | | |
| Population 15 years and over | 0.8% | ±0.1 |
| $1 to $9,999 or loss | 1.2% | ±0.2 |
| $10,000 to $14,999 | 0.5% | ±0.1 |
| $15,000 to $24,999 | 0.7% | ±0.2 |
| $25,000 to $34,999 | 0.4% | ±0.1 |
| $35,000 to $49,999 | 0.4% | ±0.1 |
| $50,000 to $64,999 | 0.3% | ±0.1 |
| $65,000 to $74,999 | 0.3% | ±0.1 |
| $75,000 or more | 0.4% | ±0.1 |
| Median income (dollars) | 19,924 | ±2,317 |
| POVERTY STATUS IN THE PAST 12 MONTHS | | |
| Population 1 year and over for whom poverty status is determined | 0.7% | ±0.1 |
| Below 100 percent of the poverty level | 1.6% | ±0.3 |
| 100 to 149 percent of the poverty level | 0.7% | ±0.2 |
| At or above 150 percent of the poverty level | 0.6% | ±0.1 |
| HOUSING TENURE | | |
| Population 1 year and over in housing units | 0.7% | ±0.1 |

Table: ACSST1Y2019.S0701

| Label | Texas | | | |
| | Total | | Moved; within same county | |
| | Estimate | Margin of Error | Estimate | Margin of Error |
|---|---|---|---|---|
| Householder lived in owner-occupied housing units | 18,304,178 | ±101,137 | 4.1% | ±0.1 |
| Householder lived in renter-occupied housing units | 9,737,787 | ±101,070 | 16.3% | ±0.4 |
| PERCENT ALLOCATED | | | | |
| Residence 1 year ago | 7.8% | (X) | (X) | (X) |

Table: ACSST1Y2019.S0701

| | Moved; from different county, same state | | Moved; from different state | |
|---|---|---|---|---|
| Label | Estimate | Margin of Error | Estimate | Margin of Error |
| Householder lived in owner-occupied housing units | 2.1% | ±0.1 | 1.1% | ±0.1 |
| Householder lived in renter-occupied housing units | 5.8% | ±0.2 | 3.2% | ±0.2 |
| PERCENT ALLOCATED | | | | |
| Residence 1 year ago | (X) | (X) | (X) | (X) |

Table: ACSST1Y2019.S0701

| Label | Moved; from abroad | |
| --- | --- | --- |
| | Estimate | Margin of Error |
| Householder lived in owner-occupied housing units | 0.3% | ±0.1 |
| Householder lived in renter-occupied housing units | 1.5% | ±0.1 |
| PERCENT ALLOCATED | | |
| Residence 1 year ago | (X) | (X) |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

|  | § |  |
|---|---|---|
| THE STATE OF MISSOURI, and | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| Plaintiffs, | § | Case No. 6:21-cv-00052 |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United | § | |
| States of America, *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

# EXHIBIT C



# THE FOREIGN-BORN POPULATION IN TEXAS: SOURCES OF GROWTH

Based on the size and composition of its foreign-born population, Texas is more international than at any time since its statehood in 1845. By 2013, more than one of every 10 foreign-born persons in the United States resided in Texas. Presently, about one out of six Texas residents was born in a foreign country. In this brief, we examine the sources of growth for the foreign-born population in Texas and discuss the implications of this trend for the State. Using U.S. Census Bureau data, we show that slightly more than half of the 2012-2013 net migration to Texas was by foreign-born persons and that domestic migration accounts for almost 40 percent of the growth in the State's foreign-born population[1].

## Background

International in-migrants are persons who move to the United States from abroad. The American Community Survey (ACS) asks respondents where they lived one year ago.  If they lived abroad one year ago, they are considered to be recent international in-migrants. In this context, international in-migrants represent the annual inflow of persons from other countries into the United States.

**Included in this Brief:**

- Texas is experiencing strong growth in its foreign-born population.

- Both international and domestic migration are fueling the growth of the foreign-born population in Texas.

- The growth of the foreign-born population is making the Texas population more international than at any time since it became a state.

Authors :

Steve White

Lloyd B. Potter, Ph.D.

Helen You, Ph.D.

Lila Valencia, Ph.D.

Jeffrey A. Jordan , Ph.D.

Beverly Pecotte

The Office of the State Demographer is responsible for interpreting and communicating information on demographic and socioeconomic issues for  the State of Texas to the public and the legislature.

October 2015

### Census Terminology

*Foreign-Born*
The foreign-born population includes anyone who is not a U.S. citizen at birth.

*In-Migrant*
A person entering a specified area by crossing its boundary from some point outside the area.

*Native-Born*
Anyone born in the United States, Puerto Rico, or a U.S. Island Area, or those born abroad of at least one U.S. citizen parent.

*Immigrant*
Admitted for lawful permanent residence in the United States.

*International Migrant*
A person who changes his or her usual place of residence from one country to another.

*Domestic Migration*
Domestic migration is the movement of people within the United States.

*Net Migration*
Net migration for a given geographic area is the difference between in-migration and out-migration during a specified time frame.

*Sources: Schmidley and Gibson 1999;  Grieco et al 2012; Perry 2006; U.S. Census 1992*

By contrast, the foreign-born population includes all persons who were not U.S. citizens at birth. As such, the foreign-born population in the United States represents all non-native international migrants regardless of when they arrived in the United States or their immigration status. Consequently, while international in-migrants represent a flow phenomenon, the foreign-born population is a stock or resident phenomenon that results from this flow.

## Historical Trends in Texas Nativity

Both the size and the share of the foreign-born population in Texas are greater than at any time since statehood in 1845. In Table 1, we find that 8.3 percent of Texas residents were foreign-born in 1850. After declining to 2.8 percent in 1970, the share of the foreign-born population in Texas increased to 16.4 percent in 2010.

Table 1: Number and Percent of Texas Residents by Nativity, Selected Years

| Year | Native-Born Residents | | Foreign-Born Residents | | Total Residents | |
|------|--------|---------|--------|---------|--------|---------|
| | Number | Percent | Number | Percent | Number | Percent |
| 1850 | 194,911 | 91.7% | 17,681 | 8.3% | 212,592 | 100.0% |
| 1900 | 2,869,353 | 94.1% | 179,357 | 5.9% | 3,048,710 | 100.0% |
| 1960 | 9,282,717 | 96.9% | 298,791 | 3.1% | 9,581,508 | 100.0% |
| 1970 | 10,885,644 | 97.2% | 309,772 | 2.8% | 11,195,416 | 100.0% |
| 1980 | 13,372,978 | 94.0% | 856,213 | 6.0% | 14,229,191 | 100.0% |
| 1990 | 15,462,074 | 91.0% | 1,524,436 | 9.0% | 16,986,510 | 100.0% |
| 2000 | 17,952,178 | 86.1% | 2,899,642 | 13.9% | 20,851,820 | 100.0% |
| 2010 | 21,115,083 | 83.6% | 4,142,031 | 16.4% | 25,257,114 | 100.0% |

Sources: Gibson and Jung 2006; U.S. Census Bureau ACS 1-Year Summary Data, 2010

**Figure 1:** Texas Population Size by Nativity, 1850-2010



Sources: Gibson and Jung 2006; U.S. Census Bureau ACS 1-Year Summary Data, 2010

Table 1 and Figure 1 show that as recently as the last decades of the twentieth century, the growth of the foreign-born population in Texas was slight and gradual. For example, from 1900 to 1970, the state's foreign-born population increased by 130,415 or by less than 2,000 persons per year. From 1970 to 2010, the number of foreign-born Texans increased by 3,832,259 which is almost 96,000 persons per year.

In Figure 2, we see the Texas share of the U.S. population has increased every decade since 1850. Until 1990, the state's share of the U.S. native

-born population was greater than its share of the U.S. foreign-born population. Beginning in 1990, Texas' share of the U.S. foreign-born population has exceeded its share of the U.S. native-born population.

*SINCE 1990, TEXAS FOREIGN-BORN POPULATION HAS GROWN MORE RAPIDLY THAN THE NATIVE-BORN POPULATION.*

From 1990 until the present, the Texas share of the U.S. foreign-born population has increased so that by 2010, Texas had 7.8 percent of the U.S. native-born population and 10.4 percent of

**Figure 2:**    Texas Percentage of the U.S. Population by Nativity, 1850-2010



■ Texas Foreign-Born Population as a Percent of U.S. Foreign-Born Population

■ Texas Native-Born Population as a Percent of U.S. Native-Born Population

*Sources: Gibson and Jung 2006; U.S. Census Bureau ACS 1-Year Summary Data, 2010*

the U.S. foreign-born population. Thus, in recent decades, the state's foreign-born population has grown more rapidly than its native-born population.

In contrast with the native-born population, migration is the sole source of growth for the foreign-born population. The following section describes the migration patterns of foreign-born persons in Texas.

## Historical Trends in Foreign-Born Migration to Texas

Table 1 and Figures 1 and 2 presented the 'migrant stock' or resident population which is the total number of foreign-born persons living in Texas at a given point in time. With these data, we saw that the state's foreign-born population has experienced tremendous growth in recent decades. In this section, we describe the sources of this growth.

Growth in the foreign-born population is the result of migration flows - the number of foreign-born persons moving to Texas during a given time period. These migration flows have two sources: international migration (originating in another country) and domestic migration (originating in another state).

Figure 3 shows the 2005 through 2013 'migrant flow' data for the foreign-born population moving to Texas. In this figure, migrants are persons who lived in another country or state in the prior year.

Between 2005 and 2013, the greatest annual migration of foreign-born people to Texas occurred in 2006, at 216,605. The least annual migration was 174,741 in 2010 following the end of the 'great recession' of 2007-2009. By 2013, the number of foreign-born migrants to Texas had increased to 213,504, the second highest level during the nine year time series.

Figure 3 shows that international migration has been the major source of growth for the foreign-born population in Texas, constituting around 60 percent of the annual foreign-born in-migration. However, growth in the domestic migration of the foreign-born also has been strong.

The domestic migration of foreign-born persons has grown from about 64,000 in 2005 to over 82,000 in 2013. This increase of almost 18,000 represents an average annual growth of more than 3 percent. By contrast, the international migration of

**Figure 3:** Number and Percent of Foreign-Born Migrants to Texas by Migration Type, 2005-2013



Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2005-2013

foreign-born persons to Texas grew from around 126,000 in 2005 to 131,000 in 2013, an increase of around 5,000 which reflects an average annual growth rate of less than 1 percent.

*RECENTLY, FOR EVERY 10 FOREIGN-BORN PERSONS ENTERING TEXAS, ROUGHLY 4 MOVED FROM ANOTHER STATE IN THE U.S.*

Even though international migration remains the largest source of growth for foreign-born Texans, domestic migrants represented close to 40 percent of the foreign-born migration to Texas between 2005 and 2013. Thus, in recent years, about four of every ten foreign-born persons moving to Texas migrated from another U.S. state.

Figure 3 showed migration flow data for total in-migrants – the number of persons moving into an area. Though in-migration is an important migration measure, it does not account for out-migration – the number of people moving out of an area. For example, in 2013, 82,174 foreign-born persons migrated to Texas from other states. However, in that same year, 50,789 foreign-born persons moved out of Texas into other states. To capture the total population gain from migration, we employ net migration. Net migration is the numerical difference between in-migration and out-migration. Using net migration, Texas gained an estimated total of 31,385 foreign-born persons from domestic migration in 2013 (i.e., 82,174 – 50,789 = 31,385).

Table 2 shows the 10 U.S. states with the largest average net domestic migration for the 2005-2013 time period. These data include both native-born and foreign-born persons. Net migration for international migrants is not presented because the ACS (American Community Survey) does not track international out-migration.

In Table 2 we see that Texas led the nation in net domestic migration between 2005 and 2013. The state's average of 125,778 net domestic migrants is 1.8 times larger than that for Florida which had the second largest number of net domestic migrants for 2005-2013.

*HIGH DOMESTIC IN-MIGRATION TO TEXAS HAS FUELED THE GROWTH OF FOREIGN-BORN POPULATION INCREASES; ABOUT ONE IN FIVE DOMESTIC MIGRANTS WAS FOREIGN-BORN.*

The rapid growth in Texas' foreign-born population has occurred alongside this pattern of high net domestic in-migration. The state's substantial net domestic migration helped fuel the growth of the foreign-born population because around one in every five of these domestic migrants was foreign-born.

Table 3 and Figure 4 have the net domestic migration to Texas for native- and foreign-born persons from 2005 through 2013. During these nine years, Texas added a little over 1.1 million persons through domestic migration. Of these, 254,181, or 22.5 percent, were foreign-born.

In the 2005-2013 series, 2006 had the largest total net migration, at 169,404, while 2010 had the smallest at 81,277. After the 2006 peak, net migration declined until 2011. As noted above, this cycle of peak and decline reflects the effects of the 2007-2009 recession. By 2013, net domestic migration had risen to 133,749, the fourth highest number during the 2005-2013 annual series.

These data suggest that the native-born and foreign-born migrants have somewhat different migration patterns. For example, the peak number of native-born migrants occurred in 2006 while the peak number of foreign-born migrants happened in 2007. The smallest net migration for the native-born happened in 2010 at 21,237. For the foreign-born, the smallest net migration was in 2005 at 10,046. As for shares of net migration, native-born in-migrants range from a high of 91.3 percent in 2005 to a low of

| Table 2 | |
|---|---|
| **States Ranked by Average Annual Net Domestic Migration 2005-2013** | |
| **State** | **Net Migration** |
| Tennessee | 24,684 |
| Oregon | 25,422 |
| Washington | 27,763 |
| Colorado | 33,504 |
| South Carolina | 38,189 |
| Georgia | 48,050 |
| Arizona | 53,863 |
| North Carolina | 67,501 |
| Florida | 69,801 |
| Texas | 125,778 |
| *Source: U.S. Census Bureau ACS 1-Year PUMs, 2005-2013* | |

Table 3: Number and Percent of Net Domestic Migrants to Texas by Nativity, 2005-2013

| Year | Native-Born Migrants | | Foreign-Born Migrants | | Total Migrants | |
|------|-----------|---------|-----------|---------|-----------|---------|
| | Number | Percent | Number | Percent | Number | Percent |
| 2005 | 105,041 | 91.3% | 10,046 | 8.7% | 115,087 | 100.0% |
| 2006 | 146,422 | 86.4% | 22,982 | 13.6% | 169,404 | 100.0% |
| 2007 | 103,034 | 70.7% | 42,638 | 29.3% | 145,672 | 100.0% |
| 2008 | 103,372 | 77.3% | 30,388 | 22.7% | 133,760 | 100.0% |
| 2009 | 89,647 | 72.2% | 34,524 | 27.8% | 124,171 | 100.0% |
| 2010 | 59,950 | 73.8% | 21,327 | 26.2% | 81,277 | 100.0% |
| 2011 | 92,693 | 78.2% | 25,831 | 21.8% | 118,524 | 100.0% |
| 2012 | 75,295 | 68.2% | 35,060 | 31.8% | 110,355 | 100.0% |
| 2013 | 102,364 | 76.5% | 31,385 | 23.5% | 133,749 | 100.0% |
| **All Years** | 877,818 | 77.5% | 254,181 | 22.5% | 1,131,999 | 100.0% |

*Source: U.S. Census Bureau ACS 1-Year Summary Data, 2005-2013*

**Figure 4:**     Net Domestic Migration to Texas by Nativity, 2005-2013



*Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2005-2013*

68.2 percent in 2012. Conversely for the foreign-born, their highest share was in 2012 at 31.8 percent and the lowest was 2005 at 8.7 percent. Also, for the recession years, 2007-2009, the foreign-born share of net migration was 26.6 percent, higher than its overall average share of 22.5 percent. By contrast, the native-born share fell to 73.4 percent in this period, below its overall 77.5 percent average share.

We have demonstrated that the stock of foreign-born persons in Texas has had strong growth in recent years. We have also shown that migration - both international and domestic – is the source of this growth. In the next section we will describe the origins of these foreign-born migrants to Texas.

## Origins of Foreign-Born Migrants to Texas

Figures 5, 6, and 7 are based on the world area of birth for foreign-born migrants to Texas. In Figure 5, we find that, for both international and domestic migration, persons from Latin America and Asia[2] predominate foreign-born migration to Texas (for more details on the origins of international migrants to Texas, please see White et al 2015).

Between 2005 and 2013, 2005 was a peak year for the international migration of Latin-American born persons to Texas. During 2005, over 70 percent of the Latin-American origin migrants were international migrants. By 2013, less than 60 percent

**Figure 5:** Comparison of 2005 and 2013 Foreign-Born Migrants to Texas by World Area of Birth and Migration Type



*Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2005 and 2013*

App.118

**Figure 6:**     Foreign-Born Migrants to Texas by Region of Origin, 2005-2013



Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2005-2013

of Latin-American born persons moving to Texas were international migrants, resulting in nearly 31,000 fewer international Latin-American origin migrants to Texas.

*BETWEEN 2005 AND 2013, DECLINES IN LATIN AMERICAN ORIGIN MIGRATION TO TEXAS WERE LARGELY OFFSET BY INCREASES IN ASIAN ORIGIN MIGRATION.*

In 2005, 56.0 percent of Asian-born persons moving to Texas were international migrants while 44.0 percent came from other U.S. states. By 2013, Texas was experiencing an unprecedented growth

in the Asian-born population. The peak year for Asian migration to Texas was 2013 and 62.4 percent of Asian-origin migrants to Texas moved from abroad while 37.6 percent moved from other states.

Figure 6 shows a time-series for foreign-born migration to Texas. In this figure, international and domestic migration are combined, and we see a trend where migration to Texas from Latin-American origin persons is declining while that for Asian origin persons is increasing. Between 2005 and 2013, Latin American migration declined by almost 25 percent while migration for Asian origin persons doubled.

**Figure 7:**     Numerical Difference in the Size of the 2005 and 2013 Foreign-Born Migrant Streams to Texas by World Area of Birth and Migration Type



Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2005 and 2013

The shift from Latin-American born to Asian born migration to Texas is further illustrated in Figure 7. This figure shows differences in the 2005 and 2013 migration streams for international and domestic migration to Texas. We find that the international migration of Latin-American origin persons declined by more than 30,000 while that for Asian origin persons increased by almost 30,000. With domestic migration, the Latin-American origin migrants increased by less than 2,000 while Asian origin migration increased by more than 13,000. Thus, between 2005 and 2013, the declining Latin American origin migration to Texas was largely offset by increases in Asian origin migration.

The primary states of origin for domestic migration to Texas are examined in Figure 8. Taken together, the 10 states in this figure contributed to more than half of the total domestic migration to Texas in 2013.

*IN 2013, ONE OF EVERY FIVE FOREIGN-BORN DOMESTIC MIGRANTS MOVED TO TEXAS FROM CALIFORNIA.*

Figure 8 shows that California, the nation's most populous state, is the primary source of domestic migration to Texas. In 2013, California sent a total of 62,386 migrants to Texas. This was almost twice as many as the 33,321 from Florida, the second largest sender.

California also dominates as the primary sender of foreign-born domestic migrants to Texas. In 2013, 16,412 foreign-born persons migrated from

**Figure 8:** Nativity of Domestic Migrants to Texas from the Top Ten Origin States, 2013



*Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2013*

App.120

California to Texas. This represented 26.3 percent of the 62,386 total migrants from California. The 16,412 foreign-born migrants from California comprise 20 percent of the 82,174 total 2013 domestic foreign-born migrants from all states to Texas. That is, one of every five foreign-born domestic migrants to Texas in 2013 originated from California.

We have seen that Texas's foreign-born migrants are predominantly of Asian and Latin American origin. We also found that California is a primary source for foreign-born domestic migrants to Texas. The next section describes the destinations of these migrants within Texas.

## Destinations of Foreign-Born Migrants to Texas

Figure 8 indicated that most of the state's domestic in-migrants originate in large population states such as California and geographically proximate states such as Oklahoma. Figures 9-11

**Figure 9:**     Top Ten Receiving Counties in Texas for Foreign-Born International Migrants, 2013



*Source: U.S. Census Bureau ACS 1-Year Summary Data, 2013*

**Figure 10:**     Top Ten Receiving Counties in Texas for Foreign-Born Domestic Migrants, 2013



*Source: U.S. Census Bureau ACS 1-Year Summary Data, 2013*

show there also is a degree of selectivity in where these in-migrants locate within Texas.

*IN 2013, THE MAJORITY OF FOREIGN-BORN MIGRANTS TO TEXAS SETTLED IN THE STATE'S FOUR MOST POPULOUS COUNTIES.*

Figures 9 and 10 respectively show the top destination counties for foreign-born international and domestic in-migrants to Texas. Not surprisingly, these migrants tend to settle in the state's more populous counties. However, these migrants also tend to be highly concentrated. For example, four counties, Harris, Dallas, Bexar, and Tarrant, received 52.4 percent of the state's foreign-born migrants in 2013. For comparison, these four counties contained only 39.8 percent of the state's total population.

Figure 11 shows the five counties that received 60 percent of the foreign-born migration to Texas in 2013. This figure indicates there are some

differences in the types of migrants to the destination counties. For Harris, Dallas, and Travis counties, there is roughly a 60-40 split between international and domestic foreign-born migrants. In Tarrant County, the split is close to 50-50. For Bexar County, the foreign-born migrant stream is about 70 percent international versus 30 percent domestic.

We have shown that foreign-born migrants to Texas tend to settle in the state's largest metropolitan areas. Next we examine how current trends in foreign-born migration are shaping population growth in Texas.

## Current Trends in Texas Nativity

The foreign-born population of Texas is growing because of international and domestic migration. Table 4 indicates that between 2010 and 2013, Texas received an average of 182,593 international migrants per year (the left panel in Table 4). This made Texas second only to California

**Figure 11:** Number and Percentage of Foreign-Born In-migrants by Migration Type to the Top Five Receiving Counties in Texas, 2013



*Source: U.S. Census Bureau ACS 1-Year Summary Data, 2013*

Table 4: Comparison of International Migration and Foreign-Born Population Growth 2010-2013

| Average Annual International Migration | | Numerical Change Foreign-Born | |
|---|---|---|---|
| **State** | **Migration** | **State** | **Foreign-Born** |
| Illinois | 67,106 | New Jersey | 81,192 |
| New York | 151,412 | New York | 85,699 |
| Florida | 164,710 | Florida | 140,019 |
| Texas | 182,593 | California | 160,771 |
| California | 268,868 | Texas | 227,240 |

*Source: U.S. Census Bureau ACS 1-Year Summary Data, 2010-2013*

which received an annual average of 268,868 international in-migrants during the 2010-2013 time period.

*WHILE CALIFORNIA CONSISTENTLY RECEIVES THE LARGEST NUMBER OF INTERNATIONAL MIGRANTS, TEXAS LEADS THE NATION IN THE GROWTH OF THE FOREIGN-BORN POPULATION.*

Even though California is the leading destination for international migrants, recent data indicate that Texas leads the nation in the growth of the foreign-born population. Between 2010 and 2013, Texas added 227,240 foreign-born persons (the right panel in Table 4). California was second to Texas, adding 160,771 foreign-born persons during the same time period.

Thus, while California consistently receives the largest number of international migrants, Texas leads the nation in the growth of the foreign-born population. The explanation for this apparent paradox is the domestic migration of the foreign-born population to Texas.

Earlier, we saw that California is a major source of foreign-born domestic migrants to Texas. In 2013, around one-in-five foreign-born domestic migrants to Texas moved from California. The data suggest that California is not only a gateway for international migrants but also a 'staging area' for their subsequent relocation. It appears that many of the international migrants who initially settle in California subsequently relocate in Texas as domestic migrants.

**Figure 12:** Net Population Gain from Domestic and International Migration to Texas by Migrant Nativity, 2013[3]



*Source: U.S. Census Bureau ACS 1-Year PUMS Data, 2013*

When net migration is examined in Figure 12, the importance of foreign-born migration to the recent growth of the Texas population is immediately apparent. Using net migration, Figure 12 shows that slightly more than half of Texas' 2013 growth from migration can be attributed to foreign-born persons moving to Texas.

For contemporary Texas, about half of its population growth is from natural increase (i.e., the excess of births over deaths) while the other half is from net migration. Figure 12 shows about half of this net migration was by the foreign-born. Consequently, this means that about one of every four new Texans in 2013 was born abroad.

The migration of foreign-born persons to Texas is not only adding to the size of the state's population but also leading to greater diversity in the state's population composition. Recent migrants to Texas represent an increasing variety of countries, yielding greater racial/ethnic heterogeneity in the state's population (White et al 2015).

## Summary and Conclusions

In recent decades, the international and domestic migration of foreign-born persons have made Texas more international than at any time since its statehood in 1845. In 2013, about one of every four new Texans was born abroad. These foreign-born Texans came to the state from other countries as well as other states. International migration accounts for the majority of these foreign-born Texans. Nonetheless, between 2005 and 2013, Texas added a little over 1.1 million persons through net domestic migration and 254,181, or 22.5 percent, of these domestic migrants were foreign-born.

For both international and domestic migration, persons from Latin America and Asia dominate the migration of the foreign-born to Texas. Historically, people of Latin-American have comprised the vast majority of Texas' foreign-born population. Recently, however, this trend has moderated as the migration of Latin-American origin persons to Texas has declined while that for Asian origin persons has increased. Between 2005 and 2013, Latin-American origin migration to Texas declined by almost 25 percent while the migration of

Asian origin persons to the state doubled. With this shift in the traditional migration patterns of the foreign-born, Texas now has an unprecedented number of Asian origin residents.

The data show selectivity in both the origins and destinations of foreign-born migrants to Texas. For example, in 2013, one of every five foreign-born domestic migrants to Texas originated in California. As for destinations, in 2013, the majority of the state's foreign-born in-migrants (52.4 percent) settled in just four counties: Bexar, Dallas, Harris, and Tarrant.

Whether these recent patterns will sustain into the future is impossible to know. But, should there be continued growth in the state's foreign-born population, Texas can expect an increasingly diverse and more international population in its future. The continuing growth of the foreign-born population could lead to a future Texas that is different in several important ways:

- First, a continuing shift toward more Asian origin migrants which would make the state's population more racially and culturally diverse.

- Second, while the state as a whole will become more international, the foreign-born will not be distributed evenly across Texas' geography. Because of geographic selectivity, the population of cities such as Houston and Dallas will become more similar to the traditional foreign-born gateways of New York, Miami, and Los Angeles.

- Lastly, the continued domestic migration of the foreign-born to the state would mean that even in the absence of international migration to Texas the state's foreign-born population would continue to grow.

This report has examined the sources of growth for the foreign-born population in Texas. The focus has been on domestic and international migration because these are the only processes by which the foreign-born population of the state can grow. By definition, these migrants either lived abroad or in another U.S. state one year ago. As such, the report described only the newly arrived foreign-born Texans. The majority of the state's foreign-born residents have been in Texas for more than a year. Future reports will examine the entire

foreign-born population of Texas. Topics to be covered include:

◊ Education and Labor Force Characteristics;
◊ Income Levels, Poverty, and Income Distribution;
◊ Family, Household, and Fertility Patterns;
◊ Age, Sex, and Race/Ethnicity;
◊ Housing and Suburbanization Patterns; and,
◊ Language Acquisition and Citizenship Patterns.

## Notes

[1]   Please be aware that the U.S. Census Bureau has several programs that estimate migration. These include the American Community Survey (ACS), the Current Population Survey (CPS), Population Estimate (Components of Population Change), and the Survey of Income and Program Participation. Each of these estimation programs uses specific data sources, time frames, and sampling techniques. For example migration estimates in the ACS are based on the respondents' answer to where they lived one year ago. By contrast, migration in the Population Estimates is based on a wide range of administrative data including IRS filings, Medicare enrollment, Social Security information, and Defense Manpower data. Consequently, the estimates of migration by the different Census programs are not equivalent. As such, data users should not compare estimates from one Census source to another without a thorough understanding of their differing methodologies.

[2]   The U.S. Census (2014) uses the following countries to designate the world area of birth for Asia and Latin America:

• Asia:   Afghanistan, Armenia, Azerbaijan, Bahrain, Bangladesh, Bhutan, Brunei, Burma (Myanmar), Cambodia, China, Cyprus, East Timor, Georgia, Hong Kong, India, Indonesia, Iran, Iraq, Israel, Japan, Jordan, Kazakhstan, Korea, Kuwait, Kyrgyzstan, Laos, Lebanon, Macau, Malaysia, Maldives, Mongolia, Nepal, North Korea, Oman, Pakistan, Paracel Islands, Philippines, Qatar, Saudi Arabia, Singapore, South Korea, Spratly Islands, Sri Lanka, Syria, Taiwan, Tajikistan, Thailand, Turkey, Turkmenistan, United Arab Emirates, Uzbekistan, Vietnam, and Yemen.

• Latin America:   Anguilla, Antigua & Barbuda, Argentina, Aruba, Bahamas, Barbados, Belize, Bolivia, Bonaire, Brazil, British Virgin Islands, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, Falkland Islands, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Netherlands Antilles, Nicaragua, Panama, Paraguay, Peru, Saba, Sint Eustatius, Sint Maarten, St. Barthelemy, St. Kitts -Nevis, St. Lucia, St. Vincent & the Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos Islands, Uruguay, Venezuela, and West Indies

[3]   Please note that international migrants are persons who were living abroad one year ago. The Census Bureau includes the following as native-born migrants who were living abroad one year ago: persons from Puerto Rico, the U.S. Virgin Islands, Guam, and other outlying parts of the United States who are U.S. citizens at birth; overseas military personnel and their dependents who are returning to the U.S.; and, any other U.S. citizens who return from abroad (Faber 2000).

## References

Faber, Carol S. 2000. "Geographical Mobility – March 1997 to March 1998." Current Population Reports, Series P20-520, U.S. Census Bureau (Available: https://www.census.gov/prod/2000pubs/ p20-520.pdf 09/02/2015).

Gibson, Campbell and Kay Jung. 2006. "Historical Census Statistics on the Foreign-Born Population of the United States: 1850 to 2000." U.S. Census Bureau, Population Division, Working Paper No. 81 (Available: https://www.census.gov/population/www/ documentation/twps0081/twps0081.pdf 07/31/2015).

Grieco, Elizabeth, Yesensia Acosta, G. Patricia de la Cruz, Christine Gambino, Thomas Gryn, Luke Larsen, Edward Trevelyan, and Nathan Walters. 2012. "The Foreign-Born Population in the United States: 2010." American Community Survey Reports, ACS-19, U.S. Census Bureau (Available: https://www.census.gov/prod/2012pubs/acs-19.pdf 07/28/2015)

Perry, Mark. 2006. "Domestic Net Migration in the United States: 2000 to 2004." Current Population Reports, Series P25-1135, U.S. Census Bureau (Available: https://www.census.gov/prod/2006pubs/p25-1135.pdf 07/28/2015)

Schmidley, A. Dianne and Campbell Gibson. 1999. "Profile of the Foreign-Born Population in the United States: 1997." Current Population Reports, Series P23-195, U.S. Census Bureau (Available: https://www.census.gov/prod/99pubs/p23-195.pdf 01/26/2015)

U.S. Census Bureau. 1992. "Part B. Glossary, 1990 Census of Population and Housing." (Available: http://www.census.gov/prod/cen1990/cph-r/cph-r-1b.pdf 07/29/2015)

_____. 2014. "American Community Survey and Puerto Rico Community Survey: 2013 Code List." (Available: http://www2.census.gov/programs-surveys/acs/tech_docs/code_lists/2013_ACS_Code_Lists.pdf 08/10/2015)

_____. (various years). American Community Survey (ACS): One-Year Public Use Microdata Sample (PUMS). (Available: http://www.census.gov/programs-surveys/acs/data/pums.html 09/03/2015).

_____. (various years). One-Year American Community Survey. (Available: http://factfinder.census.gov/faces/nav/jsf/pages/index.xhtml 09/03/2015).

White, Steve, Lloyd B. Potter, Helen You, Lila Valencia, Jeffrey A. Jordan, and Beverly Pecotte. 2015. "Origins of Immigrants to Texas." Office of the State Demographer. (Available: http://osd.state.tx.us/Publications/2015_05_Origins.pdf 06/25/2015).



OFFICE OF THE STATE DEMOGRAPHER

P.O. Box 13455
Austin, TX 78701
http://osd.state.tx.us
Ph: 512-463-8390
Fx: 512-463-7632
Email: state.demographer@state.tx.us



UTSA
The University of Texas at San Antonio™



TEXAS STATE DATA CENTER

501 West Cesar E. Chavez Blvd.
San Antonio, TX 78207-4415
http://txsdc.utsa.edu
Ph: 210-458-6543
Fx: 210-458-6541
Email: txsdc@utsa.edu

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSOURI, and | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| Plaintiffs, | § | Case No. 6:21-cv-00052 |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

# EXHIBIT D

# GONE TO TEXAS

The latest state-to-state migration flows data from the U.S. Census Bureau reveal over half a million people moved to Texas from other states in 2019, among the highest in-migration flows of all U.S. states, second only to Florida. Texas net migration (in-migrants minus out-migrants) during this time was over 106,000, with California contributing over 42% to this net migration. The next two highest sending states to Texas were Florida and Illinois. During this same period, over 37,000 Texans moved to California, but the greatest net migrant loss from Texas went to Colorado.

## Percent of Net Migration Flows to Texas, 2019



Source: U.S. Census Bureau, 2019 State-to-State Migration Flows Data

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| THE STATE OF MISSOURI, and | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| Plaintiffs, | § | Case No. 6:21-cv-00052 |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United States | § | |
| of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF SHERI GIPSON

My name is Sheri Gipson, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.      I am the Chief of the Texas Department of Public Safety ("DPS") Driver License Division. In this capacity, I oversee DPS's issuance of driver licenses and identification cards to residents of the State of Texas.

2.      I was appointed to my current position and confirmed by the Texas Public Safety Commission in February 2020. Prior to that, I served as Assistant Chief of the Driver License Division from March 2016 through February 2020. I have worked for the Driver License Division of DPS for 38 years.

3.      Pursuant to Section 521.142(a) of the Texas Transportation Code, an individual applying for an original driver license "who is not a citizen of the United States must present to [DPS] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States before the applicant may be issued a driver's license." Section

521.1425(d) of the Texas Transportation Code provides that DPS "may not deny a driver's license to an applicant who provides documentation described by Section 521.142(a) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Section 521.142(a)."

4.     Pursuant to Section 521.101(f-2) of the Texas Transportation Code, an individual applying for an original personal identification certificate "who is not a citizen of the United States must present to [DPS] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States." Section 521.101(f-4) of the Texas Transportation Code provides that DPS "may not deny a personal identification certificate to an application who complies with Subsection (f-2) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Subsection (f-2)."

5.     If an individual presents documentation issued by the federal government showing authorization to be in the United States (such as an Employment Authorization Document), and otherwise meets eligibility requirements, DPS will issue a limited term driver license or personal identification certificate to a non-citizen resident of Texas.[1] A license or identification certificate issued to such an applicant is limited to the term of the applicant's lawful presence, which is set by the federal government when it authorizes that individual's presence. In fiscal year 2021 (September 2020 through August 2021), DPS issued 354,625 limited term licenses and identification certificates. In fiscal year 2020 (September 2019 through August 2020), DPS issued 304,031 limited term licenses and identification certificates. Driver license and identification card transactions for FY 2020 and FY 2021 were impacted by office closures and

---

[1] DPS maintains a list documents acceptable for verifying lawful presence. *See* Tex. Dep't of Public Safety, Verifying Lawful Presence 4 (Rev. 7-13), https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifyinglawfulpresence.pdf. A copy is attached to this declaration as Exhibit A.

reduced customer capacity in offices due to the pandemic.

6.      For each non-citizen resident of Texas who seeks a limited term driver license or personal identification certificate, DPS verifies the individual's lawful presence status with the United States government using the Systematic Alien Verification of Entitlements ("SAVE") system. The State of Texas currently pays $0.30 per customer for SAVE verification purposes. Approximately 18% of customers must complete additional SAVE verification at $0.50 per transaction.

7.      For each non-United States citizen resident of Texas who seeks a limited term driver license, DPS verifies the individual's social security number and that person's eligibility through Social Security Online Verification ("SSOLV") and the American Association of Motor Vehicle Administrators' ("AAMVA") Problem Drivers Pointer System ("PDPS") and, if applicable, the Commercial Driver License Information System ("CDLIS"). The State of Texas currently pays $0.05 per customer for SSOLV and PDPS verification purposes. There is a cost of $0.028 for CDLIS verification purposes, which is about 2% of all limited term licenses.

8.      Each additional customer seeking a limited term driver license or personal identification certificate imposes a cost on DPS. DPS estimates that for an additional 10,000 driver license customers seeking a limited term license, DPS would incur a biennial cost of approximately $2,014,870.80. The table below outlines the estimated costs that DPS would incur based on the additional number of customers per year for employee hiring and training, office space, office equipment, verification services, and card production cost. For every 10,000 additional customers above the 10,000-customer threshold, DPS may have to open additional driver license offices or expand current facilities to meet that increase in customer demand.

| Customer Volume Scenario | Additional Employees Required | Additional Office Space Required (SqFt) (96 per employee) | Biennial Cost for Additional Employees, Leases, Facilities and Technology | Biennial Cost for Verification Services | Biennial Cost for Card Production | Total Cost to DPS |
|---|---|---|---|---|---|---|
| 10,000 | 9.4 | 902.4 | $1,978,859.60 | $9,011.20 | $27,000.00 | $2,014,870.80 |
| 20,000 | 18.8 | 1,804.8 | $3,957,719.20 | $18,022.40 | $54,000.00 | $4,029,741.60 |
| 30,000 | 28.2 | 2,707.2 | $5,936,578.80 | $27,033.60 | $81,000.00 | $6,044,612.40 |
| 40,000 | 37.6 | 3,609.6 | $7,915,438.40 | $36,044.80 | $108,000.00 | $8,059,483.20 |
| 50,000 | 46.9 | 4,502.4 | $9,894,298.00 | $45,056.00 | $135,000.00 | $10,074,354.00 |
| 100,000 | 93.9 | 9,014.4 | $19,788,596.01 | $90,112.00 | $270,000.00 | $20,148,708.01 |
| 150,000 | 140.8 | 13,516.8 | $29,682,894.01 | $135,168.00 | $405,000.00 | $30,223,062.01 |
| 200,000 | 187.8 | 18,028.8 | $39,577,192.01 | $180,224.00 | $540,000.00 | $40,297,416.01 |

9.      Standard term licenses issued to most citizens are valid for a period of eight years with an allowance to renew online once after an office visit. Therefore, most license holders only have to visit a driver license office once every sixteen years. Because limited term licenses are limited to the term of the applicant's lawful presence, it is possible that an individual would have to renew their limited term license sixteen or more times during the same sixteen-year span. The frequency of renewing the license would depend on the length of time the appropriate United States agency authorizes the applicant to be in the United States. Every renewal for a limited term license requires an additional in-person visit to a DPS facility, and thus requires additional costs related to employee hiring and training, verification of lawful presence status through the SAVE system, office space, office equipment, and infrastructure. Thus, the estimated costs identified above that DPS would incur would only increase as more limited term licenses are issued.

10.      The added customer base that may be created by an increase in the number of individuals authorized to be in the United States who chose to reside in Texas will substantially burden driver license resources without additional funding and support.

11.      All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

      Executed on this 4th day of November 2021.

_____
SHERI GIPSON

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | § | |
|---|---|---|
| THE STATE OF MISSOURI, and | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| Plaintiffs, | § | Case No. 6:21-cv-00052 |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United | § | |
| States of America, *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | | |

# EXHIBIT A



# Verifying Lawful Presence

An applicant for a driver license (DL) or identification card (ID) must present proof of lawful presence in the US.  The table on the following pages describes the acceptable documents for each type of applicant attempting to verify lawful presence.  All documentation must show the applicant's name and date of birth.  The applicant must validate a name change or other inconsistent information through additional documentation such as a marriage license, divorce decree or court order.

The department must verify applicable lawful presence documentation through the US Department of Homeland Security's (DHS) Systematic Alien Verification for Entitlements (SAVE) Program.  Verification through SAVE is often instantaneous, but when it is not, receipt of the DL/ID may be delayed for up to 30 days.  If SAVE cannot verify on the first attempt, SAVE will permit two additional stages of verification.  Each stage may require additional documentation from the applicant.  After each stage, the applicant will receive instructions either verbally or by mail on how to proceed with the transaction.  To avoid further delay, the applicant should comply with the instructions fully and as soon as possible.  If the applicant provides timely responses, the process timeline generally occurs as follows.

| Stage | DLD receives response from DHS | DLD response to applicant |
|---|---|---|
| First | Within a few seconds | If verified, card issued |
| Second | 3 to 5 business days | Instruction letter issued within 48 hours after DHS response received by DLD |
| Third | Up to 20 additional business days after second response received from DHS | Instruction letter issued within 48 hours after DHS response received by DLD |

## *Temporary Visitor/Limited Term Issuance*

An applicant may be issued a limited term DL/ID if he or she is NOT:

- A US citizen;
- A US national;
- A lawful permanent resident;
- A refugee; or
- An asylee.

A limited term DL/ID will expire with the applicant's lawful presence as determined by DHS.

## *Commercial Driver Licenses*

This guide does not apply to commercial driver licenses.  A person who is a US citizen, US national, lawful permanent resident, refugee or asylee may apply for a commercial driver license.  All others may apply for a nonresident commercial driver license, if eligible.  Refer to http://www.dps.texas.gov/DriverLicense/CommercialLicense.htm or Chapter 522 of the Transportation Code for application and eligibility requirements.

| Category | Acceptable Documents |
|---|---|
| U.S. Citizen | ❖ Birth certificate issued by the appropriate vital statistics agency of a U.S. State, a U.S. territory, or the District of Columbia indicating birth in U.S.<br>❖ Department of State Certification of Birth issued to U.S. Citizens born abroad (FS-240, DS-1350, or FS-545) or Consular Report of Birth Abroad<br>❖ Certificate of U.S. Citizenship<br>❖ Certificate of Naturalization<br>❖ U.S. Dept. of Justice – INS U.S. Citizenship Identification Card (I-197 or I-179)<br>❖ Northern Mariana Card (I-873)<br>❖ U.S. passport book that **does not** indicate on the last page that "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN"<br>❖ U.S. passport card |
| U.S. National | U.S. passport book that indicates on the last page that "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN" |
| Kickapoo Traditional Tribe of Texas ("KIC") (U.S. citizen) | American Indian Card (form I-872) which indicates "KIC" |
| Kickapoo Traditional Tribe of Texas ("KIP") (non-U.S. citizen) | American Indian Card (form I-872) which indicates "KIP" |
| American Indian born in Canada (First Nations) | An applicant may refer to the Jay Treaty, 8 U.S.C. § 1359, or 8 C.F.R. § 289.2 and may present a variety of documents.  Issuance cannot occur without approval of the documents by Austin headquarters.  DLD Personnel:  make copies of documentation and seek approval through the chain of command. |
| Lawful Permanent Resident | ❖ Permanent Resident Card (I-551)<br>❖ Resident Alien Card (I-551) – card issued without expiration date<br>❖ Valid Immigrant Visa (with adit stamp) and unexpired foreign passport<br>❖ Unexpired foreign passport stamped with temporary I-551 language (adit stamp), "Approved I-551," or "Processed for I-551"<br>❖ I-94 stamped with temporary I-551 language (adit stamp), "Approved I-551," or "Processed for I-551"<br>❖  Re-entry Permit I-327<br><br>Note: I-151, the predecessor to I-551, is not acceptable as proof of permanent resident status. |
| Immigrant Visa with Temporary I-551 language | A valid Immigrant Visa within one year of endorsement (i.e. stamped by Customs and Border Protection – adit stamp) and an unexpired passport |
| Conditional entrants | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 or other document showing admission under Section 203(a)(7), "refugee conditional entry"<br>❖ I-688B coded 274a.12(a)(3)<br>❖ I-766 with category A3 or A03 |

| Category | Acceptable Documents |
|---|---|
| Asylee | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 with annotation "Section 208" or "asylee"<br>❖ Unexpired foreign passport with annotation "Section 208" or "asylee"<br>❖ I-571 Refugee Travel Document<br>❖ I-688B coded 274a.12(a)(5)<br>❖ I-766 with category A5 or A05 |
| Refugee | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 with annotation "Section 207" or "refugee"<br>❖ Unexpired foreign passport with annotation "Section 207" or "refugee"<br>❖ I-571 Refugee Travel Document<br>❖ I-688B coded 274a.12(a)(3)<br>❖ I-766 with category A3 or A03 |
| Temporary Protected Status (TPS) | Immigration documentation with an alien number or I-94 number indicating this status or Employment Authorization Document (EAD) (I-766) with category A12 or C19 |
| Applicant with Employment Authorization Document | Employment Authorization Document (EAD)( I-766) |
| Applicants for adjustment of status<br><br>Note: These are individuals applying to become lawful permanent residents. | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to a form I-797 indicating pending I-485 or pending application for adjustment of status. |
| Applicants for extension of status, change of status, petition for non-immigrant worker, with a pending I-918 application, or other pending category. | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to a form I-797 indicating a pending application for an extension of status, change of status, petition for non-immigrant worker, or other pending category. |
| Citizens of the Republic of Palau | Unexpired foreign passport or I -94 with annotation "CFA/PAL" or other annotation indicating the Compact of Free Association/Palau<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |
| Citizens of the Republic of the Marshall Islands | Unexpired foreign passport or I -94 with annotation "CFA/RMI" or other annotation indicating the Compact of Free Association/Republic of Marshall Islands<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |

3

App.137

| Category | Acceptable Documents |
|---|---|
| Citizens of the Federated States of Micronesia | Unexpired foreign passport or I -94 with annotation "CFA/FSM" or other annotation indicating the Compact of Free Association/Federated States of Micronesia<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |
| Cuban/Haitian entrants | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 with annotation "Cuban/Haitian entrant" |
| Lawful temporary residents | Immigration documentation with an alien number or I-94 number |
| Self-petitioning abused spouses or children, parents of abused children, or children of abused spouses<br><br>(Applicants with Violence Against Women Act (**VAWA**) petitions) | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to I-797 indicating approved, pending, or prima facie determination of I-360 or an approved or pending I-360 or an I-766 with category C31. |
| Parolees | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 with annotation "parole" or "paroled pursuant to Section 212(d)(5)." |
| Person granted **deferred action** | Immigration documentation with an alien number or I-94 number |
| Persons granted **deferred enforcement departure** (DED) | Immigration documentation with an alien number or I-94 number or Employment Authorization Document (EAD) (I-766) with category A11<br><br>Note: Individuals in this status may have been granted an extension to the period of authorized stay that is not reflected on the current EAD.  Notifications regarding any extensions to this category will be distributed by Austin headquarters. |
| Person granted **family unity** | Immigration documentation with an alien number or I-94 number |
| Persons under an **order of supervision** | Immigration documentation with an alien number or I-94 number |
| Persons granted **extended or voluntary departure** | Immigration documentation with an alien number or I-94 number |

App.138

| Category | Acceptable Documents |
|---|---|
| Persons granted **withholding of deportation or removal** | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 or passport with annotation "Section 243(h)" or a letter or order from USCIS or court granting withholding of deportation or removal. |
| Persons in **removal or deportation proceedings** | Immigration documentation with an alien number or I-94 number |
| Persons granted a **stay of deportation** | Immigration documentation with an alien number or I-94 number |
| Persons granted **voluntary departure** | Immigration documentation with an alien number or I-94 number |
| **A-1, A-2, and A-3** | Unexpired foreign passport or I -94<br><br>**Note:** Issuance **cannot occur unless** applicant presents a letter from U.S. Department of State with original signature <u>indicating ineligibility for Department of State issued driver license or requesting issuance of a state issued identification card.</u> |
| **B1/B2 Visa/BCC with I-94**<br><br>(Border Crosser Card , DSP-150, or "laser visa") | All of the following:<br>♦ Unexpired foreign passport,<br>♦ Visa (border crosser card), **and**<br>♦ **I -94**<br>Note:  Applicant must have an I-94 to be eligible because of the time and distance from the border restrictions for applicants who do not obtain an I-94. |
| **B-1, B-2, C-1, C-3, D-1, and D-2** | Unexpired foreign passport or I -94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |
| **C-2**<br><br>Alien in transit to U.N. Headquarters district.  Travel limited to 25 miles radius of Columbus Circle in New York, NY | This status is restricted to New York, NY and not eligible for a Texas driver license under the domicile/residency requirements. |
| **E-1, E-2, and E-3** | Unexpired foreign passport or I -94 |
| **E-2 CNMI**<br><br>Treaty-investor and dependents in Commonwealth of the Northern Mariana Islands | This status is limited to persons entering the Commonwealth of the Northern Mariana Islands (CNMI) and is not eligible for a Texas driver license (8 CFR § 214.2(3)(23)). |
| **F-1**<br><br>Foreign academic student | Unexpired foreign passport or I -94 or I-20 |

| Category | Acceptable Documents |
|---|---|
| **F-2**<br><br>Dependent on F-1 | Unexpired foreign passport or I -94 |
| **F-3**<br><br>Commuter Student from Canada or Mexico | This status is for commuters from Mexico or Canada and is not eligible for a Texas driver license under the domicile/residency requirements. |
| **G-1, G-2, G-3, G-4, and G-5** | Unexpired foreign passport or I -94<br><br>Note: Issuance cannot occur unless applicant presents a letter from US Department of State approving the issuance of a DL/ID. |
| **H-1B, H-1B1, H-1C, H-2A, H-2B, H-2R, H-3, H-4, and I** | Unexpired foreign passport or I -94 |
| **J-1**<br><br>Exchange visitor (may be student, trainee, work/travel, au pair, etc.) | Unexpired foreign passport or I -94 or DS-2019 |
| **J-2**<br><br>Dependent of J-1 exchange visitor | Unexpired foreign passport or I -94 |
| **K-1, K-2, K-3, K-4, L-1, L-1A, L-1B, and L-2,** | Unexpired foreign passport or I -94 |
| **M-1**<br><br>Non-academic student | Unexpired foreign passport or I -94 or I-20 |
| **M-2**<br><br>Dependents of non-academic students | Unexpired foreign passport or I -94 |
| **M-3**<br><br>Commuter Student from Canada or Mexico | This status is for commuters from Mexico or Canada and is not eligible for a Texas driver license under the domicile/residency requirements. |
| **N-1 through N-7 (NATO)**<br><br>North American Treaty Organization Representatives and dependents | Unexpired foreign passport or I -94 |
| **N-8, N-9, O-1, O-2, O-3, P-1, P-2, P-3, P-4, Q-1, Q-2, Q-3, R-1, R-2, S-5, S-6, S-7, T-1, T-2, T-3, T-4, T-5, TN-1, TN-2, TD, U-1, U-2, U-3, U-4, U-5, V-1, V-2, and V-3** | Unexpired foreign passport or I -94 |

6

| Category | Acceptable Documents |
|---|---|
| **WB\***<br><br>Visitor for business (visa waiver program) | Unexpired foreign passport with admission stamp annotated "WT/WB" or I -94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |
| **WT\***<br><br>Visitor for pleasure (tourist in visa waiver program) | Unexpired foreign passport with admission stamp annotated "WT/WB" or I -94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |

\*Visa waiver program countries: Andorra, Australia, Austria, Belgium, Brunei, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Japan, Latvia, Liechtenstein, Lithuania, Luxembourg, Malta, Monaco, the Netherlands, New Zealand, Norway, Portugal, San Marino, Singapore, Slovakia, Slovenia, South Korea, Spain, Sweden, Switzerland, and the United Kingdom.

App.141

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| THE STATE OF MISSOURI, and | § § § | |
| THE STATE OF TEXAS, | § § | |
| Plaintiffs, | § § | Case No. 6:21-cv-00052 |
| v. | § § | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*, | § § § § | |
| Defendants. | § § | |

## DECLARATION OF LEONARDO R. LOPEZ

My name is Leonardo R. Lopez, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.      I am the Associate Commissioner for School Finance/Chief School Finance Officer at the Texas Education Agency ("TEA"). I have worked for TEA in this capacity since June 2016, having previously served as the Executive Director of Finance for the Austin Independent School District ("AISD") for four years. Prior to my time at AISD, I served for ten years in a variety of roles for TEA, including six years as the Foundation School Program Operations Manager for the TEA's State Funding Division.

2.      In my current position, I oversee TEA's school finance operations, including the administration of the Foundation School Program and analysis and processing of financial data.

My responsibilities also include representing TEA in legislative hearings and school finance-related litigation.

3.      TEA estimates that the average funding entitlement for 2021 was $9,250 per student in attendance for an entire school year. If a student qualified for the additional Bilingual and Compensatory Education weighted funding (for which most, if not all, UAC presumably would qualify), it would have cost the State $11,536 to educate each student in attendance for the entire school year. Assuming additional Bilingual and Compensatory Education weighted funding, comparable student costs for fiscal year 2022 would be $11,486.

4.      TEA has not received any information directly from the federal government regarding the precise number of unaccompanied children ("UAC") in Texas. However, I am aware that data from the U.S. Health and Human Services ("HHS") Office of Refugee Resettlement (accessed on November 3, 2021 at 1:50 p.m. CST at https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state) (attached as Exhibit A), indicates that in Texas, 3,272 UAC were released to sponsors during the 12-month period covering October 2014 through September 2015; 6,550 UAC were released to sponsors during the 12-month period covering October 2015 through September 2016; 5,391 UAC were released to sponsors during the 12-month period covering October 2016 through September 2017; 4,136 UAC were released to sponsors during the 12-month period covering October 2017 through September 2018; 9,900 UAC were released to sponsors during the 12-month period covering October 2018 through September 2019; 2,336 UAC were released to sponsors during the 12-month period covering October 2019 through September 2020; and 13,197 UAC were released during the 11-month period covering October 2020 through August 2021. If each of these children is educated in the Texas public school system and qualifies for Bilingual and Compensatory Education weighted funding (such that the

State's annual cost to educate each student for fiscal years 2016, 2017, 2018, 2019, 2020, 2021, and 2022 would be roughly $9,573, $9,639, $9,841, $10,330, $11,323, $11,536, and $11,486, respectively), the annual costs to educate these groups of children for fiscal years 2016, 2017, 2018, 2019, 2020, 2021, and 2022 would be approximately $31.32 million, $63.13 million, $53.05 million, $42.73 million, $112.10 million, $26.95 million, and $151.58 million, respectively.

5.     School formula funding is comprised of state and local funds. The state funding is initially based on projections made by each school district at the end of the previous biennium. Districts often experience increases in their student enrollment from year to year, and the State plans for an increase of approximately 36,000 students in enrollment growth across Texas each year.

6.     The Foundation School Program serves as the primary funding mechanism for providing state aid to public schools in Texas. Any additional UAC enrolled in Texas public schools would increase the State's cost of the Foundation School Program over what would otherwise have been spent.

7.     Based on my knowledge and expertise regarding school finance issues impacting the State of Texas, I anticipate that the total costs to the State of providing public education to UAC will rise in the future to the extent that the number of UAC enrolled in the State's public school system increases.

8.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 3rd day of November 2021.

_____

LEONARDO R. LOPEZ

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

|  |  |  |
|---|---|---|
| THE STATE OF MISSOURI, and | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| Plaintiffs, | § | Case No. 6:21-cv-00052 |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United | § | |
| States of America, *et al.*, | § | |
| | § | |
| Defendants. | § | |

# EXHIBIT A

# Unaccompanied Children Released to Sponsors by State

Listen

Publication Date: June 24, 2021

When a child who is not accompanied by a parent or legal guardian is apprehended by immigration authorities, the child is transferred to the care and custody of the Office of Refugee Resettlement (ORR).  Federal law requires that ORR feed, shelter, and provide medical care for unaccompanied children until it is able to release them to safe settings with sponsors (usually family members), while they await immigration proceedings. These sponsors live in many states.

Sponsors are adults who are suitable to provide for the child's physical and mental well-being and have not engaged in any activity that would indicate a potential risk to the child. All sponsors must pass a background check. The sponsor must agree to ensure the child's presence at all future immigration proceedings. They also must agree to ensure the minor reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.

HHS is engaging with state officials to address concerns they may have about the care or impact of unaccompanied children in their states, while making sure the children are treated humanely and consistent with the law as they go through immigration court proceedings that will determine whether they will be removed and repatriated, or qualify for some form of relief.

HHS has strong policies in place to ensure the privacy and safety of unaccompanied children by maintaining the confidentiality of their personal information. These children may have histories of abuse or may be seeking safety from threats of violence. They may have been trafficked or smuggled.  HHS cannot release information about individual children that could compromise the child's location or identity.

---

n the table below shows **state-by-state** data of unaccompanied children released to sponsors as of August 31, 2021. ACF will update each month. Additional data on unaccompanied children released to sponsors by state is available on the HHS website .

View unaccompanied children released to sponsors by county.

**Please note:** ORR makes considerable effort to provide precise and timely data to the public, but adjustments occasionally occur following review and reconciliation. The FY2014 release data posted in the chart below were updated on March 13, 2015. The FY2015 release data were updated May 9, 2016. The FY2017 release data were updated May 22, 2018. The FY2018 release data were updated December 3, 2019. Questions may be addressed to ORR directly, at (202) 401-9246.

# Unaccompanied Children Release Data

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — AUG. 2021)* |
|---|---|---|---|---|---|---|---|
| Alabama | 808 | 870 | 598 | 736 | 1,111 | 247 | 1,643 |
| Alaska | 2 | 5 | 3 | 0 | 4 | 0 | 3 |
| Arizona | 167 | 330 | 322 | 258 | 493 | 162 | 557 |
| Arkansas | 186 | 309 | 272 | 193 | 359 | 87 | 672 |
| California | 3,629 | 7,381 | 6,268 | 4,675 | 8,447 | 2,225 | 9,254 |
| Colorado | 248 | 427 | 379 | 313 | 714 | 172 | 958 |
| Connecticut | 206 | 454 | 412 | 332 | 959 | 260 | 1,240 |
| Delaware | 152 | 275 | 178 | 222 | 383 | 107 | 445 |
|  | 201 | 432 | 294 | 138 | 322 | 48 | 266 |
|  | 2,908 | 5,281 | 4,059 | 4,131 | 7,408 | 1,523 | 9,661 |

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — AUG. 2021)* |
|---|---|---|---|---|---|---|---|
| Georgia | 1,041 | 1,735 | 1,350 | 1,261 | 2,558 | 559 | 3,747 |
| Hawaii | 2 | 4 | 4 | 1 | 16 | 6 | 19 |
| Idaho | 11 | 39 | 11 | 28 | 62 | 19 | 74 |
| Illinois | 312 | 519 | 462 | 475 | 863 | 211 | 1,460 |
| Indiana | 240 | 354 | 366 | 394 | 794 | 209 | 1,368 |
| Iowa | 201 | 352 | 277 | 238 | 489 | 119 | 587 |
| Kansas | 245 | 326 | 289 | 305 | 453 | 95 | 608 |
| Kentucky | 274 | 503 | 364 | 370 | 710 | 158 | 905 |
| Louisiana | 480 | 973 | 1,043 | 931 | 1,966 | 355 | 2,413 |
| Maine | 4 | 9 | 11 | 22 | 26 | 11 | 55 |
| Maryland | 1,794 | 3,871 | 2,957 | 1,723 | 4,671 | 825 | 4,692 |
| Massachusetts | 738 | 1,541 | 1,077 | 814 | 1,756 | 448 | 2,199 |
| n | 132 | 227 | 160 | 136 | 248 | 74 | 382 |
| ota | 243 | 318 | 320 | 294 | 624 | 151 | 857 |

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — AUG. 2021)* |
|---|---|---|---|---|---|---|---|
| Mississippi | 207 | 300 | 237 | 299 | 482 | 108 | 599 |
| Missouri | 170 | 261 | 234 | 203 | 431 | 93 | 672 |
| Montana | 2 | 0 | 2 | 3 | 0 | 2 | 20 |
| Nebraska | 293 | 486 | 355 | 374 | 563 | 130 | 776 |
| Nevada | 137 | 283 | 229 | 132 | 324 | 79 | 390 |
| New Hampshire | 14 | 25 | 27 | 20 | 25 | 8 | 59 |
| New Jersey | 1,462 | 2,637 | 2,268 | 1,877 | 4,236 | 921 | 4,959 |
| New Mexico | 19 | 65 | 46 | 43 | 89 | 34 | 99 |
| New York | 2,630 | 4,985 | 3,938 | 2,845 | 6,367 | 1,663 | 7,360 |
| North Carolina | 844 | 1,493 | 1,290 | 1,110 | 2,522 | 610 | 3,663 |
| North Dakota | 2 | 10 | 3 | 2 | 10 | 1 | 10 |
| Ohio | 483 | 693 | 584 | 547 | 1,091 | 260 | 1,448 |
| ma | 225 | 301 | 267 | 286 | 581 | 120 | 811 |

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — AUG. 2021)* |
|---|---|---|---|---|---|---|---|
| Oregon | 122 | 188 | 170 | 200 | 318 | 71 | 382 |
| Pennsylvania | 333 | 604 | 501 | 563 | 1,229 | 271 | 1,758 |
| PR | 0 | 0 | 0 | 1 | 3 | 3 | 0 |
| Rhode Island | 185 | 269 | 234 | 235 | 453 | 92 | 420 |
| South Carolina | 294 | 562 | 483 | 508 | 1,012 | 255 | 1,524 |
| South Dakota | 61 | 81 | 81 | 96 | 149 | 44 | 192 |
| Tennessee | 765 | 1,354 | 1,066 | 1,173 | 2,191 | 510 | 3,678 |
| Texas | 3,272 | 6,550 | 5,391 | 4,136 | 9,900 | 2,336 | 13,197 |
| Utah | 62 | 126 | 99 | 97 | 179 | 75 | 269 |
| Vermont | 1 | 1 | 0 | 2 | 6 | 1 | 7 |
| Virginia | 1,694 | 3,728 | 2,888 | 1,650 | 4,215 | 770 | 4,692 |
| Washington | 283 | 476 | 494 | 435 | 723 | 237 | 919 |
| rginia | 12 | 26 | 23 | 23 | 41 | 4 | 48 |

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — AUG. 2021)* |
|---|---|---|---|---|---|---|---|
| Wisconsin | 38 | 85 | 94 | 98 | 246 | 62 | 450 |
| Wyoming | 6 | 23 | 14 | 15 | 15 | 6 | 17 |
| Virgin Islands | 0 | 0 | 3 | 0 | 0 | 0 | 0 |
| **TOTAL** | **27,840** | **52,147** | **42,497** | **34,953** | **72,837** | **16,837** | **92,484** |

*The FY2015 numbers have been reconciled.

*The FY2017 numbers have been reconciled.

*The FY2018 numbers have been reconciled.

*The FY2021 numbers have been reconciled.

For more information, please read ORR's reunification policy.

**Topics:**

Unaccompanied Children (UC)

**Types:**

s & Funding

nces:

ompanied Alien Children (UAC)

Current as of: September 30, 2021

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| THE STATE OF MISSOURI, and | § § § | |
| THE STATE OF TEXAS, | § § | |
| Plaintiffs, | § § | Case No. 6:21-cv-00052 |
| v. | § § | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*, | § § § § | |
| Defendants. | § § | |

## DECLARATION OF LISA KALAKANIS

My name is Lisa Kalakanis, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.   I serve as the Director of the Texas Health and Human Services Commission's Data Dissemination and Reporting Unit within the Office of Data, Analytics, and Performance, parts of which were formally known as the Center for Analytics and Decision Support (CADS). The Texas Health and Human Services Commission (HHSC) is the state agency responsible for ensuring the appropriate delivery of health and human services in Texas. As such, HHSC has operational responsibility for certain health and human services programs and oversight authority over the state health and human services (HHS) agencies.

2.      As a part of my employment with HHSC, I am responsible for analytic and quantitative research on health care utilization, demographic trends, and enrollment patterns for the state's health care and human service programs, including Medicaid. I am also responsible for analytic support across all of the HHS agencies and programs.

3.      I served as Interim CADS Director from September 1, 2020 to May 31, 2021.

4.      This declaration was first prepared by Monica Smoot, then Chief Data and Analytics Officer for CADS. Ms. Smoot retired from the agency in August 2020. The data contained in this declaration is true and correct.

5.      In 2007, as part of the 2008-2009 General Appropriations Act, the Texas Legislature required HHSC to report the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. This report, also known as the Rider 59 Report, was first completed by HHSC in 2008. Due to numerous requests for more recent information following the issuance of the 2008 report, the Rider 59 Report was updated in 2010, 2013, 2014, 2017, and 2021. The Rider 59 Report completed in 2021 covered state fiscal year (SFY) 2019.

6.      HHSC provides three principal categories of services and benefits to undocumented immigrants in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and (iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage. Undocumented immigrants also receive uncompensated medical care from public hospitals in the State.

7.      Emergency Medicaid is a federally required program jointly funded by the federal government and the states. The program provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, to undocumented immigrants living in the United States. Because HHSC Medicaid claims data do not conclusively identify an individual's residency status, the portion of Emergency Medicaid payments attributable to undocumented immigrants must be estimated. Attached as Exhibit A is a document that explains the methodology HHSC utilized to obtain the estimates provided in this declaration. It is the same methodology relied upon by HHSC for preparing internal estimates and for preparation of the Rider 59 report. The total estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants residing in Texas was approximately $80 million in SFY 2007, $62 million in SFY 2009, $71 million in SFY 2011, $90 million in SFY 2013, $73 million in SFY 2015, and $85 million in SFY 2017; the estimate in SFY 2019 was $80 million.

8.      The Family Violence Program contracts with non-profit agencies across the State to provide essential services to family violence victims, including undocumented immigrants, in three categories: shelter centers, non-residential centers, and Special Nonresidential Projects. Because the FVP does not ask individuals about their residency status, the portion of the FVP's expenditures attributable to undocumented immigrants must be estimated. Attached as Exhibit A is a document that explains the methodology HHSC utilized to obtain the estimates provided in this declaration. It is the same methodology relied upon by HHSC for

preparing internal estimates and for preparation of the Rider 59 report. The total estimated cost to the State for the provision of direct FVP services to undocumented immigrants residing in Texas was $1.2 million in SFY 2007, $1.3 million in SFY 2009, $1.3 million in SFY 2011, $1.4 million in SFY 2013, $1.0 million in SFY 2015, and $1.2 million in SFY 2017; the estimate for SFY 2019 is $1.0 million.

9.      Texas CHIP Perinatal Coverage provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. There is no way to definitively report the number of undocumented immigrants served by CHIP Perinatal Coverage because the program does not require citizenship documentation. Attached as Exhibit A is a document that explains the methodology HHSC utilized to obtain the estimates provided in this declaration. It is the same methodology relied upon by HHSC for preparing internal estimates and for preparation of the Rider 59 report. CHIP Perinatal Coverage expenditures were not included in HHSC's original Rider 59 Report because a full year of program data was not available when the report was prepared. The total estimated cost to the State for CHIP Perinatal Coverage to undocumented immigrants residing in Texas was $33 million in SFY 2009, $35 million in SFY 2011, and $38 million in SFY 2013, $30 million in SFY 2015, and $30 million in SFY 2017; the estimate for SFY 2019 is $6 million.

10.      In the 2008 and 2010 versions of the Rider 59 Report, HHSC also provided estimates of the amount of uncompensated medical care provided by state public hospital district facilities to undocumented immigrants. In these reports, HHSC estimated that the State's public hospital district facilities incurred

approximately $596.8 million in uncompensated care for undocumented immigrants in SFY 2006 and $716.8 million in SFY 2008. HHSC has not provided any estimates of uncompensated care for undocumented immigrants in more recent versions of the Rider 59 Report.

11.    Although all of these numbers are estimated costs for the respective programs, it is a certainty that each of these programs has some positive cost to the State of Texas due to utilization by undocumented immigrants.

12.    Based on my knowledge, expertise, and research regarding the provision of services and benefits to undocumented immigrants by HHSC, I believe that the total costs to the State of providing such services and benefits to undocumented immigrants will continue to reflect trends to the extent that the number of undocumented immigrants residing in Texas increases or decreases each year.

13.    DAP can produce an updated report on the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. Because of other DAP workload, including ongoing reporting on the impacts of COVID on Texas' vulnerable populations and demands associated with other litigation, and because the necessary data is not considered complete until eight months after the end of the fiscal year, we estimate that the report will be ready in December 2022.

14.    All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 5th day of November 2021.

LISA KALAKANIS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| THE STATE OF MISSOURI, and | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| | § | |
| Plaintiffs, | § | Case No. 6:21-cv-00052 |
| | § | |
| v. | § | |
| | § | |
| JOSEPH R. BIDEN, JR., in his official | § | |
| capacity as President of the United | § | |
| States of America, *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | | |

# EXHIBIT A

# Appendix B:  Estimating the Percent of Undocumented Clients

<u>Previous Undocumented Immigrant Estimates</u>

Previously, HHSC relied on different methods to estimate the percent of non-U.S. citizens in Texas who are undocumented. The first method consisted of assuming that one-half of the estimated non-U.S. citizen population in the state was undocumented. Under this method, HHSC would obtain the estimate for total number of non-U.S. citizens in the state, as reported from the U.S. Census Bureau's American Community Survey (ACS)[1], and would divide that number by two in order to obtain an estimate of the undocumented population in the state.

More recently HHSC relied on a method that uses two different sources of official federal government data to develop its own in-house estimates of the percent of Texas residents that are undocumented immigrants:

- The Texas-specific sample of the U.S. Census Bureau's American Community Survey (ACS), and
- The Office of Immigration Statistics of the U.S. Department of Homeland Security (DHS).

The ACS was the source for estimates of the total non-U.S. citizen population in the state while DHS was the source for the estimated number of persons in the state who are undocumented.

Using these two sources, HHSC estimated the percent of non-U.S. citizens who are undocumented by taking DHS' estimate of the number of undocumented immigrants in Texas (the numerator) and dividing it by the ACS estimate for the number of non-U.S. citizens in the state (the denominator). This calculation resulted in HHSC's estimate of the proportion/percent of non-U.S. citizens in the state who are undocumented.

---

[1] The ACS is a large-scale demographic survey that provides annual estimates of the total population in Texas according to U.S. citizen status (citizen versus non-citizen). However, the estimate for the non-U.S. citizen population is not broken down any further according to documented/undocumented status because that type of information is not collected by the survey.

According to this method, during 2008-2014, an estimated two-thirds (62 to 66%) of non-citizens were considered undocumented on any given year within that period.

DHS temporarily suspended the publication of its estimates for the unauthorized/undocumented population after March 2013, when it published estimates for this population as of January 2012. It resumed publication of the estimates on April 19, 2021, when it released previously unpublished estimates for the years 2013-2018.  The new updates may be used to develop future versions of this report.

With the temporary suspension of DHS's estimates after March 2013, HHSC lost the official information source relied upon for data on the number of non-citizens who are undocumented, as none of the other Federal and Texas state agencies collected and published information about the legal status of non-U.S. citizens' residing in the state of Texas.

This situation resulted in the need to develop and alternative method for estimating the number and percent of non-U.S. citizens using HHSC services who are undocumented. The goal was to develop a method that does not rely on the simple assumptions previously used (that one-half of non-citizens are undocumented). The alternative method is explained below.

## Method for Current Estimates

Benchmark Program: Texas' Medicaid Type Program 30

Texas' Medicaid Type Program 30 (TP 30) plays an important role in paying for emergency medical services provided to non-U.S. citizens who do not meet the eligibility criteria for Medicaid. Given the high-profile role the program plays in compensating health care providers for services provided to non-eligible non-citizens, it was chosen as the benchmark program for developing an estimate of the percent of non-citizens provided HHSC services who are undocumented.

To a very significant degree, uninsured non-citizen reproductive-age (ages 15-44) females are the main caseload driver within TP 30. In SFY 2017, reproductive- age females accounted for 81% of the clients served. Given the highly disproportionate impact this group has on the program, it is by far the most important one to analyze to obtain the best and most accurate estimate possible of the percent of clients served under this program that are likely to be undocumented non-citizens.

<u>Data Analysis and Estimate</u>

According to the U.S. Census Bureau's American Community Survey (ACS), in 2016 there were approximately 446,000 uninsured non-U.S. citizen reproductive-age females in Texas. Of those, 39 percent (176,000) had resided in the U.S. for 10 years or less and 61 percent (270,000) for more than 10 years.

It is reasonable to expect that the longer a non-citizen has resided in the U.S., the more likely he/she would have been able to attain some form of U.S. legal permanent resident status.

Assuming that the fraction of non-citizen reproductive-age females (ages 15-44) who have not attained some form of legal permanent resident status is 7 of every 10 (70%) among those who have lived in the U.S 10 years or less, and 4 of every 10 (40%) among those in the U.S. for more than 10 years, the estimated potential percentage for undocumented females of reproductive age in Texas is 52%.

**Calculation for Estimated Percent Undocumented**

**((0.7\*176,000 + 0.4\*270,000) / (446,000)) \* 100 = 51.8% ~ 52%**

Extending these assumptions derived from the ACS data to non-citizen reproductive-age females that received assistance under TP 30 – for whom year of entry into the U.S. information is not known -- it is then estimated that 52% of them are likely to be undocumented.

Taking into consideration that uninsured, non-citizen reproductive-age females represent a highly disproportionate share of the program's caseload, the estimated potential percentage for undocumented clients applicable to them, slightly adjusted downwards to 50%, is also applied to the entire TP 30 program. Due to the lack of sufficient demographic data on populations at-risk for other programs of interest, the same percentage was also applied to the Family Violence and CHIP-P programs for the purposes of the analysis in this report.

Date: November 8, 2021

ERIC S. SCHMITT
Attorney General of Missouri

D. JOHN SAUER, #58720MO*
Solicitor General

/s/ *Jesus A. Osete*
JESUS A. OSETE, #69267MO*
Deputy Attorney General
for Special Litigation

MADDIE M. GREEN, #73724MO*
Assistant Attorney General
for Special Litigation

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-1800
Fax (573) 751-0774
John.Sauer@ago.mo.gov
Jesus.Osete@ago.mo.gov
Maddie.Green@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

*Admitted pro hac vice

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Tex. State Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

AARON F. REITZ
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
Southern Dist. of Texas Bar No. 3653771

/s/ *Ryan D. Walters*
RYAN D. WALTERS
*Attorney-in-Charge*
Special Counsel, Special Litigation Unit Texas
Bar No. 24105085
Southern Dist. of Texas Bar No. 3369185

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
aaron.reitz@oag.texas.gov
ryan.walters@oag.texas.gov

*Counsel for Plaintiff State of Texas*

**CERTIFICATE OF SERVICE**

I certify that on November 8, 2021, a true and accurate copy of the foregoing

document was filed electronically (via CM/ECF) and served on all counsel of record.

/s/ *Jesus A. Osete*
Counsel for Plaintiffs