# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# MCALLEN DIVISION

| | |
|---|---|
| THE STATE OF MISSOURI, and THE STATE OF TEXAS,<br><br>                Plaintiffs,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*,<br><br>                Defendants. | Civil Action No. 7:21-cv-00420<br>(formerly 6:21-cv-00052) |

### BRIEF OF IMMIGRATION REFORM LAW INSTITUTE
### AS *AMICUS CURIAE* IN SUPPORT OF
### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

MATT A. CRAPO
CHRISTOPHER J. HAJEC
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
matt.crapo@pm.me
litigation@irli.org

Counsel for *Amicus Curiae*
Immigration Reform Law Institute

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ........................................................................................................................ 2

    I.     Defendants' Refusal to Construct the Border Wall as Directed by Congress Violates the Take Care Clause .......................................................................... 2

    II.    The Take Care Clause Supplies a Cause of Action .......................................... 10

CONCLUSION ................................................................................................................... 11

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*Adams v. Richardson*,
   480 F.2d 1159 (D.C. Cir. 1973) (en banc) ................................................................... 3

*Arizona v. United States*,
   567 U.S. 387 (2012) ..................................................................................................... 7

*Armstrong v. Exceptional Child Center, Inc.*,
   575 U.S. 320 (2015) ................................................................................................... 10

*City of New York v. United States*,
   179 F.3d 29 (2d Cir. 1999) ..................................................................................... 8, 10

*Communist Party of Indiana v. Whitcomb*,
   414 U.S. 441 (1974) ................................................................................................... 10

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ................................................................................................. 7, 8

*Davis v. Passman*,
   442 U.S. 228 (1979) ................................................................................................... 10

*Escoe v. Zerbst*,
   295 U.S. 490 (1935) ..................................................................................................... 4

*Ex parte Young*,
   209 U.S. 123 (1908) ................................................................................................... 10

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
   505 U.S. 88 (1992) ....................................................................................................... 7

*Galvan v. Press*,
   347 U.S. 522 (1954) ..................................................................................................... 9

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ..................................................................................................... 3

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ................................................................................................... 7, 8

*Kendall v. United States ex rel. Stokes*,
    37 U.S. 524 (1838) .................................................................................................. 3

*Larson v. Domestic & Foreign Comm. Corp.*,
    337 U.S. 682 (1949) ................................................................................................ 10

*Nat'l Treasury Employees Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974) ................................................................................. 3

*Nishimura Ekiu v. United States*,
    142 U.S. 651 (1892) ................................................................................................. 9

*Savage v. Jones*,
    225 U.S. 501 (1912) ................................................................................................. 8

*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021) ................................................................................... 7

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .................................................................................. 3

*Texas v. United States*,
    524 F. Supp. 3d 598 (S.D. Tex. 2021) .................................................................... 4

*Texas v. United States*,
    2021 U.S. Dist. LEXIS 156642, 2021 WL 3683913, No. 6:21-cv-00016
    (S.D. Tex. Aug. 19, 2021) ........................................................................................ 4

*United States v. Midwest Oil Co.*,
    236 U.S. 459 (1915) ................................................................................................. 4

*United States v. Texas*,
    577 U.S. 1101 (2016) ............................................................................................... 3

*United States v. Texas*,
    136 S. Ct. 2271 (2016) ............................................................................................. 3

*United States v. Zadeh*,
    820 F.3d 746 (5th Cir. 2016) .................................................................................. 7

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................................................. 2

iii

## STATUTES

§ 209(b)(1)(A), Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, Div. D, 133 Stat. 2511 (Dec. 20, 2019) .................................................................................... 4

5 U.S.C. § 706 ................................................................................................................ 10

8 U.S.C. § 1103(a)(5) ....................................................................................................... 5

8 U.S.C. § 1158 ................................................................................................................ 9

8 U.S.C. § 1182(a) ............................................................................................................ 9

8 U.S.C. § 1182(d)(5) ....................................................................................................... 6

8 U.S.C. § 1225(a)(1) ....................................................................................................... 5

8 U.S.C. § 1225(a)(3) ....................................................................................................... 5

8 U.S.C. § 1225(b) ........................................................................................................... 5

8 U.S.C. § 1225(b)(1)(A)(i) .............................................................................................. 5

8 U.S.C. § 1225(b)(1)(B)(ii) ............................................................................................. 5

8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ..................................................................................... 5

8 U.S.C. § 1225(b)(2)(A) .................................................................................................. 6

8 U.S.C. § 1225(b)(2)(C) .................................................................................................. 6

8 U.S.C. § 1227(a) ............................................................................................................ 9

8 U.S.C. § 1229a .............................................................................................................. 9

8 U.S.C. § 1229b .............................................................................................................. 9

8 U.S.C. § 1255 ................................................................................................................ 9

28 U.S.C. § 1331 ............................................................................................................. 10

U.S. CONST. art. I, § 10 .................................................................................................... 9

U.S. CONST. art. II, § 3 ............................................................................................... 2, 7

U.S. CONST. art. VI, cl. 2 ................................................................................................ 7

## MISCELLANEOUS

Proclamation 10142 of January 20, 2021, *Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction*, 86 Fed. Reg. 7225 (Jan. 27, 2021) .................................................. 4

## INTRODUCTION

In the Executive actions challenged here—the termination by the Department of Homeland Security ("DHS") of contracts to build a border wall, and DHS's refusal to spend funds appropriated by Congress solely for border wall construction—the administration shows itself to be at war with a law it is charged with administering. It is at war not only with the requirements of the law, which it refuses to follow, but with the law's purposes.

Indeed, DHS's policies of non-enforcement drastically frustrate Congress's purpose in appropriating these funds, to the point of reversing the result Congress intended. In the face of Congress's purpose of stopping unlawful border crossing with a barrier that has been 90% effective, DHS's termination of border-wall construction ensures the continuation of the unlawful border-crossing that would have been stopped by a wall. This reversal of Congress's purpose abundantly shows that these policies, to use the language of the Supreme Court, are extreme enough to amount to an abdication of the agency's statutory responsibilities, and thus to be a violation of the Executive's constitutional duty to take care that the laws be faithfully executed.

Because DHS's actions are the antithesis of the Executive's duty to take care that the laws be faithfully executed, this Court should grant Plaintiffs' motion and preliminarily enjoin Defendants from preventing further construction of the border wall.

1

# ARGUMENT

I.  **Defendants' Refusal to Construct the Border Wall as Directed by Congress Violates the Take Care Clause**

The Court should grant Plaintiffs' motion in order to reinforce the rule of law and the constitutional separation of powers. The Take Care Clause provides that the President "shall take care that the laws be faithfully executed." U.S. Const. art. II, § 3. Under separation-of-powers principles, it falls to Congress to make the laws, to the Executive to enforce the laws faithfully, and to the judiciary to interpret the laws. Under that division of authority, this Court should roundly reject DHS's active opposition to border wall construction:

> With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations.
>
> Such institutions may be destined to pass away. But it is the duty of the Court to be last, not first, to give them up.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (1952). Justice Jackson put *Youngstown* within a "judicial tradition" beginning with Chief Justice Coke's admonishing his sovereign that "[the King] is under God and the Law." *Id.* at 655 n.27 (interior quotation marks omitted). By framing the Take Care Clause as a duty, the Framers rejected the idea that the Executive should be vested with the power to suspend or dispense with laws enacted by Congress.

There is less than an abundance of case law providing guidance on how to apply the Take Care Clause. Importantly, however, the Supreme Court has suggested that nonenforcement of the law may run afoul of the Take Care Clause "where it could

justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985) (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc)).[1]

Further, the D.C. Circuit has held that the Take Care Clause "does not permit the President to refrain from executing laws duly enacted by the Congress as those laws are construed by the judiciary." *Nat'l Treasury Employees Union v. Nixon*, 492 F.2d 587, 604 (D.C. Cir. 1974). The D.C. Circuit further observed that "the judicial branch of the Federal Government has the constitutional duty of requiring the executive branch to remain within the limits stated by the legislative branch." *Id.*; *see also Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 613 (1838) (rejecting suggestion that the Take Care Clause vested the President with the power to dispense with laws and that recognizing such a power "would be clothing the President with a power entirely to control the legislation of [C]ongress"). Recently, another judge of this Court addressed the Take Care Clause and ruled that the Executive Branch, including its agencies, "must exercise any discretion accorded to it by statute in the manner which Congress has prescribed" and "may not dispense with a clear congressional mandate under the guise of exercising

---

[1] The Supreme Court indicated a willingness to address the Take Care Clause when it granted *certiorari* in *United States v. Texas*, 577 U.S. 1101 (2016), and ordered the parties to brief "[w]hether the [Deferred Action for Parents of Americans and Lawful Permanent Residents] Guidance violates the Take Care Clause of the Constitution, Art. II, § 3." The Fifth Circuit had declined to address the question. *See Texas v. United States*, 809 F.3d 134, 146 n.3 (5th Cir. 2015) (as revised). The Supreme Court affirmed that decision by an equally divided Court. *See United States v. Texas*, 136 S. Ct. 2271 (2016).

3

'discretion.'" *Texas v. United States*, 2021 U.S. Dist. LEXIS 156642, *138-39 (S.D. Tex. Aug. 19, 2021)*; see also Texas v. United States*, 524 F. Supp. 3d 598, 649 (S.D. Tex. 2021) (holding that the Executive's inherent authority over immigration "does not include the authority to 'suspend' or 'dispense with' Congress's exercise of legislative Powers in enacting immigration laws") (quoting *United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915) (Day, J., dissenting), *Escoe v. Zerbst*, 295 U.S. 490, 493 (1935)).

Under these principles, the failure to take care here is glaring. After stating its policy difference with Congress (claiming that wall construction "is not a serious policy solution" and is "a waste of money," Proclamation 10142 of January 20, 2021, 86 Fed. Reg. 7225 (Jan. 27, 2021)), and offering no other justification, the administration has refused to execute the appropriation to build a wall. And that evidently conscious policy of refusal is extreme, as seen in its effects. As Plaintiffs demonstrate, *see* Plaintiffs' Motion for Preliminary Injunction ("PI Motion") at 9-10, 24, Congress designated funds solely for the construction of the border wall. That congressional purpose—the building of the wall—is simply blocked. Further, by refusing to execute the appropriation, the administration is accomplishing the opposite of a more substantive result intended by Congress: the vast reduction—by 90 percent—of illegal border crossings where the wall would be built. *See* App.006-08 (DHS noting in 2018 that the steel-bollard border wall design first funded in 2017 led to a 90 percent decrease in border apprehensions in the Yuma sector); App. 010-12 (DHS 2020 assessment of the effectiveness of border wall designs first funded in 2017); *see also* App. 016 (section 209(b)(1)(A) of Pub. L. No. 116-93, Div. D, 133 Stat. 2512, which limits funds only to barrier designs that are

4

operationally effective "as of the date of enactment of the Consolidated Appropriations Act, 2017 (Public Law 115-31), *such as currently deployed steel bollard designs …*") (emphasis added); PI Motion at 9-10 (showing that Congress expressed the same purpose in its 2021 appropriations for border wall construction).

In addition to frustrating these congressional purposes, DHS's termination of construction contracts and refusal to spend designated funds on new border wall construction contracts frustrate Congress's broader goal of securing the border. Congress has charged the Secretary of DHS with the "power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens . . . ." 8 U.S.C. § 1103(a)(5). Further evidence of Congress's purpose of securing the border against illegal entry are the mandated enforcement actions to be taken with respect to illegal border crossers.

For example, "an alien present in the United States who has not been admitted or who arrives in the United States … shall be deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1). This designation triggers section 1225(a)(3), which specifies that all applicants for admission "shall be inspected by immigration officers." Section 1225(b), which governs the inspection of applicants for admission, mandates the expedited removal of aliens who either lack entry documents or attempt to gain admission through misrepresentation.[2] 8 U.S.C. § 1225(b)(1)(A)(i).

---

[2] If such an alien requests asylum, the INA mandates the detention of such an alien throughout the credible fear screening process or pending final consideration of an application for asylum. 8 U.S.C. § 1225(b)(1)(B)(ii), (iii)(IV).

5

Subsection 1225(b)(2) governs all other applicants for admission and specifies that "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall* be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A) (emphasis added).[3] Nowhere in section 1225 does Congress grant the Executive branch authority (discretionary or otherwise) to release any inadmissible alien into the United States.

As Plaintiffs point out, DHS concluded that border walls work and are extremely effective at stopping illegal aliens from crossing the border. PI Motion at 6-10, 18-20. Yet in the face of its own assessment of the effectiveness of a border wall, not to mention the statutory mandates set forth above, DHS refuses to execute—indeed, effectively suspends—the laws passed by Congress aimed at securing the border and controlling illegal entry by aliens. Instead of taking proven and funded measures to secure the border, DHS is taking actions that are resulting in chaos at the border, and thus signally frustrating the purposes of Congress.

Indeed, DHS's termination of construction projects and refusal to spend further appropriations are both suspensions of the law and a strong incentive for yet more illegal entry. DHS's actions frustrate the purposes of the law—which include a secure border— and creates a situation diametrically opposed to those purposes: a porous, chaotic,

---

[3] The only alternative to expedited removal or detention for inadmissible applicants for admission is found in subsection 1225(b)(2)(C), which grants DHS the discretion to return an alien who is arriving on land from a foreign territory contiguous to the United States to that territory pending a removal proceeding before an immigration court. DHS does, however, retain narrow authority to parole such aliens into the United States on a temporary, case-by-case, basis. *See* 8 U.S.C. § 1182(d)(5).

6

unsecure border. *See*, *e.g.*, *Texas v. Biden*, 10 F.4th 538, 553 (5th Cir. 2021) (noting that the termination of an immigration enforcement program "has and will continue to increase the number of aliens being released into the United States"). DHS's actions therefore constitute not only a failure or refusal to "take Care that the Laws be faithfully executed," U.S. CONST. art. II, § 3, but active opposition to those laws that offends the Take Care Clause in a way that may be unprecedented.

The ready comparison is with a state law that frustrates the purposes of Congress and therefore is conflict-obstacle preempted under the Supremacy Clause of the Constitution. The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under this clause, Congress has the power to preempt state and local laws. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)).

Preemption may be either express or implied, and implied preemption includes both field preemption and conflict preemption. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). "[C]onflict preemption takes two forms: (i) when compliance with both state and federal law is impossible, and (ii) when a state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *United States v. Zadeh*, 820 F.3d 746, 751 (5th Cir. 2016) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (internal citations omitted). "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be

7

frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Savage v. Jones*, 225 U.S. 501, 533 (1912), *quoted in Hines*, 312 U.S. at 67 n.20. The judgment of courts about what constitutes an unconstitutional impediment to federal law is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373.

Underlying the doctrine of obstacle preemption is the necessity of cooperation between state and federal sovereignties for our federal system to function properly. As the Second Circuit has explained:

> A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system. The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals. Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s). The potential for deadlock thus inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes.

*City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (internal citations omitted). Similarly, although the Executive Branch may have differing political and policy goals than Congress, the Take Care Clause resolves the potential for ineffective governance if not deadlock by requiring the Executive Branch faithfully to execute to the laws enacted by Congress.

Thus, more than cooperation is demanded from the Executive. There is little question that Congress, being vested with the Legislative power under the Constitution,

has exclusive authority to determine immigration policy. It has long been recognized that the power "to forbid the entrance of foreigners … or to admit them only in such cases and upon such conditions as it may see fit to prescribe" is an inherent sovereign prerogative entrusted exclusively in Congress. *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress . . . ."). Upon their admission to the Union, the several States (at least absent "actual[] inva[sion]," U.S. CONST. art. I, § 10) ceded their sovereign prerogative to control their respective borders to the federal government. Thus, whatever discretion the Executive exercises with respect to immigration policy, it is only the discretion that Congress has granted through legislation.[4]

The comparison between obstacle-preempted state laws and Executive policies that frustrate the purposes of Congress is not exact, but only because the Take Care Clause may well be more demanding than the Supremacy Clause. The Executive Branch surely owes a higher duty of fidelity to a co-equal branch of government than a separate sovereign under the dual sovereign system described by the Second Circuit in *City of*

---

[4] By simply defining the various classes of inadmissible or removable aliens, *see* 8 U.S.C. §§ 1182(a), 1227(a), and by merely establishing the system by which such aliens may be ordered removed, *see* 8 U.S.C. § 1229a (establishing removal proceedings), Congress left many enforcement decisions to the discretion of DHS. Congress did not, however, leave such enforcement discretion unbounded. Congress exercised its legislative power in defining which classes of aliens are removable from the United States, and nowhere did Congress suggest that DHS has the authority to narrow or broaden those classifications. Congress authorized the Executive to grant certain discretionary forms of relief to removable aliens under specific circumstances. *See*, *e.g.*, 8 U.S.C. §§ 1158 (asylum), 1229b (cancellation of removal), 1255 (adjustment of status).

*New York*,179 F.3d at 35. Instead of demanding mutual respect and cooperation between sovereigns, the Take Care Clause "imposes on the President the *affirmative duty* to 'take Care that the Laws be faithfully executed.'" *Communist Party of Indiana v. Whitcomb*, 414 U.S. 441, 452 (1974) (Powell, J., concurring) (emphasis added).

In short, when an administration's policies of non-enforcement give rise to this comparison—when they go to the extreme of drastically frustrating and thwarting the very purposes of the law the executive is supposed to administer—those policies amount to the abdication of the administration's statutory responsibilities, and thus a violation of the Take Care Clause, under *Heckler*.

## II.  The Take Care Clause Supplies a Cause of Action

Unconstitutional agency action or inaction violates the Administrative Procedures Act ("APA"), *see* 5 U.S.C. § 706, and can be enjoined on that basis. Violations of the Take Care Clause, however, are actionable independently of the APA, and this Court can enjoin the Defendants' violations of their Take Care obligations under its inherent equitable powers. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England"); *Davis v. Passman*, 442 U.S. 228, 241-44 (1979) (holding that the Constitution itself, coupled with 28 U.S.C. § 1331, provides a cause of action to challenge federal officials who violate the Constitution). The Constitution, moreover, permits anyone with standing to raise equitable claims (and injunctive relief) against federal officers who act unconstitutionally. *Larson v. Domestic & Foreign Comm. Corp.*, 337 U.S. 682, 698-99 (1949); *cf. Ex parte Young*, 209 U.S. 123 (1908). Thus, even if

10

Plaintiffs' claims fail under the APA, the Consolidated Appropriations Acts of 2020 and 2021, and the Impoundment Control Act of 1974, the Take Care Clause provides a cause of action to challenge DHS's actions blocking the construction of the border wall.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for preliminary injunction.

Respectfully submitted on November 22, 2021,

>  */s/ Matt Crapo*
>  MATT A. CRAPO
>  CHRISTOPHER J. HAJEC
>  Immigration Reform Law Institute
>  25 Massachusetts Ave., NW, Suite 335
>  Washington, DC 20001
>  matt.crapo@pm.me
>  litigation@irli.org
>
>  Counsel for *Amicus Curiae*
>  Immigration Reform Law Institute

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2021, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

/s/ Matt Crapo
MATT A. CRAPO
